# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Alexander S. Weller, MD

      Plaintiff

                                **Civil Action 1:23-CV-04775(PKC)(LB)**

v.

Icahn School of Medicine at Mount Sinai,
Kathy Navid, MD, Dennis Charney, MD,
Clarissa Jones-Winter, Mount Sinai Health System Inc.,
The Mount Sinai Hospital Inc.

      Defendants



# First Amended Complaint

      Alexander Weller, MD, ("Plaintiff") brings this First Amended Complaint[1] against the

Icahn School of Medicine at Mount Sinai, Kathy Navid, MD, Dennis S. Charney, MD,

Clarissa Jones-Winter, Mount Sinai Health System Inc., The Mount Sinai Hospital Inc.

(hereinafter "Defendants")[2], individually alleges upon knowledge as to himself and his own

actions and upon information and belief as to all other matters as follows:

**Nature of Case**

1.     This is a civil action for damages and equitable relief based upon violations that

Defendants committed of Plaintiff's rights guaranteed to him by: (i) the anti-retaliation

provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215; (ii) the anti-

retaliation provisions of the New York Labor Law ("NYLL"), NYLL § 215; (iii) the NYLL's

requirement that employers furnish employees with wage statements containing specific

---

[1] Plaintiff was granted leave to file an amended complaint at the October 31, 2023, conference.
[2] In this Complaint, "Corporate Defendants" shall refer to Icahn School of Medicine at Mount Sinai, Mount Sinai Health System Inc., The Mount Sinai Hospital Inc.

1



categories of accurate information on each payday, NYLL § 195(3) and fully compensate employees; (iv) the Sherman Act; and (v) any other claims that can be inferred from the facts set forth herein.

2.     This is also an action that challenges practices that suppress the compensation of Corporate Defendant's physician-employees, where Defendants required prospective part-time, per diem physicians to enter into a non-compete agreement that prevents said physicians from practicing medicine anywhere else in the world while they remain employed by Mt. Sinai, thus eliminating or reducing competition among hospitals and clinics for skilled medical labor, including medical facility faculty. The intended and actual effect of these agreements is to suppress employee compensation, and to impose unlawful restrictions on employee mobility, all of which ultimately harms patients and consumers, in this era of major shortages of physicians and other healthcare workers. Because Mount Sinai is one of the largest health systems in New York City, their required non-compete agreement has reduced competition for medical facility faculty, thereby suppressing faculty pay.

3.     Corporate Defendants' agreements have restrained trade and are *per se* unlawful under federal law, such that they represent a naked, horizontal market allocation agreement. In the alternative, Corporate Defendants' actions are also monopolization in the form of an unlawful exclusive dealing arrangement that lacks any procompetitive benefit, thus causing an unreasonable restraint of trade. Plaintiff seeks injunctive relief and damages for violations of §§1 & 2 of the Sherman Act, 15 U.S.C. § 1 *et seq*.

4.     Plaintiff, who worked for Defendants as a part-time hospitalist physician in the autumn of 2022, made multiple good faith complaints to Defendants about Defendants' failure to pay his wages, and as a result, Defendants retaliated by accusing Plaintiff of

2

violating various policies, conjuring up pretextual reasons to terminate Plaintiff's
employment, and imposed new timekeeping and reporting requirements on Plaintiff not
required of others, all in violation of the FLSA and NYLL. Defendants then withheld
Plaintiff's outstanding wages after Plaintiff made a complaint under the law and therefore
failed to pay Plaintiff in accordance with the agreed-upon terms of compensation and as
required by law.

### Jurisdiction and Venue

5.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 & 1337 as
this action arises under 29 U.S.C. § 201, *et seq*. The supplemental jurisdiction of the Court is
invoked pursuant to 28 U.S.C. § 1367 over all claims arising under New York law.

6.      This Court also has subject matter jurisdiction pursuant to §§ 4 & 16 of the
Clayton Act (15 U.S.C. §§ 15 & 26).

7.      Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2), as a
substantial part of the events or omissions giving rise to the claims for relief occurred in
Queens and Brooklyn, which are within this judicial district.

8.      Plaintiff originally commenced this case on January 17, 2023, with the filing of a
summons and complaint in Kings County Civil Court, index number SC-00150-23/KI.
During the pendency of the case in state court, Plaintiff did obtain court-issued subpoenas,
signed by the Clerk of the Court, for limited discovery[3]. On June 6, 2023, Plaintiff withdrew
the claim without prejudice, and before any final judgment, in Part 45, Judge Leroy D'Souza

---

[3] In this First Amended Complaint, Plaintiff incorporates documentary evidence obtained as a product of judicial subpoenas issued during the pendency of the matter in state court. While the matter was in state court, Defendants did not make a motion to quash, fix the conditions of, or modify the subpoenas pursuant to CPLR § 2304, nor seek a protective order under CPLR § 3103; accordingly, Defendants have waived any objections thereof. Furthermore, for the record, Defendants redacted certain other documents *sua sponte*, and did not produce a corresponding privilege log.

3

presiding, as the Court lacked subject matter jurisdiction to grant the comprehensive suite of relief Plaintiff is entitled to under the law, including equitable relief.

9. As a condition precedent to the filing of this lawsuit, Plaintiff provided written notice to the Attorney General for the State of New York of the alleged NYLL § 215 violation on December 19, 2022.

**Parties**

10. At all relevant times herein, Plaintiff worked for Defendants in New York and was an "employee" entitled to protection as defined by the FLSA and NYLL.

11. Mount Sinai Health System, Inc. is a domestic not-for-profit corporation, duly organized and existing under the laws of New York, with offices at One Gustave L. Levy Place, New York, New York, 10029. It is the ultimate parent of an integrated health care system encompassing the Icahn School of Medicine at Mount Sinai and nine hospital campuses in the New York metropolitan area.

12. The Icahn School of Medicine at Mount Sinai, formerly known as Mount Sinai School of Medicine of the City University of New York, is a New York education corporation, organized under the New York Education Law and chartered by the Board of Regents of the State of New York. Its sole member is Mount Sinai Health System, Inc., a not-for-profit corporation organized under the laws of the State of New York.

13. The Icahn School of Medicine at Mount Sinai is one of the top medical schools in United States and is led by the Anne and Joel Ehrenkranz Dean, Dennis S. Charney MD

("Charney"), who also serves as President for Academic Affairs at Mount Sinai Health System, Inc[4].

14.   Kathy Navid, MD ("Navid") is the Chief of Medicine, Director of the Hospital Medicine service at Mount Sinai Queens Hospital, located in Astoria, Queens, and is an Associate Professor of Medicine.

15.   Clarissa Jones-Winter[5] ("Jones-Winter") is the Associate Dean for Faculty, Staff and Trainee Relations at the Icahn School of Medicine at Mount Sinai.

16.   Gwendolyn Martin ("Martin") is the administrative assistant for the Division of Hospital Medicine at Mount Sinai Queens hospital.

17.   Charney, Navid and Jones-Winter are all individuals who are domiciled in the State of New York, who at all times relevant were employed by Corporate Defendants or its affiliates and subsidiaries.

18.   At all relevant times herein, all Defendants were and are "employers" within the meaning of the FLSA and the NYLL. Additionally, Defendants qualifying annual business exceeded and exceeds $500,000.00, and Mount Sinai was and is engaged in interstate commerce within the meaning of the FLSA, as it employs two or more employees and used and uses supplies in the course of its business, such as medications and  medical supplies,

---

[4] To better understand the Mt. Sinai culture and Charney in particular, reference is made to this excerpt from an article in *New York* magazine in 2019: "But the hierarchical, macho, fear-based, profit-oriented culture of hospital medicine is especially intense and pervasive there, according to dozens of interviews, most off-the-record owing to anxiety about career-damaging retribution. People who know Charney well note that, for a psychiatrist, he is short on empathy and patience, and though the hospital denies it, among the faculty and staff, he has a reputation as a bully." Lisa Miller, *One Night at Mount Sinai*. NEW YORK (October 15, 2019) https://www.thecut.com/2019/10/mount-sinai-david-newman.html

[5] During the time period relevant to this Complaint, Jones-Winter did not have the legal authority to practice law in the State of New York, as her registration (4328761) had been suspended by the Appellate Division – 1st Department effective March 17, 2020, and as of November 12, 2023, had not been restored. Therefore, Defendants may not claim privilege with respect to any communications or advice given by Jones-Winter. See Formal Opinion No. 1998-1: Attorney Employing Disbarred or Suspended Attorney to Work in Law Office; Aiding Unauthorized Practice of Law, 54 The Record 85, New York City Bar Association

which originate in states other than New York, the combination of which subjects Defendants

to the FLSA's antiretaliation requirements. Corporate Defendants are also categorically

subject to the FLSA as a hospital. 29 USC § 203(r)(2)(A).

19.     Defendants that are natural persons are each deemed to be an employer pursuant

to the FLSA, 29 U.S.C. § 201 *et seq*. and NYLL, and are thus jointly and severally liable

with the Corporate Defendants.

20.     Defendants exercised control over the terms and conditions of their employees'

employment, in that they have the power to: (i) hire and fire employees, (ii) determine rates

and methods of pay, (iii) determine work schedules, (iv) supervise and control the work of

the employees, and (v) otherwise affect the quality of the employees' employment.


**Background Facts**

21.     In October 2022, Mount Sinai hired Plaintiff to work as a hospitalist medicine

physician to work part-time, per diem, at Mount Sinai Queens Hospital. Plaintiff's

compensation was based on an hourly rate that varied based on clinical needs, shift time, and

urgency, but was generally $130  - $150/hour. Plaintiff served in that role until Plaintiff

resigned in December 2022, after being subject to intolerable retaliation.

22.     On November 2, 2022, Plaintiff signed an employment contract with Mount Sinai.

The contract, stated in part "You will be required to document the time you spend on these

activities consistent with Mount Sinai's policies and procedures. You shall submit such

documentation on a monthly basis to the Chairman [sic] and Administrator of your

Department... In order to receive payments for per diem services, you must complete Mount

Sinai's attestation form and submit it to the Administrator of the Department within five (5)

business days of providing coverage for the per diem session. Payment for each service will be made in a lump sum within 60 days of your service if the faculty attestation form is submitted timely."

23.     The contract further stated: "You agree that you will not engage in any other clinical activity outside of your employment with Faculty Practice except for your existing employment at Advanced Wellness Services, located at [address redated]. You agree to notify the Chairman [sic] of your department if your employment arrangements outside Mount Sinai change from your existing arrangement. Any violation of this provision will void your contract with ISMMS."

24.     The "Standard Terms and Conditions of Part Time Physician Employment" incorporated by reference in the employment contract, states in part: "Under the Employment Agreement, the Physician may not accept an appointment or other position at any other educational, medical, or scientific institution (school of medicine, hospital, research organization, college, or university) or maintain a clinical practice outside Mount Sinai, other than as described in the cover letter and position description, unless prior written approval has been granted by the Chair."

25.     Advanced Wellness Services is Plaintiff's Pennsylvania restricted LLC, through which Plaintiff would on occasion provide physician services on an independent contractor basis.

26.     The employment agreement was signed by, *inter alia*, Dennis S. Charney, MD.

27.     Prior to signing the Employment Agreement, Plaintiff sent Navid and Martin the following concerns regarding the Employment Agreement:

Preamble: The names of the legal entities should be specified.

Section A: Allocation of Effort should specify that this allocation only applies during scheduled work shifts. It is written vague in such a way that it could imply all effort must be done only at Mount Sinai.

Section B: Effective date needs to be defined

Section C: The type of year needs to be defined. The beginning and end need to be defined.

Section D: Holiday needs to be defined. The timesheet submission provision in D conflicts with submission provision in Section A. Within Section D, there are two different payroll timelines.

Section G: As a per diem employee, I have no duty to commit to working only at Mt Sinai. Therefore, the section should be changed to state "Physician will not engage in any other clinical activity outside of your employment with Faculty Practice that reasonably could or does create a material conflict of interest with Mount Sinai. However, there are no restrictions on employment or other relationships with any other hospital, health system, payers or providers." The last sentence should be struck; otherwise, under typical contract construction, the agreement would terminate, not be void. Also, I am a contractor at Jacobi, not an employee.

Section J: Should state that the contract will be interpreted under New York law, without reference to any conflict of laws. Should include "The rights and obligations of Employer under this Agreement shall inure to the benefit and be binding upon the successors and assigns of Employer. This Agreement may be assigned by Employer, without the consent of Physician, to any parent subsidiary, or affiliated entity of Employer. This Agreement, being a contract for the personal services of Physician, shall not be assignable by Physician." . Should state that obligation to provide malpractice coverage survives termination of the agreement   Should also add "The individuals signing this Agreement represent that they are authorized to bind the parties to this Agreement." What about automatic renewal of the contract?

Standard Terms and Conditions:

Section A1:  First sentence should specify that obligation only applicable during shifts working at Mount Sinai.

Section A3: What are the terms of this malpractice coverage? Deductible? Participation in state excess liability insurance pool?

Section A4: First sentence is not a sentence. Should specify that it is only applicable to services rendered at Mount Sinai during the terms of the contract.

 What does "legally sufficient patient consent" mean?

Section B3iv: Should be modified to state "conviction of a felony or crime of moral turpitude". How is commission different than conviction? How is the commission of a crime determined? "Crime" includes low level traffic offenses or administrative violation?

Section B3viii: How is protracted defined?

Section B4: This section conflicts with Section B3. Why are "causes" included if it can be terminated without cause?

Section D3: "We intend to comply" should be changed to "Parties shall fully comply with"

Section D4: The second sentence should be struck.

Section E: Waiver of jury trial right should be highlighted or bolded.

28.     On October 27, 2022, Navid replied to Plaintiff and Martin: "We forwarded your requests to the legal department. Since that is a standardized per diem contract, I doubt they will change much. We had them edit the non-compete clause for hospitalists two years ago and they modified the language that per diems would notify MSHS if they added other employers. That was the best we could do.  I just want to set expectations about the edits and if they can't edit anything do you want to withdraw?  I don't want you to waste more of your time on onboarding etc if this isn't feasible for you."

29.     A few moments later on October 27, 2022, Plaintiff replied to Navid and Martin:



**Alex Weller** <asweller4@gmail.com>                    Oct 27, 2022, 8:35 AM

to Kathy, Gwendolyn

Hi Kathy-

Thank you for the note.

The contract as presented to me was poorly drafted. As a result, there were covenants that were internally contradictory, vague or otherwise ambiguous. There were covenants that were not compliant with state law. There were also grammatical errors. Moreover, the absence of certain terms (as I included above) could actually make the agreement non-enforceable. Frankly, a second-year law student could draft a better contract. Nonetheless, I am confident that a brief call with a member of the office of the general counsel (or outside counsel) could lend further insight into and resolve these issues. I have no reason to believe that these issues cannot be resolved with negotiation and discussion. There is no reason for me to withdraw.

Do let me know when the appropriate legal counsel from Mount Sinai is available for a zoom meeting to discuss these changes. Otherwise, I look forward to receiving the new contract, mutatis mutandis, and starting orientation in short order.

Cheers-
Alex Weller, MD MS

30.    On October 28, 2022, Plaintiff received the following responses (in red)

putatively from Shema Patel, Dean of Faculty Affairs and Administration:

Preamble: The names of the legal entities should be specified. **Already there**

Section A: Allocation of Effort should specify that this allocation only applies during scheduled work shifts. It is written vague in such a way that it could imply all effort must be done only at Mount Sinai. **NO**

Section B: Effective date needs to be defined **NO**

Section C: The type of year needs to be defined. The beginning and end need to be defined. **NO**

Section D: Holiday needs to be defined. The timesheet submission provision in D conflicts with submission provision in Section A. Within Section D, there are two different payroll timelines. **NO**

Section G: As a per diem employee, I have no duty to commit to working only at Mt Sinai. Therefore, the section should be changed to state "Physician will not engage in any other clinical activity outside of your employment with Faculty Practice that reasonably could or does create a material conflict of interest with Mount Sinai. However, there are no restrictions on employment or other relationships with any other hospital, health system, payers or providers." The last sentence should be struck; otherwise, under typical contract construction, the agreement would terminate, not be void. Also, I am a contractor at Jacobi, not an employee. **We can take out Jacobi but no other change**

Section J: Should state that the contract will be interpreted under New York law. without reference to any conflict of laws. Should include "The rights and obligations of Employer under this Agreement shall inure to the benefit and be binding upon the successors and assigns of Employer. This Agreement may be assigned by Employer, without the consent of Physician, to any parent, subsidiary, or affiliated entity of Employer. This Agreement, being a contract for the personal services of Physician, shall not be assignable by Physician." . Should state that obligation to provide malpractice coverage survives termination of the agreement. Should also add "The individuals signing this Agreement represent that they are authorized to bind the parties to this Agreement." What about automatic renewal of the contract? **NO**

Standard Terms and Conditions: **Cannot change what so ever – these are approved by our BOT**

Section A1:  First sentence should specify that obligation only applicable during shifts working at Mount Sinai.

Section A3:  What are the terms of this malpractice coverage? Deductible? Participation in state excess liability insurance pool?

Section A4:  First sentence is not a sentence. Should specify that it is only applicable to services rendered at Mount Sinai during the terms of the contract.

Section A5:  What does "legally sufficient patient consent" mean?

Section B3iv:  Should be modified to state "conviction of a felony or crime of moral turpitude". How is commission different than conviction? How is the commission of a crime determined? "Crime" includes low level traffic offenses or administrative violation?

Section B3viii:  How is protracted defined?

Section B4:  This section conflicts with Section B3. Why are "causes" included if it can be terminated without cause?

Section D3:  "We intend to comply" should be changed to "Parties shall fully comply with"

Section D4:  The second sentence should be struck.

Section E;  Waiver of jury trial right should be highlighted or bolded.

31.     On October 28, 2022, Martin sent to Plaintiff a revised agreement without any

meaningful changes.

32.     A few moments later, Plaintiff replied to Martin and Navid:



33.     On October 29, 2022, Plaintiff emailed Navid and Martin:



34.     A few minutes later on October 29, 2022, Navid replied to Plaintiff: "I asked Shema Patel if she would reconsider about G. I'm not optimistic and will let you know. If that works out- what day do you want to do orientation?"

35.     On October 31, 2022, Navid emailed Plaintiff and Martin: "Hi Alex- The contract department will only remove Jacobi. Are you ok with proceeding?"

36.     Jacobi refers to Jacobi Medical Center, a hospital in the Bronx where Plaintiff would occasionally work as an independent contractor physician through Plaintiff's LLC through a staffing agency.

37.     Five minutes later, Plaintiff replied to Navid and Martin: "It is not clear to me that your contract department understands the nature of my relationship with Jacobi. Furthermore, I am unsure of how to interpret part of the covenant. I think it would be be [sic] easiest if we could arrange a quick zoom call for this afternoon to discuss it? In the alternative, can you give me the contact information of the relevant person in the contract department?"

38.     Less than one hour later, on October 31, 2022, Navid replied to Plaintiff and Martin: "Alex-we can't change the contract. Let me know how you want to proceed.  If they consider it down the road it would take the board of trustees approval etc."

39.     Plaintiff signed the Employment Agreement.

40.     During his employment, Plaintiff served as an attending hospitalist medicine physician, where he would admit patients to the hospital, manage and coordinate their medical care during the course of their hospitalization, and discharge patients at the appropriate time.

41.     Plaintiff would work various shifts as needed, including during the daytime and overnight.

42.     On November 8, 2022, Gwendolyn Martin emailed Plaintiff a prepopulated timesheet to be signed for the overnight shift that Plaintiff worked on November 6, 2022; this prepopulated timesheet indicated that Plaintiff worked 12 hours: 7pm to 7am.

43.     A few minutes later, Plaintiff replied that the prepopulated timesheet did not reflect the "time required for turnover of patients to ensure continuity of care." The Plaintiff further indicated that this time should be reflected on the timesheet. The Plaintiff further indicated that the Plaintiff spent 0.5 hours on this activity on the morning of November 7.

44.     A few minutes later, Martin replied "Would you give me the definition of "turnover," so I'm clear on your language.[sic]"

45.     On November 9, 2022, at 10:12 am, Navid emailed Plaintiff and Martin:



46.     On November 9, 2022, at 12:02 pm, Plaintiff replied to Navid and Martin:



47.     On November 10, 2022, Gwendolyn Martin emailed Plaintiff "Attached for your review and signature are the Faculty Attestation forms for the hours you worked on November 4, November 6 and November 9, 2022.  Kindly return the signed forms to me so

they can be submitted for processing." The attached timesheet for the November 6 shift only reflected 12 hours of work, despite communications from the previous day indicating that Plaintiff worked 12.5 hours.

48.    A few minutes later, on November 10, Plaintiff emailed Navid and Martin indicting *inter alia*, "The form for November 6 must reflect 12.5 hours of work, 1900 - 0730."

49.    A few minutes later, on November 10, 2022, at 9:37 am, Navid replied to Plaintiff and Martin:



50.    A few minutes thereafter, Martin emailed Plaintiff "Just to follow up on my earlier question, what is the definition of "turnover?""

51.    A few minutes later, Plaintiff emailed Navid and Martin:



52.    A few minutes later, Plaintiff emailed Navid and Martin a copy of the Court's opinion in *Cadena v. Customer Connexx LLC* 51 F.4th 831 (9th Cir. 2022).

53.     A few minutes later, Martin emailed Plaintiff and Navid: "Which date did you performed the 30 minutes of 'turnover?'" Plaintiff replied "The services are related to the Nov 6-7 overnight shift."

54.     On November 11, 2022, Plaintiff emailed Navid and Martin:



55.     On November 16, 2022, Navid emailed Plaintiff and Martin:



56.     On November 21, 2022, Plaintiff emailed Navid and Martin:



57.     A few minutes later, Navid replied to Plaintiff:

Case 1:23-cv-04775-PKC-LB Document 18 Filed 11/13/23 Page 15 of 53 PageID #: 98
Case 1:23-cv-04775-PKC-LB Document 27-1 Filed 02/02/24 Page 16 of 53 PageID #: 221



**Navid, Kathy** <kathy.navid@mtountsinai.org>
to me, Gwendolyn ⌄

Mon, Nov 21, 2022, 10:13 AM   ☆   ↩   ⋮

Yes I had a meeting with the legal team and we will be paying for the work you did by hour.

I don't usually track people by the minute like this but we will need to have you sign in and out on your time here. Gwen and I noted that you left early at 430 pm on one of your days but requested payment for the full time. We will need you to accurately portray time and will you need to edit any other attestations where you left early?

We can set up a shared electronic time sheet on Microsoft Teams.

Thank you.

58.    A few minutes later, on November 21, 2022, Plaintiff emailed Navid and Martin:



**Alex Weller** <aaweller4@gmail.com>
to Kathy; Gwendolyn ⌄

Nov 21, 2022, 11:02 AM   ☆   ↩   ⋮

Hi Kathy-

Thanks for getting back to me.

I am concerned that imposing these additional reporting requirements against me is in retaliation for complaining of a possible FLSA violation (29 U.S.C. § 215(a)(3) and NYLL violation (NYLL § 215(a)(1)), and for other related protected activity. Requesting compensation for time worked, and questioning wage and payroll compensation policies is protected activity under the Fair Labor Standards Act and NYLL. You are aware of my participation in the protected activity. Requiring me now to sign in and out (which is not required of other physicians), and demanding other reporting, are adverse actions that might dissuade a reasonable worker from making or supporting a good faith claim of a violation of the FLSA. Furthermore, the very close temporal proximity of these actions gives rise to the inference of a causal connection between the protected activity and the adverse action. Therefore, I demand that you immediately reverse the retaliatory act(s) described in your email sent at 10.13 am today. I will pursue legal remedies if the adverse action is not reversed. Moreover, I call your attention to the attached litigation hold letter.

Regards-
Alex Weller, MD MS

References:
Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006);
Ray v. Henderson, 217 F.3d 1234, 1243 (9th Cir. 2000)
Darveau v. Datecon, Inc., 515 F.3d 334, 338
Acosta v. Austin Elec. Servs., LLC, 322 F. Supp. 3d 951, 958 (D. Ariz. 2018)
Jones v. Potter 488 F.3d 397, 408 (6th Cir. 2007)

15

59.    Within one hour of receiving the email immediately *supra*, Navid forwarded it to

Jones-Winter, and other senior administrators at Mt. Sinai:

| From: | Navid, Kathy |
|---|---|
| Sent: | Monday, November 21, 2022 11:50 AM |
| To: | Jones-winter, Clarissa; Tiger-Paillex, Caryn |
| Cc: | Martin, Gwendolyn |
| Subject: | FW: Time |
| Attachments: | MSQ Litigation Hold Letter.pdf |

So far it's not going well.  See my email and his response.  Please advise if this draft response is ok and if I should also state we will require for other per diems or not. They don't request to be paid by the minute so not sure if it applies but want to precisely follow the rules.

"Hi Alex,
Requesting clocking your time is not retaliatory.  We discovered you attested for time that you weren't here so we want to make sure we have an accurate monitoring system in place to prevent any (future) inaccurate attestations.  More info to follow about how to do this."

From: Alex Weller <asweller4@gmail.com>
Sent: Monday, November 21, 2022 11:03 AM
To: Navid, Kathy <kathy.navid@mountsinai.org>
Cc: Martin, Gwendolyn <gwendolyn.martin@mountsinai.org>
Subject: Re: Time

Hi Kathy-

Thanks for getting back to me.

I am concerned that imposing these additional reporting requirements against me is in retaliation for complaining of a possible FLSA violation (29 U.S.C. § 215(a)(3) and NYLL violation (NYLL § 215(a)(1)), and for other related protected activity. Requesting compensation for time worked, and questioning wage and payroll compensation policies is protected activity under the Fair Labor Standards Act and NYLL. You are aware of my participation in the protected activity. Requiring me now to sign in and out (which is not required of other physicians), and demanding other reporting, are adverse actions that might dissuade a reasonable worker from making or supporting a good faith claim of a violation of the FLSA. Furthermore, the very close temporal proximity of these actions gives rise to the inference of a causal connection between the protected activity and the adverse action. Therefore, I demand that you immediately reverse the retaliatory act(s)

60.    On November 21, 2022, Martin sent Plaintiff the following email:



61.     A few minutes later, Plaintiff replied to Martin and Navid: "Thank you for the note. That sounds fine. However, I am not in agreement with your characterization of November 4."

62.     A few minutes later, on November 21, 2022, Navid emailed Plaintiff and Martin:



63.     An hour later, on November 21, 2022, Plaintiff replied to Navid and Martin:



64.     A few minutes later, Navid[6] replied to Plaintiff: "Did you do clinical work on 11/4 between 430-5pm or was your attestation incorrect?"

65.     A few minutes later, on November 21, Plaintiff replied to Navid and Martin: "My attestation regarding the hours worked on 11/4/22 was made in good faith, consistent with applicable generally accepted practices amongst hospitalist physicians and the controlling law in the jurisdiction."

66.     On November 22, 2022, Plaintiff emailed Navid, Martin, Jones-Winter and Caryn Tiger-Paillex, Dean for Faculty, Staff, and Trainee Relations at Icahn School of Medicine:



**Alex Weller** <aweller4@gmail.com>                                                     Nov 22, 2022, 8:32 AM   ☆   ↰   ⋮
to compliance.info, caryn.tiger-paillex, clarissa.jones-winter, Kathy, Gwendolyn ▾

Kathy-

I have spent more than 4 hours over the past several weeks working to vindicate my legal right to payment for the 30 minutes of time from the beginning of this month. Since it would appear that I am the prevailing party, will Mt Sinai now compensate me for the time I have had to spend?

It would appear that you are retaliating against me for having made a complaint under the federal Fair Labor Standards Act and equivalent New York Labor Law. I notified you of this concern yesterday morning, along with a demand for preservation of all electronically stored evidence in the event legal proceedings occurs, and a request that you cease and desist from retaliating against me. Federal law has established that individuals can be personally liable in law and equity for FLSA retaliation. There remains a disputed claim of liability for FLSA retaliation. Therefore, it would appear that there is a conflict of interest, in that you can no longer be my supervisor. Will you recuse yourself from supervising my employment? Pursuant to Mt. Sinai policies related to anti-retaliation and conflict of interests, Will Mt Sinai arrange for a different supervisor and/or worksite?

It is sad to think that all this started because I requested to be paid for 30 minutes, worth a sum total of $75.

Regards-
Alex Weller, MD MS

---

[6] Although both Navid and Martin were aware of the alleged incident on November 4, when Plaintiff was alleged to have left work 30 minutes early, on November 4, as they were both primary, first-hand witnesses to it, they did not raise any objection until Plaintiff made his claim regarding November 6's compensation and pressed his demand to be fairly compensated.

67.  Within 20 minutes of receiving the email in paragraph immediately *supra*, Navid

forwarded the email to Jones-Winter and other administrators:

| | |
|---|---|
| **From:** | Navid, Kathy |
| **Sent:** | Tuesday, November 22, 2022 8:56 AM |
| **To:** | Tiger-Paillex, Caryn; Jones-winter, Clarissa; Martin, Gwendolyn |
| **Subject:** | Re: Orientation Payment |

The PAs complained about how he is intimidating to them and it's already such a difficult job for them. The quality of his work is fair at best. I need legal assistance to cut ties as this email seems like a good opportunity.

Thanks in advance for any help/suggestions.

Sent from my iPhone

On Nov 22, 2022, at 8:45 AM, Navid, Kathy <kathy.navid@mountsinai.org> wrote:

This isn't worth it even with the desperate situation. How can I proceed here?

Sent from my iPhone

Begin forwarded message:

From: Alex Weller <asweller4@gmail.com>
Date: November 22, 2022 at 8:33:02 AM EST
To: "Navid, Kathy" <kathy.navid@mountsinai.org>
Cc: "Martin, Gwendolyn" <gwendolyn.martin@mountsinai.org>, "Compliance.info" <Compliance.info@mountsinai.org>, "Tiger-Paillex, Caryn" <caryn.tiger-paillex@mssm.edu>, "Jones-winter, Clarissa" <clarissa.jones-winter@mssm.edu>
Subject: Re: Orientation Payment

Kathy-

I have spent more than 4 hours over the past several weeks working to vindicate my legal right to payment for the 30 minutes of time from the beginning of this month. Since it would appear that I am the prevailing party, will Mt Sinai now compensate me for the the time I have had to spend?

19

68.    On November 22, 2022, at 5:46 pm, Plaintiff sent this email to Jones-Winter:

**From:** Alex Weller <asweller4@gmail.com>
**Sent:** Tuesday, November 22, 2022 5:46:19 PM
**To:** Tiger-Paillex, Caryn <caryn.tiger-paillex@mssm.edu>; Jones-winter, Clarissa <clarissa.jones-winter@mssm.edu>
**Subject:** FLSA Retaliation Inquiry

Dear Deans Tiger-Paillex and Jones-Winter-

As I am sure you are aware, I have made a good-faith claim of FLSA retaliation against Dr. Kathy Navid, the Hospitalist Division Director at Mount Sinai Queens and my direct supervisor at MSQ.

I am scheduled to work on Sunday, November 27, 2022 at MSQ. As I noted previously, it would be a conflict of interest for Dr. Navid to continue to supervise my employment. Therefore, who is my new supervisor? Furthermore, pursuant to applicable policies and law, how will Mt Sinai and ISMMS ensure that I am not subject to any further retaliation or other adverse action (as defined by the federal Department of Labor(1))? In addition, I will note that failure to ensure that I have a work environment free of retaliation and discrimination is a form of continuing corporate retaliation, actionable under the FLSA. Finally, what is the ISMMS process/policy for filing a formal complaint?

Thank you for your assistance in this matter.

Have a pleasant holiday.

Regards-
Alex Weller, MD MS
asweller4@gmail.com
267-566-2440

1. https://www.dol.gov/sites/dolgov/files/WHD/fab/fab-2022-2.pdf

69.    On November 22, at Jones-Winter forwarded the email immediately *supra*, from 5:46 pm, to Daniel McCabe an attorney-investigator with human resources at Mt. Sinai, with this note attached:

**From:** Jones-winter, Clarissa
**To:** Mccabe, Jr., Daniel
**Subject:** Fwd: FLSA Retaliation Inquiry
**Date:** Tuesday, November 22, 2022 5:49:16 PM

The attending who is also now a 2L.

Get Outlook for iOS

70.    On November 25, 2022, Plaintiff emailed Martin, Navid and Jones-Winter: "Hi Gwendolyn- I approved most of the timesheets you had submitted for my approval to Oracle.

However, I noticed that for Nov 6, you put down only 12 hours, despite the fact that on the attestation I indicated that I worked 12.5 hours that shift. Can you please fix this?"

71.     A few minutes later, Martin replied: "The 30 minutes for the handoff for November 6 was included on the form with the orientation charges that was sent to you."

72.     On November 27, Martin sent the following email to Jones-Winter and Navid:

**From:** Martin, Gwendolyn <gwendolyn.martin@mountsinai.org>
**Sent:** Sunday, November 27, 2022 9:27 AM
**To:** Jones-winter, Clarissa <clarissa.jones-winter@mssm.edu>; Navid, Kathy <kathy.navid@mountsinai.org>
**Cc:** Lee, Allegra <allegra.lee@mountsinai.org>
**Subject:** Timesheet Approval for Nov 6

Good morning

I will prepare a revised attestation form for Alexander Weller for 6.5 hours for November 6 (the form will include the 30 minutes for the handoff on November 6). Should this attestation form also include the alleged 7 hours Alexander stated he used to discussed the extra 30 minutes? He did not perform any work at the hospital for the additional hours he is requesting. Is there any legal citation to support paying the 7 hours of non-hospital work?

73.     A few minutes later, Jones-Winter replied to Martin:

**From:** Jones-winter, Clarissa <clarissa.jones-winter@mssm.edu>
**Sent:** Sunday, November 27, 2022 10:17 AM
**To:** Martin, Gwendolyn <gwendolyn.martin@mountsinai.org>; Navid, Kathy <kathy.navid@mountsinai.org>
**Cc:** Lee, Allegra <allegra.lee@mountsinai.org>; Mccabe, Jr., Daniel <daniel.mccabejr@mssm.edu>
**Subject:** Re: Timesheet Approval for Nov 6

Hi Gwendolyn,

Weller's choice to engage in extended antagonistic emails and research legal language to support this was his own choice. You should absolutely not entertain this. I would advise responding that he will be paid for hours worked in the performance of his assigned hospital duties. That's it.

Best,
Clarissa

Get Outlook for iOS

74.     Six hours later, Martin replied to Plaintiff, Navid and Jones-Winter:

21



Martin, Gwendolyn <gwendolyn.martin@mountsinai.org>                                          Nov 25, 2022, 6:12 PM   ☆   ↩   ⋮
to me, Kathy, Clarissa ▾

Hi Alex:

My earlier statement about including the 30 minutes with the orientation costs was incorrect.  The amount was not included based on my message to you of November 21 and your response about the times being considered a wash."

If you are not in agreement with your statement, kindly let me know and I will send you a revised form for your review and signature for hours worked on November 6, which will include the 30 minutes for handoff.

Thanks.

Gwendolyn

75.    On November 27, 2022, Plaintiff replied to Martin, Jones-Winter and Dr. Allegra

Lee, Associate Director of Hospital Medicine at Mount Sinai Queens:



Alex Weller <asweller4@gmail.com>                                                           Nov 27, 2022, 7:01 AM   ☆   ↩   ⋮
to Allegra, Gwendolyn, Clarissa ▾

Hi Gwendolyn:

My position regarding the number of hours I worked Nov 6-7 has not changed. Moreover, I have now spent over 7 hours vindicating my legal entitlement to the aforementioned compensation. Therefore, can you please send me a time sheet reflecting 7 additional hours of work?

Also, please note that Kathy Navid is not my current supervisor.

Cheers-
Alex Weller, MD

76.    Plaintiff did not receive a response to the email of November 27, 2022 7:01 am.

77.    On December 15, 2022, Plaintiff emailed Tiger-Paillex and Jones-Winter:



Alex Weller <asweller4@gmail.com>                                                        ⊖ Dec 15, 2022, 6:43 PM   ☆   ↩   ⋮
to Caryn, Clarissa ▾

Dear Deans Tiger-Paillex and Jones-Winter-

A. On November 25, you informed me that Dr. Lee would replace Dr. Navid as my supervisor. However, I received the attached letter via email today. Therefore, did Dr. Navid have the proper authority to send the attached letter? Does the attached letter represent the position of Mt Sinai?

B. Please send me all records of hours that I worked and all paystubs

C. I presume you received the attached demand/settlement letter. Does Mt Sinai (and Dr. Navid) wish to settle this matter out of court?

Regards-
Alex Weller, MD MS

78.    Plaintiff resigned on December 2, 2022.

79.    Plaintiff received the following letter dated December 14, 2022:

Dear Dr. Weller:

RE: Resignation Acceptance

Dear Dr. Weller:

We have received your notice of resignation that you sent on Friday, December 2, 2022.

Prior to sending the notice of resignation, you agreed to work night shifts on Sunday, December 4 and Monday, December 5 at Mount Sinai Queens; however, you backed out of working those shifts immediately after providing your resignation. Most recently, you sent a correspondence stating you consider yourself discharged from the School. The School accepts your resignation effective December 2, 2022 and you will not be expected to work any shifts going forward.

We thank you for bringing various concerns to the School's attention and the School will continue to appropriately investigate those issues, as we take them very seriously.

If you would like to discuss your most recent correspondence, please contact Ms. Caryn Tiger to set up a time to speak.

Sincerely,

Kathy Navid, MD

80.     On November 28, 2022, Plaintiff had a Zoom meeting with Daniel Mccabe Jr., Director of Employee and Labor Relations at Icahn School of Medicine at Mount Sinai. Prior to the meeting, Mccabe confirmed to Plaintiff that: "I do not function in a legal or in-house capacity for Mount Sinai. Rather, I am a member of the Human Resources team for the Icahn School of Medicine... I, therefore, do not believe *Upjohn* applies under the circumstances."

81.     Soon after the Zoom meeting on November 28, Plaintiff emailed Mccabe:

 **Alex Weller** <asweller4@gmail.com>                                                    Nov 28, 2022, 12:46 PM
to Jr., 

Dear Mr. Mccabe-

It was good to chat with you today. To follow up on our conversation, I would refer you to these cases that discuss the applicable standards in FLSA retaliation cases:

Greathouse v. JHS Sec. Inc., 784 F.3d 105 (2d Cir. 2015)
Potter v. MooreGroup Corp.., 2020 U.S. Dist. LEXIS 398 (E.D.N.Y. Jan. 2, 2020)
Ray v. Henderson, 217 F.3d 1234 (9th Cir. 2000)
Darveau v. Detecon, Inc., 515 F.3d 334
Acosta v. Austin Elec. Servs., LLC, 322 F. Supp. 3d 951
Jones v. Potter 488 F.3d 397 (6th Cir. 2007)

On a different note, our conversation lasted approximately 45 minutes. Is this time compensable?

Thank you for your time and assistance with this matter.

Regards-
Alex Weller, MD

23

82.    A few moments later, Mccabe responded to Plaintiff:

 **Mccabe, Jr., Daniel** <daniel.mccabejr@mssm.edu>                                    Nov 28, 2022, 1:43 PM
to me ▾

Hello Dr. Weller,

Likewise, it was good speaking with you, and thank you for the additional information.

As to your question, are you claiming that our time spent speaking about your claim is compensable? If so, can you please clarify upon what authority you are relying?

83.    A few moments thereafter, Plaintiff responded to Mccabe:

 **Alex Weller** <asweller4@gmail.com>                            Nov 28, 2022, 2:32 PM   ☆   ↰   
to Jr. ▾

Please see:
29 C.F.R. §§ 785.11-785.12
29 C.F.R. § 785.48(b)
DOL Field Assistance Bulletin No. 2020-5 (Aug. 24, 2020).
29 C.F.R. § 785.42
N.Y. Lab. Law § 195
Chao v. Gotham Registry, Inc., 514 F.3d 280, 287–88 (2d Cir. 2008) ("It is clear an employer's actual or imputed knowledge that an employee is working is a necessary condition to finding the employer suffers or permits that work ... . An employer who has knowledge that an employee is working, and who does not desire the work be done, has a duty to make every effort to prevent its performance."). See also Gonzalez v. McNeil Techs., Inc., 2007 U.S. Dist. LEXIS 27262, at **18–22 (E.D. Va. Apr. 11, 2007); Donovan v. Williams Chem. Co., 682 F.2d 185, 188 (5th Cir. 1982); Handler v. Thrasher, 191 F.2d 120, 123 (10th Cir. 1951); Republican Pub. Co. v. American Newspaper Guild, 172 F.2d 943, 945 (1st Cir. 1949).
29 C.F.R. § 785.11 ("employees must be compensated for time they work outside of their scheduled shifts, even if the employer did not ask that the employees work during that time"), so long as the employer "knows or has reason to believe that [the employee] is continuing to work' and that work was "suffered or permitted" by the employer); see also Hertz v. Woodbury Cnty., Ia., 566 F.3d 775, 781–82 (8th Cir. 2009); Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 718 (2d Cir. 2001); Newton v. City of Henderson, 47 F.3d 746, 748–49 (5th Cir. 1995), reh'g denied, 1995 U.S. App. LEXIS 9609 (5th Cir. Apr. 13, 1995); Davis v. Food Lion, 792 F.2d 1274, 1277 (4th Cir. 1986).

84.    On November 29, 2022 at 3:22 pm, Mccabe emailed Plaintiff: "I am following up on your question from yesterday. More specifically, you asked whether time spent on a call with me discussing your concerns is compensable. I have looked into this, and it is not compensable." In response, Plaintiff inquired about what authorities support that conclusion.

85.    On November 30, 2022 at 12:21 pm, Mccabe emailed Plaintiff: "It is my understanding that even if the time you spent on the call with me (i.e., Human Resources) qualified as time spent in "adjusting grievances," such time would only qualify as "hours worked" for purposes of determining compensable time if our call was during the time you were required to be on the Hospital premises as part of your work. 29 C.F.R. § 785.42."

86.    A few moments later, Plaintiff replied to Mccabe:



Alex Weller <asweller4@gmail.com> ·            Nov 30, 2022, 12:54 PM   ☆   ↰   ⋮
to Jr. ▾

Dear Mr. McCabe-

Thank you for that information. However, I would call your attention to case law, which would lead to a different conclusion:

"Plaintiffs respond that on the district court's (and Milwaukee's) approach even the formal, dispositive hearing would not be compensable, a conclusion that would contradict 29 C.F.R. § 785.42. If, as some of its language suggests, § 785.42 is limited to grievances adjusted during an employee's regular shift, there is no contradiction, for Milwaukee always has compensated officers for time devoted to hearings during their scheduled work time. An employee who voluntarily invests additional time can't demand that the employer pay him for self-appointed (and wholly self-interested) efforts. That this is the right way to understand § 785.42 is implied by another regulation, which defines 'voluntary.' Attendance at meetings 'is not voluntary in fact if the employee is given to understand or led to believe that his present working conditions or the continuance of his employment would be adversely affected by nonattendance." 29 C.F.R. § 785.28. *Debraska v. City of Milwaukee*, 189 F.3d 650, 652 (7th Cir. 1999)

Therefore, is the time I spent for our conversation on Monday compensable?

Cheers-
Alex Weller, MD

87.     On December 1, 2022, Plaintiff replied to Mccabe:



Alex Weller <asweller4@gmail.com>            Dec 1, 2022, 12:08 AM   ☆   ↰   ⋮
to Jr. ▾

Dear Mr. McCabe-

On Monday, I shared with you significant deviations from routine and customary practice that I observed during my shift at Mount Sinai Queens this past weekend. Inter alia, I relayed that nurses were assigned 15 patients each in the emergency department. I relayed that there was an absence of support staff in the ED, such as transporters. I indicated that this situation engendered a significantly increased risk of harm to patients, and that patients I did take care of experienced preventable delays in their evaluation and treatment. Moreover, I relayed that hospitalist physician assistants were each assigned to 40 patients on Sunday.

Inadequate nursing and support staff in a hospital does present a substantial danger to patients. It was my intention to bring it to the attention of a supervisor, which I did do when I shared those concerns with you. Therefore, I request that Mt Sinai classify me as whistleblower, and afford me the protections and remedies available under N.Y. Lab. Law § 741, 2021 Bill Text NY S.B. 4394 (now law), and 31 U.S.C. § 3730(h)(1-2).

Regards-
Alex Weller, MD

88.     On December 1, 2022, Mccabe replied to Plaintiff:



Mccabe, Jr., Daniel <daniel.mccabejr@mssm.edu>         Dec 1, 2022, 5:26 PM   ☆   ↰
to me ▾

Hello Dr. Weller,

Thank you for following up about this – acknowledging receipt. Corporate Compliance has been notified about your whistleblower claim and will determine appropriate next steps.

As I mentioned when we spoke on Monday, there is zero tolerance within the health system for retaliation of any kind. If you believe that you have experienced any action resembling retaliation, please notify me or Corporate Compliance so we can investigate and take appropriate remedial action if necessary.

89.     On December 9, 2022, Mccabe emailed Plaintiff: "Hello Dr. Weller, As a follow up to my last email, I have looked into this further and am confirming that the time you and I spent speaking on Monday, 11/28/2022 is not compensable."

90.     On November 29, 2022, Plaintiff received the following email from Darrick Fuller, Vice President for Audit and Compliance Services at Mount Sinai Health System:



91.     A few moments later, Plaintiff replied to Fuller: "[] However, so that I may better prepare for this meeting, can you please give me an idea of what you would like to discuss? Also, since I am a per-diem, hourly employee, how will I be compensated for this time/who is it billable to? Also, will there be any legal privilege or Upjohn notice associated with this meeting?"

92.     A few hours later on November 29, Fuller replied to Plaintiff:



93.     On December 2, 2022, Plaintiff emailed Fuller:



94.     Defendant's failure to provide Plaintiff with accurate wage statements denied Plaintiff the ability to be appropriately apprised of the terms and conditions of Plaintiff's employment, resulting in ambiguity (*inter alia*, inability to reconcile timesheets with wage statements), confusion, and ultimately, underpayment of wages. See Exhibit A.

95.     In addition to the foregoing, Defendants have a widespread practice of not properly paying all wages owed, and shorting employees by informing providers (physicians, physician assistants, nurse practitioners) they do not have a right to compensation for work performed before and after the a provider's scheduled shift, and also intentionally denied approval of timesheets that accurately reflected work performed thereof.

96.     As a result of the incidents described *supra*, Plaintiff has suffered extreme mental anguish and emotional distress, including *inter alia*, difficulty sleeping, loss of enjoyment of normal life events, diminishment in quality of life, anxiety, and stress.

97.     There is no question Plaintiff expressed concerns protected by the FLSA and NYLL, as Defendants were clearly violating the FLSA and NYLL. And Plaintiff was retaliated against by Defendants for objecting to an unlawful wage and hour practice of Defendants when Defendants accused Plaintiff of violating policy, conjured up pretextual reasons to terminate Plaintiff, and imposed new hour reporting and tracking requirements not required of other physicians. This all combined constitutes unlawful, materially adverse retaliatory actions in violation of the FLSA and NYLL.

98.     On information and belief, as it is challenging to know what shifts Plaintiff was actually compensated for (See Exhibit A) to date, Defendants have failed to compensate Plaintiff for:

-   0.5 hours – November 4 shift

-   0.5 hours – November 6 shift

-   0.75 hours – November 29 meeting with Mccabe

-   19 hours – researching and reviewing Mt. Sinai policy, federal and state law, drafting emails and other correspondences.

99.  Plaintiff reasonably expected to work 4 – 8 shifts per month indefinitely, each shift being scheduled for 8 to 12 hours, at a rate of $130/hr to $150/hr.

100.  Plaintiff has made reasonable efforts to mitigate his damages resulting from Defendants' wrongful actions.

### Facts Relating to the Non-Compete & Sherman Act Violations

101.  In a properly functioning and lawfully competitive labor market, Corporate Defendants would compete for physician faculty members and medical staff by offering the most desirable compensation and working conditions.

102.  Competition for part time workers and restrictions thereof, both have a significant impact on faculty and staff compensation in a variety[7] of ways. First, when employers become aware of attractive outside opportunities for their employees, the threat of losing employees to competitors encourages employers to preemptively increase compensation to increase morale and competitive positioning, and ultimately to retain valuable medical faculty and staff. If employers do not react to competition, their employees may seek positions that offer more generous compensation and benefits elsewhere or may be receptive to recruiting by a rival employer. Once an employee has received an offer from a rival, retaining the employee may require a disruptive increase in compensation for one individual, if retention is possible at all. Employers therefore have an incentive to preempt part time physicians from offering their services to other hospitals by paying all employees well enough that they are unlikely to seek or pursue outside opportunities. In a competitive

---

[7] In addition to the reasons set forth herein, Plaintiff incorporates by reference the literature review, interpretation of law, reasoning, and conclusions of the Federal Trade Commission in its recently proposed rule that would provide that it is an unfair method of competition for an employer to enter into or attempt to enter into a non-compete clause with a worker and to maintain with a worker a non-compete clause. Non-Compete Clause Rule, 88 Fed. Reg. 3482 (Fed. Trade Comm'n. proposed Jan. 19, 2023) (Notice of Proposed Rulemaking) (to be codified at 16 CFR 910).

market, preemptive retention measures thus lead to increased compensation for all employees.

103.     Second, the availability of desirable positions at competing employers forces employers to reactively increase compensation to retain employees who are likely to join a competitor institution. This can occur both when a particular employee or group of employees becomes interested in switching employers and the current employer responds by offering a compensation increase to retain them, or when an employer responds to overall attrition rates among its faculty and staff by increasing compensation levels. In the former case, even a targeted increase designed to retain specific employees may put upward pressure on the entire compensation structure, especially in the case where per diem employees have the freedom to work at the employer with the highest compensation each day.

104.     Third, non-compete agreements discourage employees from threatening to resign to demand better working conditions, discourage employees from concertedly seeking or accepting employment with a local competitor to obtain better working conditions, discourage employees from soliciting their co-workers to go work for a local competitor as part of a broader course of protected concerted activity and discourage employees from seeking employment, at least in part, to specifically engage in protected activity with other workers at an employer's workplace.[8]

105.     Corporate Defendants' collusion, being a routine practice of their business, has consisted of an express agreement between Defendants and prospective physicians to not permit certain skilled medical employees, including faculty, from having

---

[8] This paragraph is derived from N.R.L.B. Gen. Counsel Memoranda, May 30, 2023, "Non Compete Agreements that Violate the National Labor Relations Act"

any other employment or clinical practice outside the Mount Sinai system. The full scope of the agreements and their harmful impact will be determined through discovery.

106.     As Plaintiff's experience illustrates, Corporate Defendants' policy and conduct reduced competition among hospitals and outpatient clinics for certain skilled medical employees by entering into the non-compete agreement alleged herein. Corporate Defendants entered into, implemented, and policed the non-competition agreement with the intent and effect of fixing the compensation of their medical facility faculty and staff at artificially low levels.

107.     The non-compete agreement required of part-time faculty eliminated competitive pressure for Mount Sinai to preemptively raise the compensation of Plaintiff, because there was no threat that the Plaintiff would be contractually allowed to practice medicine anywhere outside of the Mount Sinai system. Mount Sinai could therefore retain Plaintiff at an artificially depressed compensation level. Mount Sinai is one of the preeminent employers for skilled medical labor in the region, and thus the agreement drastically increased the costs for Plaintiff to seek or accept employment elsewhere.

108.     Besides directly hiring physicians as employees, Corporate Defendants obtain skilled physician labor through physician staffing agencies. In this case, physicians are hired on an independent contractor basis with a staffing agency and are compensated on a 1099 basis, and without any non-compete restrictions[9].

---

[9] A new law in New York prohibits temporary healthcare staffing agencies from requiring the payment of liquidated damages, employment fees, or other compensation should health care personnel be hired as a permanent employee of a health care entity in any contract with any health care personnel or health care entity. New York Public Health Law § 2999-ii - § 2999-mm

109.    Corporate Defendants own and operate dozens of primary care clinics throughout New York City[10], many of which are staffed by internal medicine physicians.

110.    Plaintiff is an Internal Medicine physician, which means Plaintiff can either work in the inpatient setting as a hospitalist, or in the outpatient setting as a primary care doctor.

111.    Plaintiff and Corporate Defendants are horizontal competitors, in that both are in the market of offering and selling primary care medical services to patients.

112.    Plaintiff and Corporate Defendants are also vertical competitors, in that Corporate Defendants employ hospitalist physicians, such as Plaintiff.

113.    Corporate Defendants have over 10% of the market share in the New York City region, which is substantially higher in certain geographic areas of NYC[11]. Corporate Defendants have a 39% market share[12] in Manhattan adult medical/surgical inpatient volume.

114.    Corporate Defendants have substantial market power[13] in the NYC region, and Manhattan in particular, in (a) selling inpatient hospital services (b) selling outpatient

---

[10] https://www.mountsinai.org/care/primary-care
[11] "The greater New York City region is a very fragmented market with no health system having more than 20% inpatient share. MSH reports a 5% inpatient market share in the greater New York City region, with the total MSHG hospitals having a 13% inpatient market share. MSH also reports a leading market share in a more limited geographic area of New York City neighborhoods and areas within which it competes. Overall, MSH's market position is supported by its solid, strategic initiatives that support its tertiary and quaternary services, its level of integration with the ISMMS, sizable clinical platform across the New York City, and its network of related hospitals through MSHG contribute to its revenue defensibility. MSH includes nearly 7,480 primary and specialty care physicians, 11 joint-venture ambulatory surgery centers, more than 410 ambulatory practices in New York City, Westchester, Long Island, and Florida. While MSH's OG facilities are located on the Upper East Side of Manhattan and in Astoria Queens, MSH competes across the five boroughs of New York City (Manhattan, Queens, Brooklyn and Staten Island), Westchester County, and Long Island. The demographics in this large and densely populated service area can vary greatly but are generally in line or better than the state and the U.S." https://www.fitchratings.com/research/us-public-finance/fitch-assigns-mount-sinai-hospital-ny-a-idr-outlook-stable-16-12-2019
[12] http://origin-states.politico.com.s3-website-us-east-1.amazonaws.com/files/men_doc_0.pdf
[13] "MSH maintains a competitive market position through strategic initiatives that support its tertiary and quaternary services, its level of integration with the ISMMS, its sizable regional clinical platform and its coordination within the network of other hospitals in the MSHG." https://www.fitchratings.com/research/us-public-finance/fitch-affirms-mount-sinai-hospital-ny-revs-at-a-outlook-stable-16-11-2022

physician services (c) buying/employing physicians, all as demonstrated in part by their high market share.

115.     Plaintiff's hourly compensation increased by over 20% as soon as Plaintiff obtained similar employment at a different NYC-based health system.

116.     Plaintiff has previously provided outpatient primary care services, enjoys doing so, and will resume doing so upon completion of a graduate course of study, currently in progress.

117.     Plaintiff received this email solicitation from a staffing agency to work at Defendant's hospitals as an independent contractor:



## Statement of Claims

### Count 1
### Fair Labor Standards Act – Impermissible Rounding/Unpaid Wages
### (Against All Defendants)

118.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

119.    Defendants are employers subject to the FLSA.

120.    At all relevant times, Navid, Charney and Jones-Winter were employees or agents of Corporate Defendants who, as Dean of the Icahn School of Medicine at Mount Sinai and President for Academic Affairs at Mount Sinai Health System, Inc., Associate Dean, and Chief of Medicine all had the power to do more than carry out personnel decisions (including *inter alia*, hire and fire employees, supervise work scheduled, set rates of pay, maintain payroll records) made by others, and aided, abetted, incited, compelled, or coerced improper payroll practices and wage payment acts against Plaintiff.

121.    Defendants are associated and joint[14] employers, such that they all jointly employed Plaintiff, and are thus jointly and severally liable to Plaintiff.

122.    Plaintiff was an employee of Defendants[15], [16], [17] and thus encompassed within the ambit of protection afforded by the FLSA.

---

[14] "[C]orporations and corporate officers with operational control over employees both fit the definition of 'employer' under the FLSA and NYLL. Courts have held that establishing joint and several liability under the FLSA and NYLL requires no further analysis." *Coley v. Vannguard Urb. Improvement Ass'n, Inc.*, No. 12-CV-5565(PKC)(RER), 2018 WL 1513628, at *6 (E.D.N.Y. Mar. 27, 2018), as amended (Mar. 29, 2018)(internal citation omitted).

[15] See *Loo v. I.M.E. Rest., Inc.*, No. 17-CV-02558 (ARR)(RER), 2018 U.S. Dist. LEXIS 147436, 2018 WL 4119234, at *4 (E.D.N.Y. Aug. 29, 2018) ("A single employee can have multiple employers under the FLSA, and an employer can be held liable even if he was not personally complicit in FLSA violations.") (quotation and citation omitted).

[16] Corporate Defendants are categorically covered by the FLSA, which specifically includes entities that are " engaged in the operation of a hospital, an institution primarily engaged in the care of the sick, the aged…, or an institution of higher education (regardless of whether or not such hospital, institution, or school is public or private or operated for profit or not for profit)." 29 U.S.C.S. § 203.

[17] Defendants who are natural persons are also covered by the FLSA and NYLL, which to be a covered "employer" "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees. Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control 'do not diminish the significance of its existence.'" *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999) (quoting *Donovan v. Janitorial Servs., Inc.*, 672 F.2d 528, 531 (5th Cir. 1982)) (alteration omitted), quoted by *Perry v. High Level Dev. Contracting & Sec. LLC*, No. 1:20-CV-02180 (AMD)(PK), 2022 U.S. Dist. LEXIS 47165, at *15 (E.D.N.Y. Mar. 16, 2022)

123.     Plaintiff's employment with Defendants was not exempted from the ambit of protection offered by the FLSA.

124.     At all relevant times, Defendants had a policy and practice of refusing to pay Plaintiff in full for all hours he worked, of rounding Plaintiff's hours to Plaintiff's detriment, including for "[w]ork not requested but suffered or permitted" to work. 29 C.F.R. § 785.11. See also 29 C.F.R. § 785.48(b).

125.     Defendants rounded Plaintiff's hours to Plaintiff's detriment.

126.     Defendants' Vice President for Corporate Compliance, a representative for human resources, and Plaintiff's direct manager all attempted to evade compliance with the FLSA.

127.     Defendants knowingly and willfully disregarded the provisions of the FLSA as evidenced by failing to compensate Plaintiff for time Plaintiff worked after the scheduled completion of his shift.

128.     Plaintiff was harmed when Defendants failed to compensate him for work performed as described *supra*.


## Count 2
### New York Labor Law – Failure to Pay Straight Wages/Unpaid Gap Time
### NYLL §§ 198 & 663
### (Against All Defendants)

129.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

130.     At all relevant times, Plaintiff was employed[18] by Defendants within the meaning of New York Labor Law § 651.

---

[18] "NYLL's definition of "employer" is "nearly identical" to that of the FLSA, and the analysis of the employment relationship under both statutes is based on the same factors. See *Mahoney v. Amekk Corp.*, No. 14-CV-4131 (ENV)(VMS), 2016 U.S. Dist. LEXIS 137786, 2016 WL 6585810 (E.D.N.Y. Sept. 30, 2016), R&R adopted, 2016

34

131. At all relevant times, Defendants had a policy and practice of refusing to pay, and in fact failed to pay Plaintiff in full for all hours Plaintiff worked.

132. Defendants' Vice President for Corporate Compliance, a representative for human resources, and Plaintiff's direct manager all attempted to evade compliance with the NYLL.

133. Defendants knowingly and willfully violated Plaintiff's rights under the NYLL by failing to pay him fully for all hours worked as described *supra*.

134. Plaintiff was harmed when Defendants failed to compensate him for work performed as described above.

## Count 3
### New York Labor Law – Failure to Keep Accurate Records (Wage Statements)
### NYLL § 195(3)
### (Against All Defendants)

135. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

136. Defendants did not maintain, establish, and preserve Plaintiff's accurate weekly payroll records for a period of not less than six years, as required by NYCRR § 146-2.1.

137. Defendants failed to accurately[19] disclose the number of hours Plaintiff worked on his wage statements, as required by NYLL § 195(3). (See Exhibit A for sample wage statements).

---

U.S. Dist. LEXIS 154286, 2016 WL 6601445 (E.D.N.Y. Nov. 7, 2016) (collecting cases holding that the FLSA and NYLL are interpreted consistently with one another on the question of employer status)." *Perry v. High Level Dev. Contracting & Sec.* LLC, No. 1:20-CV-02180 (AMD)(PK), 2022 U.S. Dist. LEXIS 47165, at *17 (E.D.N.Y. Mar. 16, 2022)

[19] "The Court agrees with Plaintiffs that a failure to include all hours worked on their wage statements would render those inaccurate and would, thus, violate NYLL § 195(3). The plain language of § 195(3) requires disclosure of 'the number of regular hours worked, and the number of overtime hours worked,' NYLL § 195(3). See *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015) (finding that failure to list the correct number of hours that

138.    Plaintiff was caused to suffer a tangible[20] injury, manifest as ambiguity, confusion, inability and difficulty in reconciling timesheets with wage statements, inability to reconcile claimed time with time actually compensated, difficulty in making expostulations to Defendants of underpayment of wages, and ultimately underpayment of wages.

139.    As a result of Defendants' unlawful conduct, Plaintiff is entitled to statutory damages.

140.    Upon information and belief, Defendants failed to maintain adequate and accurate written records of actual hours worked and true wages earned by Plaintiff in order to facilitate their exploitation of Plaintiff's labor.

141.    Defendants' failure to maintain adequate and accurate written records of actual hours worked and true wages earned by Plaintiff and documentation of wages earned were not in good faith.

**Count 4**
**Retaliation – FLSA & NYLL**
**(29 U.S.C. § 215 & N.Y. Lab. Law § 215)**
**(Against All Defendants)**

142.    Plaintiff incorporates and realleges each and every allegation set forth in the preceding paragraphs as if set forth here in full.

---

employee actually worked would establish liability for a wage statement violation)." *Gonzalez v. Dom's Lawnmaker, Inc.*, No. 17-CV-3519 (JMA) (SIL), 2022 U.S. Dist. LEXIS 220899, at *22 (E.D.N.Y. Dec. 7, 2022)

[20] See *Stih v. Rockaway Farmers Mkt., Inc.*, No. 22-CV-3228 (ARR)(RER), 2023 WL 2760492 (E.D.N.Y. Apr. 3, 2023); *Cuchimaque v. A. Ochoa Concrete Corp.*, No. 22-CV-6136 (RPK)(RML), 2023 WL 5152336 (E.D.N.Y. July 18, 2023), adopted by Order Adopting R. & R., *Cuchimaque v. A. Ochoa Concrete Corp.*, No. 22-CV-6136 (RPK)(RML) (E.D.N.Y. Aug. 23, 2023).

143.     At all relevant times, Plaintiff was an employee of Defendants whose education, background, experience, and established employment history made him exceptionally qualified for his position.

144.     At all relevant times, Defendants were an employer within the meaning of the FLSA and NYLL.

145.     On information and belief, Defendants receives financial assistance and reimbursements from the United States government for educational and healthcare purposes.

146.     At all relevant times, Navid, Charney and Jones-Winter were employees or agents of Corporate Defendants who, as Dean of the Icahn School of Medicine at Mount Sinai and President for Academic Affairs at Mount Sinai Health System, Inc., Associate Dean, and Chief of Medicine all had the power to do more than carry out personnel decisions (including *inter alia*, hire and fire employees, supervise work scheduled, set rates of pay, maintain payroll records) made by others, and aided, abetted, incited, compelled, facilitated or coerced retaliatory acts against Plaintiff.

147.     Defendants are associated and joint employers, such that they all jointly employed Plaintiff, and are thus jointly and severally liable to Plaintiff.

148.     On numerous occasions during his employment with Defendants, Plaintiff voiced opposition to unlawful wage and hour practices, including *inter alia*, the instance of the Chair of the Department of Medicine wrongfully advised that employees are not entitled to compensation for work completed after their scheduled shift and that employees are expected to work off the clock immediately before and after their scheduled shift. Soon

thereafter, Defendants took material adverse action[21] by accusing Plaintiff of violating various corporate policies, imposing new hourly record requirements not required of other similarly situated employees, colluding internally to generate pretextual reasons to fire Plaintiff, manifesting an intent to terminate Plaintiff's employment, wrongfully docking Plaintiff's pay based on pretextual and factually incorrect allegations, all within two weeks after Plaintiff reported and voiced opposition to unlawful wage and hours practices.

149.    Defendants' adverse actions against Plaintiff could well dissuade a reasonable employee from making or supporting a claim of unlawful wage and hours practices.

150.    But for his participation in these protected activities, Defendants would not have taken adverse action against Plaintiff.

151.    As a result of Defendants' retaliatory actions, Plaintiff has and will continue to suffer irreparable injury.

152.    As a result of Defendants' retaliatory actions, Plaintiff has suffered extreme emotional distress, the symptoms of which include difficulty sleeping, anxiety, and stress.

153.    As a result of such violations, Plaintiff is entitled to legal and equitable[22] relief including, without limitation, reinstatement to his prior position with full compensation

---

[21] Cf. *Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023)(en banc)(holding that to adequately plead adverse employment action, a Title VII plaintiff need not allege discrimination with respect to ultimate employment decision; instead, plaintiff need only show that she was discriminated against, because of protected characteristic, with respect to hiring, firing, compensation, or terms, conditions, or privileges of employment)

[22] "For it needs no argument to show that fear of economic retaliation might often operate to induce aggrieved employees quietly to accept substandard conditions. By the proscription of retaliatory acts set forth in § 15 (a)(3)... Congress sought to foster a climate in which compliance with the substantive provisions of the [FLSA] would be enhanced... In this context, the significance of reimbursement of lost wages becomes apparent. To an employee considering an attempt to secure his just wage deserts under the Act, the value of such an effort may pale when set against the prospect of discharge and the total loss of wages for the indeterminate period necessary to seek and obtain reinstatement. Resort to statutory remedies might thus often take on the character of a calculated risk, with restitution of partial deficiencies in wages due for past work perhaps obtainable only at the cost of irremediable entire loss of pay for an unpredictable period. Faced with such alternatives, employees understandably might decide that matters had

and benefits, back pay, liquidated damages, interest, front pay, consequential damages, and compensatory damages including emotional distress.

154.    Based on Defendants intentional and malicious conduct, Plaintiff is further entitled to an award of punitive damages.

**Count 5**
**Violation of Section 1 of the Sherman Act**
**(Naked, *Per Se* Horizontal Market Allocation)**
**(Against Corporate Defendants)**
**(Plead in the Alternative to Count 6)**

155.    Plaintiff, on behalf of himself and all others similarly situated, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

156.    Corporate Defendants entered into and engaged in unlawful agreements[23] in restraint of trade and commerce as described above in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. On information and belief, having been a longstanding practice continuing through the present, Corporate Defendants engaged in continuing agreements in restraint of trade and commerce in violation of Section 1 of the Sherman Act.

157.    Corporate Defendants' agreements have included concerted action and undertakings among Corporate Defendants and physician-employees with the purpose and effect of: (a) fixing the compensation of physicians at artificially low levels; (b)

---

best be left as they are. We cannot read the Act as presenting those it sought to protect with what is little more than a Hobson's choice." *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)(internal citations omitted).
[23] Non-compete agreements between employers and employees constitute concerted action properly subject to scrutiny under Section 1 of the Sherman Act. See *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154 (9th Cir. 2003) (evidence of "signed agreements" established concerted action).

eliminating, to a substantial degree, competition among Corporate Defendants and other hospitals and clinics for certain skilled medical employees.

158.    As a direct and proximate result of Corporate Defendants' combinations and contracts to restrain trade and eliminate competition for certain skilled medical employees, Plaintiff has suffered injury to his property and has been deprived of the benefits of free and fair competition on the merits.

159.    The unlawful agreements of Corporate Defendants have had the following effects[24], among others:

    a.  Competition among Corporate Defendants and other hospitals, clinics and medical practices for skilled physician labor has been suppressed, restrained, and eliminated;

    b.  Plaintiff has received lower compensation[25] from Corporate Defendants than he otherwise would have received in the absence of Corporate Defendants' unlawful agreements, and, as a result, has been injured in his property and has suffered damages in an amount to be determined at trial; and

    c.  In an era of nationwide physician shortages, consumers and patients have been deprived of access to physician services.

---

[24] "Our conclusion that injury to competition could exist in either the job market for anesthesia service positions or the patient market for anesthesia care is supported by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde…*" *Oltz v. Saint Peter's Cmty. Hosp.*, 861 F.2d 1440, 1447 (9th Cir. 1988)

[25] See Natarajan Balasubramanian et al., Locked In? The Enforceability of Covenants Not to Compete and the Careers of High-Tech Workers (U.S. Census Bureau Ctr. for Econ. Stud., Paper No. CES-WP-17-09, 2019), J. Hum. Resources. Matthew S. Johnson et al., The Labor Market Effects of Legal Restrictions on Worker Mobility (Working Paper, June 6, 2020), https://ssrn.com/abstract=3455381; Eric A. Posner, The Antitrust Challenge to Covenants Not to Compete in Employment Contracts, 83 Antitrust L.J. 165, 181 (2020); Evan P. Starr et al., Noncompete Agreements in the US Labor Force, 64 J.L. & Econ. 53 (2021); Michael Lipsitz & Evan Starr, Low-Wage Workers and the Enforceability of Non-Compete Agreements, 68 Mgmt. Sci. 143 (2021).

160.     The acts done by Corporate Defendant as part of, and in furtherance of, their contracts, combinations or conspiracies were authorized, ordered, or done by their respective officers, directors, agents, employees, or representatives while actively engaged in the management of each Corporate Defendants' affairs.

161.     Corporate Defendants' contracts, combinations and/or conspiracies are *per se*[26] violations of Sections 1 of the Sherman Act as they are horizontal market allocation agreements.

162.     Corporate Defendants used their market power and bargaining power to compel potential part-time, per diem, physician-employees to sign an employment contract that prohibited the same employee from competing with Corporate Defendants in the provisioning of healthcare services, including outpatient primary care services, anywhere else in the world.

163.     Corporate Defendants' mandatory non-compete provisions did create a horizontal market allocation scheme, such that employee-physicians, including Plaintiff, were unable to practice primary care medicine anywhere in the world outside of Mt. Sinai's clinics in New York City, where Mt Sinai is one of the largest and most powerful sellers of primary care healthcare services in NYC.

164.     The agreement was not ancillary[27], as it was not reasonably necessary to achieve the employment-related purposes of the agreement.

## Count 6

---

[26] Cf. Statement of Interest of the United States of America, *Beck v. Pickert Medical Grp.*, No. CV21-02092, Nev. Second Judicial District Court (Feb. 25, 2022), available at https://www.justice.gov/atr/case-document/file/1477091/download

[27] *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021); *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 335-38 (2d Cir. 2008) (Sotomayor, J., concurring); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 188-89 (7th Cir. 1985); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265, 269 (7th Cir. 1981); *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898) (Taft, J.), aff'd as modified in other part, 175 U.S. 211 (1899).

### Violation of Sections 2 of the Sherman Act
#### (Monopolization; Conspiracy to Monopolize; Attempted Monopolization: Exclusive Dealing)
#### (Against Corporate Defendants; Additionally, Against Navid in the Conspiracy Branch)
#### (Plead in the Alternative to Count 5)

165.    Corporate Defendants' agreements have included concerted action and undertakings among the Corporate Defendants with the purpose and effect of: (a) fixing the compensation of Plaintiff (and other physicians) at artificially low levels; (b) eliminating, to a substantial degree, competition among Corporate Defendants and other hospitals and clinics for certain skilled medical employees, including internal medicine physicians; (c) monopolizing or attempting to monopolize the market for physician services, including part-time hospitalist physicians.

166.    Corporate Defendants (1) have engaged in predatory[28] or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power within the relevant market.

167.    Here, (1) two or more Defendants conspired, (2) with specific intent to secure a monopoly, and (3) took at least one overt act in furtherance of their conspiracy.

168.    Here, the relevant markets are (a) the employment market for physician services in New York City, specifically both primary care and hospitalist services (Relevant Input Market) (b) the market for primary care medical services in NYC (c) the market for hospitalist physician services NYC. (B and C are the Relevant Output Markets). The

---

[28] "When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general. It has been recognized, albeit in a somewhat different context, that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output." *LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003); see also *Sitzer et al v. National Association of Realtors et al*, Docket No. 4:19-cv-00332 (W.D. Mo. Apr 29, 2019), ECF 1294 (October 31, 2023, jury verdict).

relevant geographic market is New York City, and in the alternative, Manhattan and
Queens.

169.    Corporate Defendants possesses monopoly power in the Relevant Output Market
and monopsony power in the Relevant Input Market. The Corporate Defendants have
obtained, enhanced, and maintained dominance in both Relevant Markets through the
exclusionary scheme alleged herein. Corporate Defendants have abused and continues to
abuse that power to maintain and enhance its market dominance in the market for
physician services through an exclusionary scheme to impair and foreclose competition
by depriving actual and potential competitors in the Relevant Output Market of necessary
inputs (i.e. physician services).

170.    The non-compete agreement required by Corporate Defendants required the
physician-employee-seller-Plaintiff to only sell his services to one particular buyer,
Corporate Defendants, even though Plaintiff was merely a part-time, per diem, hourly
employee.

171.    There are no legitimate procompetitive justifications for the anticompetitive
conduct alleged in this Complaint, or for any aspect of the anticompetitive conduct
standing alone. Even if, *arguendo*, such justifications existed, there are less restrictive
means of achieving those purported procompetitive effects. To the extent the
anticompetitive conduct or any aspect of the anticompetitive conduct has any cognizable
procompetitive effects, they are substantially outweighed by the anticompetitive effects.

172.     The non-compete substantially foreclosed substantial competition in the relevant

input markets, including that for internal medicine/hospitalist physicians in the NYC

region, leading to otherwise lower wages[29].

173.     Plaintiff was caused to be injured[30] by Corporate Defendants' non-compete by

being caused to receive otherwise lower wages than Plaintiff would have received in a

free market, and also suffer fear of immediate termination from employment with

Corporate Defendants if Plaintiff were to practice medicine outside of the Mt. Sinai

system.

174.     The non-compete agreement resulted in harm to consumers, manifesting in

decreased availability[31] of physician services.

175.     The non-compete agreement should be characterized[32] as a naked exclusive

dealing arrangement[33] between vertical competitors, and thus illegal under Section 2[34] of

the Sherman Act.

## Count 7
## Violation of New York Common Law Prohibiting Unreasonable Non-Compete Agreements

---

[29] "It must be remembered that while exclusive-dealing agreements are both "vertical" and "bilateral," they are also fundamentally exclusionary practices akin to monopolization. Unlike resale price maintenance or territorial restraints, exclusive dealing is not typically solicited by rivals. Further, the principal harm is exclusion of rivals. For these reasons structural requirements more like those used under § 2 of the Sherman Act often seem appropriate." Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 1821
[30] See *Blue Shield of Va. v. McCready*, 457 U.S. 465 (1982)
[31] See *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005).
[32] See *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022); *PharmacyChecker.com LLC v. LegitScript LLC*, 614 F. Supp. 3d 796 (D. Or. 2022); *KPH Healthcare Servs. v. Mylan N.V.*, No. 20-2065-DDC-TJJ, 2022 U.S. Dist. LEXIS 140848 (D. Kan. Aug. 8, 2022)
[33] Compare *Cung Le v. Zuffa, LLC*, No. 2:15-cv-01045-RFB-BNW, 2023 U.S. Dist. LEXIS 138702 (D. Nev. Aug. 9, 2023)(Certifying class of UFC fighters in suit against UFC for violating Sec. 2 alleging monopolization, including exclusive dealing)
[34] "The basic prudential concerns relevant to §§ 1 and 2 are admittedly the same: exclusive contracts are commonplace-particularly in the field of distribution--in our competitive, market economy, and imposing upon a firm with market power the risk of an antitrust suit every time it enters into such a contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm. At the same time, however, we agree with plaintiffs that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *United States v. Microsoft Corp.*, 253 F.3d 34, 70 (2001)

**(Against Corporate Defendants)**

176.     Plaintiff realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.

177.     The restrictions required by Corporate Defendants are unreasonable in time and geographic scope, in that the agreement is not limited to any specific geographic area and are effective during the entire term of employment, including extended periods when Plaintiff is not actually working at Defendants' hospitals.

178.     The restrictions are not necessary to protect any legitimate interest of the Corporate Defendants.

179.     The restrictions are unreasonably burdensome to the Plaintiff.

180.     The restrictions are harmful to the public, in that they limit the ability of physicians to treat patients in a time of nationwide healthcare worker shortages. As a part-time employee, there would be extended periods when Mt Sinai would not need Plaintiff's labor.

181.     A hospitalist physician does not have any customer relationships, such as a panel of patients, representing a legitimate interest of the Corporate Defendants to protect. A hospitalist physician does not come into or have access to any trade secrets.

182.     The restrictions are not necessary to prevent the disclosure of any protected information; these protections are otherwise required by federal law under HIPAA.

183.     The services of a hospitalist physician are not unique[35] or extraordinary and can be easily replaced; Corporate Defendants obtain similar hospitalist physician services as putative independent contractors from staffing agencies for periods as brief as one week.

---

[35] Compare *Delphi Hospitalist Servs. LLC. v. Patrick*, No. E2017-002036, 2017 N.Y. Misc. LEXIS 9264 (Sup. Ct. Nov. 5, 2017); *Reed, Roberts Assocs., Inc. v. Strauman*, 40 N.Y.2d 303, 386 N.Y.S.2d 677, 353 N.E.2d 590 (1976);

184.     Therefore, the concurrent non-compete restrictions are unlawful and
unenforceable under New York law[36].

## Prayer for Relief

Wherefore, Plaintiff respectfully requests that this Court enter a judgment providing the
following relief:

a.  A declaratory judgment that the practices complained of herein are unlawful under the
Fair Labor Standards Act and New York Labor Law;

b.  A declaratory judgment that the Employment Agreement, to the extent it prohibits part-
time, hourly physicians from working and practicing medicine outside of the Mount Sinai
system, is unlawful and enjoining Corporate Defendants from enforcing the agreement
and entering into similar agreements going forward;

c.  A declaration that Corporate Defendants have engaged in a trust, contract, combination,
action or conspiracy in violation of Sections 1 & 2 of the Sherman Act, and that Plaintiff
has been damaged and injured in his business and property as a result of this violation;

d.  Plaintiff recover threefold the damages determined to have been sustained by him as a
result of the conduct of Corporate Defendants for violation of the Sherman Act;

---

*Scott, Stackrow & Co., C.P.A's, P.C. v. Skavina*, 9 A.D.3d 805, 805, 780 N.Y.S.2d 675, 676 (App. Div. 3rd Dept.
2004) (Holding that a noncompetition covenant will be rejected as overly broad if it seeks to bar an employee from
soliciting or providing services to clients with whom the employee never acquired a relationship through his or her
employment or if the covenant extends to personal clients recruited through the employee's independent efforts); Cf.
*Ippolito v. NEEMA Emergency Med., P. C.*, 127 A.D.2d 821, 512 N.Y.S.2d 216 (App. Div. 2nd Dept. 1987)
[36] Compare *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 389, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999); *Veramark
Technologies v. Bouk*, 10 F. Supp. 3d 395 (W.D.N.Y. 2014); *Innovative Networks v. Satellite Airlines Ticketing Ctr.,
Inc.*, 871 F. Supp. 709 (S.D.N.Y. 1995); *Natural Organics, Inc. v. Kirkendall*, 52 A.D.3d 488, 860 N.Y.S.2d 142 (2d
Dep't 2008); *Long Island Minimally Invasive Surgery, P.C. v. St. John's Episcopal Hosp.*, 164 A.D.3d 575, 83
N.Y.S.3d 514 (App. Div. 2nd Dept. 2018)

e. For equitable relief, including a judicial determination of the rights and responsibilities of the parties;

f. Judgment be entered against Defendants and in favor of Plaintiff, for restitution and disgorgement of ill-gotten gains as allowed by law and equity as determined to have been sustained by him;

g. An injunction against Corporate Defendants, its officers, agents, successors, employees, representatives and any and all persons acting in concert with them as provided by law, from engaging in each of unlawful practices and policies set forth herein;

h. An award of liquidated, compensatory, consequential, statutory, and direct damages as a result of Defendants' knowing and willful failure to pay wages as required under the FLSA and NYLL and for retaliatory actions thereof, which includes, *inter alia,* back pay, front pay/reinstatement, pay increases, bonuses, insurance benefits, other employee benefits, training, promotion, and seniority;

i. Damages for pain, suffering, and humiliation caused by Defendants' actions;

j. An award for liquidated and punitive damages as permitted by applicable law in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious, and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

k. Up to five thousand dollars ($5,000) for Corporate Defendants' failure to provide accurate wage statements;

l. Order the Defendants to reinstate Plaintiff to his prior job;

m. An award of costs and expenses of this action together with expert fees pursuant to 29 U.S.C. §216(b) and NYLL §§198, 215 & 663;

n.  An award of prejudgment and post-judgment fees;

o.  Compensation to Plaintiff for the adverse tax consequences, if any, of receiving a lump-sum backpay award;

p.  So as to effectuate the broad remedial[37] purpose of the FLSA, and as it was de facto corporate policy to incorrectly inform employees of their legal entitlement to wages under the law (see paragraph 45), require Corporate Defendants to post[38] for 60 consecutive days at each and every one of its hospitals and clinics in conspicuous places, as well as distribute electronically by email, a notice (subject to approval by the Court) describing Corporate Defendants history of non-compliance with the FLSA/NYLL, that employee rights under the FLSA/NYLL have been enforced and vindicated, and establishing a seamless and easily-accessible means for past and current employees to obtain compensation that was either not claimed or was improperly denied, so as to dissipate the detrimental and lingering effects of Defendants' illegal practices that were de facto corporate policy;

q.  Require Defendant Charney to create and distribute a video reading the aforementioned notice to all employees;

r.  Require Corporate Defendants to publish the notice with media outlets that have broad circulation and local appeal and posting the notice on the Corporate Defendants' public social media accounts;

---

[37] "The FLSA is 'remedial and humanitarian in purpose. We are not here dealing with mere chattels or articles of trade but with the rights of those who toil, of those who sacrifice a full measure of their freedom and talents to the use and profit of others... Such a statute must not be interpreted or applied in a narrow, grudging manner.'" *Arias v. Raimondo*, 860 F.3d 1185, 1192 (9th Cir. 2017) quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944).
[38] This is modeled off the remedial orders that the National Labor Relations Board have recently imposed on employers who have been found to violate the National Labor Relations Act. See 29 CFR § 104.202; *Noah's Ark Processors LLC*, 372 NLRB No. 80 (2023); *Thryv, Inc.*, 372 NLRB No. 22 (2022)

s.   Such other and further relief as this Court deems necessary, just, and proper.

## Jury Demand

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial

for all claims and issues so triable.

/s/ASW

Dated: Brooklyn, New York
13 November 2023

Alexander S. Weller, MD
*Plaintiff*
250 North 10th Street, Apt 428
Brooklyn, NY 11211
(267) 566 – 2440

# Exhibit A – Mt. Sinai Wage Statements

| Employee Name | | | P.P Begin | P.P End | Advice Date | Advice No | Emp Num | Location | ER ID #B |
|---|---|---|---|---|---|---|---|---|---|
| Alexander Weller | | | 11/20/22 | 12/03/22 | 12/09/22 | 1882888845 | E9044332 | S02 | |

| Base | Cap/Sal | Exp Grd | Euro | Cert | Shift Rate | Fed Tax | State Tax | PTO | OD | GS | HOL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 160.0000 | | | | | | Single | Single/0 | | | | |

| Earnings | Hours | Current($) | YTD($) | VAC | CO | PZ | SICK | Per |
|---|---|---|---|---|---|---|---|---|
| Non FPA Clinical Supplement | 0.00 | 3,045.00 | 3,045.00 | | | | | |

| Deductions | Current($) | YTD($) |
|---|---|---|
| FIT Withheld | 669.90 | 669.90 |
| Social Security Employee With | 188.79 | 188.79 |
| Medicare Employee Withheld | 44.15 | 44.15 |
| SIT Withheld (NY) | 356.27 | 356.27 |
| City Withheld (Brooklyn) | 129.41 | 129.41 |

| | Current | YTD | | Current | YTD |
|---|---|---|---|---|---|
| Gross Pay | 3,045.00 | 3,045.00 | Pre-Tax Deductions | 0.00 | 0.00 |
| Net Pay | 1,656.48 | 1,656.48 | Tax Deductions | 1,388.52 | 1,388.52 |

The Mount Sinai Hospital
150 East 42nd Street
New York, NY 10017 (646) 605-4120

| ADVICE NUMBER | 1882888845 |
|---|---|
| ADVICE DATE | 12/09/22 |
| ADVICE AMOUNT | $1656.48 |

Checking Account          1656.48

DEPOSITED
FOR          Alexander Weller
             250 North 10th Street, Apt. 428,
             Brooklyn, NY 11211

PAYROLL ACCOUNT
NON-NEGOTIABLE

AUTHORIZED SIGNATURE

Location: S02          Payroll: MSH A BI WEEKLY          Seq : 1          Advice-Date : 12/09/22

The Mount Sinai Hospital
150 East 42nd Street
New York, NY 10017 (646) 605-4120

Alexander Weller
250 North 10th Street, Apt. 428,
Brooklyn, NY 11211

| Employee Name | | | P.P. Begin | P.P. End | Advice Date | Advice No | | Emp Num | Location | ER ID #B |
|---|---|---|---|---|---|---|---|---|---|---|
| Alexander Weller | | | 01/01/23 | 01/14/23 | 01/28/23 | 203604089-5 | | E5044332 | 602 | |
| Base | Cap Int | Exp Ext | Edu | Cont | State Rate | Fed Exe | State Exe | PTO | OD | SS | HOL |
| 150.0000 | | | | | | Single | Single/0 | | | | |
| Earnings | | | Hours | Current($) | YTD($) | VAC | | CO | HZ | SICK | Per |
| Non FPA Clinical Supplement | | | 0.00 | 3,712.50 | 3,712.50 | | | | | | |

| Deductions | Current($) | YTD($) |
|---|---|---|
| FIT Withheld | 816.75 | 816.75 |
| Social Security Employee With | 230.18 | 230.18 |
| Medicare Employee Withheld | 53.83 | 53.83 |
| SIT Withheld (NY) | 434.36 | 434.36 |
| City Withheld (Brooklyn) | 157.78 | 157.78 |

| | Current($) | YTD($) | | Current($) | YTD($) |
|---|---|---|---|---|---|
| Gross Pay | 3,712.50 | 3,712.50 | Pre-Tex Deductions | 0.00 | 0.00 |
| Net Pay | 2,019.60 | 2,019.60 | Tax Deductions | 1,692.90 | 1,692.90 |

The Mount Sinai Hospital
150 East 42nd Street
New York, NY 10017 (646) 605-4120

| ADVICE NUMBER | 203604085 |
|---|---|
| ADVICE DATE | 01/28/23 |
| ADVICE AMOUNT | $2019.60 |

Checking Account            2019.60

DEPOSITED
FOR      Alexander Weller
         250 North 10th Street, Apt. 428,
         Brooklyn, NY 11211

PAYROLL ACCOUNT
NON-NEGOTIABLE

AUTHORIZED SIGNATURE

Location: 602      Payroll: MSH A BI WEEKLY           Seq : 1        Advice-Date : 01/28/23

The Mount Sinai Hospital
150 East 42nd Street
New York, NY 10017 (646) 605-4120

Alexander Weller
250 North 10th Street, Apt. 428,
Brooklyn, NY 11211