# EXHIBIT 3

```
 1    UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF NEW YORK
 2
      ------------------------------x
 3                                           23-CV-4775(PKC)
      ALEXANDER S. WELLER, MD,
 4                                           United States Courthouse
              Plaintiff,                     Brooklyn, New York
 5
              - versus -                     October 31, 2023
 6                                           3:00 p.m.
      ICAHN SCHOOL OF MEDICINE
 7    AT MOUNT SINAI, ET AL.,

 8            Defendants.

 9    ------------------------------x

10         TRANSCRIPT OF CIVIL CAUSE FOR PRE MOTION CONFERENCE
                BEFORE THE HONORABLE PAMELA K. CHEN
11                   UNITED STATES DISTRICT JUDGE

12

13    APPEARANCES

14    For Plaintiff:          ALEXANDER S. WELLER, Pro Se
                              250 North 10th Street, Apt. 428
15                            Brooklyn, New York 11211

16

17    Attorney for Defendant: AKERMAN LLP
                              1251 Avenue of the Americas
18                            New York, New York 10020
                              BY:  RORY J. MCEVOY, ESQ.
19

20

21    Court Reporter:         Georgette K. Betts, RPR, FCRR, CCR
                              Phone:  (718)804-2777
22                            Fax:    (718)804-2795
                              Email:  Georgetteb25@gmail.com
23

24    Proceedings recorded by mechanical stenography.  Transcript
      produced by computer-aided transcription.
25
```

PROCEEDINGS

1          (In open court.)

2          THE COURTROOM DEPUTY:  Weller M.D. versus Icahn

3    School of Medicine at Mount Sinai, et al.  Docket 23-CV-4775.

4          Will the parties please state their appearances for

5    the record starting with the plaintiff.

6          MR. WELLER:  Dr. Alexander Weller for the pro se

7    plaintiff.

8          THE COURT:  Good afternoon.

9          MR. McEVOY:  Rory McEvoy, Akerman LLP counsel for

10   the defendants.

11         THE COURT:  Good afternoon to you as well.  Give me

12   one second I'm just pulling up the docket so I can look at a

13   couple of the filings while we speak.

14         So we're here for a premotion conference on the

15   request of the defendants to file a motion to dismiss.  The

16   reason I wanted to meet with the parties is because there are

17   a number of issues that I think are worthy of clarification,

18   even assuming that motion practice goes forward.

19         And one question I have in the back of my mind is

20   whether or not it makes sense to have or to allow, rather,

21   Mr. Weller to amend his complaint, but let's discuss the

22   various questions I have and then we'll see where we end up.

23         First of all, Dr. Weller, I understand that you're

24   of course a -- you have a medical degree, you also have a law

25   degree; is that right?

PROCEEDINGS

1          MR. WELLER:  No, I'm a third year law student at

2    Brooklyn Law School.

3          THE COURT:  So you're a third year at Brooklyn.

4          Let me start off by asking you a number of

5    questions.  Are all of these claims in your complaint being

6    alleged against all of the defendants or each of the

7    defendants?

8          MR. WELLER:  The complaint, I will admit, should be

9    amended to specify that some of the complaints do not apply to

10   some of the defendants.  And I kindly request --

11         THE COURT:  Pull the microphone closer to you, so we

12   can hear you.

13         So you acknowledge that some of these claims are

14   only applicable to or being alleged against certain

15   defendants, but not all of them; is that right?

16         MR. WELLER:  Yes, that was a deficiency in my

17   pleading and I kindly respectfully request leave of the Court

18   to amend my complaint to clarify the --

19         THE COURT:  To clarify your claim?

20         MR. WELLER:  Yes.

21         THE COURT:  Okay, fair enough.  That's part of the

22   learning process I guess for you.  We'll discuss that in a

23   moment and maybe you can clarify for me as we go along which

24   claims are meant to be alleged against which defendants.

25         Now starting off with your unpaid wages claim, and

4

PROCEEDINGS

1   that's under the F-L-S-A or FLSA and New York Labor Law or

2   NYLL, is your wage claim, your unpaid wage claim based solely

3   on the 30 minutes you say you were owed pay for finishing up

4   the work that you were doing during whatever shift you were on

5   preparing I guess for the next shift to take over, or is there

6   other unpaid time or wages that you're basing your claim on?

7          MR. WELLER:  There is other blocks of time for which

8   I would --

9          THE COURT:  Did you say blocks of time?

10          MR. WELLER:  I mean period, days, certain hours.  In

11   addition to the thirty minutes, there were meetings I had with

12   members of the administration for which compensation is

13   arguably due as well as --

14          THE COURT:  Okay.

15          MR. WELLER:  -- time required to vindicate my right

16   to use the internal -- or appeal within the internal

17   structures of Mount Sinai for the proper payment of my wages

18   due.

19          THE COURT:  Right.  I did see that in your

20   complaint.  In other words, you're claiming that you're owed

21   pay, which I think you requested but were denied, for

22   essentially putting together your request for payment of wages

23   or for other -- or for voicing or putting forth other issues

24   relating to your employment there; is that right?

25          MR. WELLER:  Yes, your Honor.

*GEORGETTE K. BETTS, RPR, FCRR, CCR*
*Official Court Reporter*

PROCEEDINGS

1      THE COURT:  Then you're saying that there are

2  certain dates on which you were required to attend meetings

3  that you say you were not compensated for.

4      MR. WELLER:  So I had a meeting over zoom with a

5  member of the -- a lawyer from the internal human resources

6  department as well as meetings thereafter with members of the

7  senior administration of Mount Sinai.

8      THE COURT:  Okay.  Did you reference those in your

9  complaint?

10     MR. WELLER:  No, your Honor.

11     THE COURT:  So you didn't spell those out?

12     MR. WELLER:  Yes, but --

13     THE COURT:  Okay.  Yes, it's good to take some notes

14 on what you might want to do when you amend your complaint.

15     MR. WELLER:  Sure.

16     THE COURT:  And I must confess I don't recall if you

17 mentioned in your response to the PMC request or in your

18 complaint, I think it's in your complaint, the time that

19 you're seeking -- that's right, here it is -- to vindicate

20 your legal right to payment for the 30 minutes, and you

21 specify time I think that you took to email defendants Navid,

22 N-A-V-I-D and Jones-Winter.  And so in paragraph 69 I think of

23 your complaint you ask for payment for time you spent

24 vindicating your legal rights and that's in the complaint

25 already, correct?

6

PROCEEDINGS

1          MR. WELLER:  Yes, that's right.

2          THE COURT:  All right, but those are basically the

3     three categories, if you will, of wages that you're seeking,

4     the unpaid wages allegedly for the 30 minutes or so that you

5     took to wrap things up or transition each shift I guess or

6     each time you worked, and then the meetings that you had with

7     HR or other parts of the hospital, and then the time it took

8     you to vindicate your legal rights.

9          Would those be the three categories of time that

10    you're seeking unpaid wages for?

11         MR. WELLER:  Yes, your Honor.

12         THE COURT:  Now you have a New York Labor Law claim

13    for failure to keep records, that's in your complaint.  I'm

14    not sure what the records you're referring to are.

15         So what were you referring to that you say the

16    defendants failed to keep?

17         MR. WELLER:  So the pay stubs provided by Mount

18    Sinai did not specify the dates of the shifts and the length

19    of the shifts and the rate of compensation of the shift itself

20    or other period of time.  It was just a cumulative total for

21    that pay period.

22         THE COURT:  I see.  You're saying they didn't

23    delineate the number of hours you're being compensated for.

24         MR. WELLER:  Correct, and for which day compensation

25    was being provided and at what rate.

PROCEEDINGS

1          THE COURT:  I see.  So instead what you received was

2     a pay stub for a pay period that just had a total number of

3     hours and/or amount?

4          MR. WELLER:  Correct.

5          THE COURT:  Okay.  But did it have a total number of

6     hours and then the total salary that you were receiving?

7          MR. WELLER:  For that pay period.

8          THE COURT:  Okay.  And the pay periods were what,

9     two weeks?

10          MR. WELLER:  Two weeks or a month, yes.

11          THE COURT:  I see.  So to your mind, under the New

12     York Labor Law, they were required to keep daily records of

13     the numbers and the rate at which you were paid?

14          MR. WELLER:  Yes.  There has recently been some high

15     profile litigation actually against Amazon with the same

16     claim.

17          THE COURT:  Under New York Labor Law?

18          MR. WELLER:  Yes, Labor Law 195 and 191.

19          THE COURT:  Okay.

20          MR. WELLER:  And the distinction here is that the

21     employees in that case were not alleging that there was any

22     inaccuracies, so there was, based on the Supreme Court

23     ruling -- I forget -- a year or two ago where there was -- the

24     plaintiffs had to show injury in fact.

25          THE COURT:  Yes, I was going to ask you about that.

PROCEEDINGS

1        MR. WELLER:  Here, I am alleging injury in fact,

2   because as a result of the defendants' failure to specify

3   exactly which shifts were being compensated and at what rate

4   on the pay stub, I was -- there was significant confusion and

5   it led to difficulty in knowing exactly what I was being paid

6   for in each pay period.

7        THE COURT:  But you're not alleging necessarily that

8   you were -- well, you are alleging unpaid wages, but I think

9   you're not necessarily alleging as a result of not getting

10  this breakdown of your hours and rate of pay on a daily basis

11  that you were necessarily shorted any pay, but rather you're

12  saying it was confusing or kept you from knowing whether you

13  were being shorted any pay, is that fair to say?

14       MR. WELLER:  Exactly.  I lacked the knowledge to

15  know exactly what I was being compensated for and it

16  frustrated my ability to ensure the accuracy of the pay stub.

17       THE COURT:  So perhaps it's worthwhile for me to

18  tell you, you might want to make that clear in your complaint

19  as well.  I mean, obviously at this point the defendants are

20  getting some notice of that by virtue of this conference, but

21  I don't think there's a clear explanation of the basis for

22  your records related claim under New York Labor Law, so you

23  may just want to explain, especially because you do have to

24  allege some injury, that you're claiming that they owed you

25  under New York Labor Law some breakdown, or you're claiming

PROCEEDINGS

1   that they failed to provide some breakdown of the daily hours

2   and rate of pay and that as a result you suffered from

3   confusion and not knowing whether you were being underpaid.

4          Then, similarly, just to go back, I think you got

5   this, but you should add what other bases you're claiming

6   unpaid wages for.  I think what's missing now is simply the

7   reference to dates of meetings with HR and other components

8   that you say you didn't get compensated for but should have

9   been compensated for.

10         And then, as we earlier talked about, you'll better

11  specify which claims are being alleged against which

12  defendants and the basis for alleging those claims against

13  those defendants.

14         Now you also do state a claim or assert a claim for

15  failure to provide time of hire wage notice under New York

16  Labor Law and then you also say you were not provided required

17  notices at the time of termination.  Again, I guess I'm trying

18  to figure out what were you not advised of when you were

19  hired?  Because you did get an employment agreement, right,

20  and did that not contain the rate of pay and other required

21  information under New York Labor Law?

22         MR. WELLER:  Under New York Labor Law a specific

23  form needs to be provided.  It's my understanding that a very

24  specific form needs to be provided to each employee within I

25  believe it's three days of starting as well as a form at the

PROCEEDINGS

1  time of termination or end of employment, specifically

2  relaying information related to eligibility for unemployment

3  benefits.

4          THE COURT:  Well, let's not going go to the

5  termination notice yet.  Let's start at the hiring period or

6  at the time you were hired.  What are you saying you didn't

7  get, the specific form that says what your wage will be?

8          MR. WELLER:  Yes.

9          THE COURT:  And are you saying that that information

10  wasn't in your employment agreement, or you're just saying

11  that the form that they used to notify you didn't comply with

12  New York Labor Law?

13          MR. WELLER:  The form.

14          THE COURT:  Otherwise, though, did you have the wage

15  information in your employment agreement that you signed?

16          MR. WELLER:  Yes, there was wage information in

17  that.

18          THE COURT:  Okay.  Let's turn now to the termination

19  notice.  Does the fact that you resigned rather than were

20  terminated, doesn't that affect whether or not you're entitled

21  to this notice under the New York Labor Law at the time of

22  termination?

23          MR. WELLER:  No.  Under the -- my understanding of

24  the statute as well as the regulation and sub regulatory

25  guidance from the State Department of Labor indicates that

PROCEEDINGS

1  regardless of the circumstances under which the employee stops

2  working, the same notice must be provided.

3        THE COURT:  Are you making this claim under New York

4  Labor Law Section 196(6) or 195(6)?  Because --

5        MR. WELLER:  196 as well as 12 of the rules and

6  regulations 472.8.

7        THE COURT:  And your interpretation is that it

8  doesn't matter whether or not you were terminated or resigned,

9  you were entitled to notice about unemployment benefits, et

10 cetera, under New York Labor Law 195(6)?

11       MR. WELLER:  Yes, that's correct.

12       THE COURT:  I'm sorry, I said 195(6).  You said

13 196(6), but you're relying on Section 196 subparagraph six?

14       MR. WELLER:  That's correct, and the rules and

15 regulations 12 NYCRR 472.8.

16       THE COURT:  Are you disputing in any way or are you

17 making a claim that you were actually fired rather than

18 resigned?

19       MR. WELLER:  I'm making -- I'm alleging constructive

20 termination.

21       THE COURT:  You are alleging constructive

22 termination.  Tell me about -- I notice you did have that

23 claim.  What facts are supporting the claim that the

24 environment became so intolerable that a reasonable person

25 would have resigned or left?

PROCEEDINGS

1    MR. WELLER:  Yes, your Honor.  It's part of my Count

2  Number Five for retaliation under the FLSA and New York Labor

3  Law.  Wherein, immediately after I attempted to clarify and

4  vindicate my rights for payment, essentially 30 minutes of

5  time, my direct supervisor, Dr. Kathy Navid, the director of

6  the hospital service and I believe the chief medical officer

7  of the hospital, at first denied I was legally entitled to

8  said compensation and thereafter as I sent her information

9  regarding Mount Sinai's legal duties under applicable case

10  law, she immediately accused me of violating policy on a

11  different day by leaving work early and --

12    THE COURT:  Well, there was an allegation in here

13  that they were going to monitor your times because there was a

14  day when you did leave early, they said, and that's what

15  you're saying gave rise to this intolerable work environment?

16    MR. WELLER:  So the -- I also have -- yes.  That I

17  indicated that I felt very uncomfortable with that situation

18  because I felt as if I was being subject to adverse --

19  materially adverse consequences for having raised the wage and

20  hour claim by being accused of violating policy, by leaving

21  early -- work early on a different day as well as being

22  subject to new hourly reporting requirements not required of

23  other similarly situated physicians.

24    THE COURT:  I don't think that part is in your

25  complaint.  Are you saying that somehow they changed the

PROCEEDINGS

1    reporting requirements for you?

2              MR. WELLER:  Yes.  Dr. Navid was going to require me

3    to essentially clock in and out and require other, unspecified

4    at the time, reporting or hourly tracking reporting not

5    required of other physicians.  Only -- and this only came up

6    immediately after she indicated I would actually be paid for

7    the 30 minutes.  It's paragraph -- I'm sorry -- 57.

8              THE COURT:  You're referring to the email?

9              MR. WELLER:  Yes.

10             THE COURT:  I see.  Oh, I see, it was part of this

11   email where they said you had left at 4:30, so a little early,

12   and then the first part of that is that they wanted you to

13   sign in and out and mentioned the fact that they wanted to

14   track you I guess by the minute.  That's what you're

15   referencing?

16             MR. WELLER:  Yes.  Yes, your Honor.

17             THE COURT:  I see.  And it's based on that alleged

18   change in the conditions of your employment that you say gave

19   rise to the intolerable working conditions and then resulted

20   in your leaving being a constructive termination.

21             MR. WELLER:  Well, your Honor, so I didn't go into

22   detail about it in the complaint.  However, in medicine, in

23   hospitals there's a process called peer review under the 1986

24   HCQA, Health Care Quality Improvement Act, I'm sorry, which

25   allows hospitals to initiate peer review proceedings that are

14

PROCEEDINGS

1   highly confidential and protected, in general, against

2   physicians.  And it is not unusual and it is not unheard of

3   for hospitals to initiate peer review proceedings against

4   physicians who may be a thorn in the side of management as a

5   way to encourage the physician to leave.  And it is almost

6   impossible to stop those proceedings once they begin and they

7   have the potential to cause severe ramifications to a

8   physician's future employability, because it's reported to the

9   NPDB, which is reported to every medical board and future

10  employer.  And Dr. Navid, as chief medical officer of the

11  hospital and a member of the medical executive committee,

12  would have that ability to easily critique my management of

13  any patient, there's always variation in management, and

14  initiate peer review proceedings.  And so --

15          THE COURT:  But she didn't do that while you were

16  there, right?

17          MR. WELLER:  I was only at Mount Sinai for about --

18          THE COURT:  Three months.

19          MR. WELLER:  -- two months.

20          THE COURT:  Two months.  October to December 2022.

21  December 2, 2022, so you're right only two months really.

22          MR. WELLER:  Yes.

23          THE COURT:  So it didn't happen because obviously

24  you were there for a short time and only part time, right?

25          MR. WELLER:  That's correct.

PROCEEDINGS

1          I also have, your Honor, in my possession, prior to

2     filing in federal court this case was previously in state

3     court.  During the pendency of those proceedings I did

4     propound a couple of subpoenas on Mount Sinai to which

5     responsive documents were provided to me.  There was no

6     objection or motion to quash the subpoenas made in state court

7     at that time.  And the emails that I am in possession of

8     demonstrate that Dr. Navid, working with Dr. Jones-Winter --

9     I'm sorry, with Ms. Jones-Winter and others in administration,

10    were trying to figure out a way to get rid of me.

11          THE COURT:  I'm sorry, what are you basing that on?

12          MR. WELLER:  Emails that are in my possession that

13    were the product of subpoenas that I had propounded on Mount

14    Sinai during the pendency of the proceeding in state court.

15    And the emails demonstrate an intent and a desire by Dr. Navid

16    to figure out a way of getting rid of me.

17          THE COURT:  But because of you're saying you being a

18    thorn in the side of the administration, or because of some

19    work performance issue?

20          MR. WELLER:  No, for having raised these wage and

21    hour issues.  The emails are all from the end of November.

22          THE COURT:  Okay.

23          MR. WELLER:  November 2022.

24          THE COURT:  And what do they say?  You don't have to

25    read all of them just one you think is most indicative of this

PROCEEDINGS

1    intent.

2              MR. WELLER:  On November 22nd I had emailed

3    Dr. Navid regarding my concern that as a result of imposing

4    these new hourly reporting requirements on me that I'd be

5    paid -- or that they not be imposed, I'm sorry.

6              THE COURT:  What did you say again?

7              MR. WELLER:  That these new hourly reporting

8    requirements I was concerned could be retaliatory.

9              THE COURT:  Right.  That's what you wrote on the

10   21st, I think, of November, at least that's what's in your

11   complaint.

12             MR. WELLER:  Yes.  Then on November 22nd Dr. Navid

13   wrote to associate deans at Mount Sinai, quote, This isn't

14   worth it even with the desperate situation.  How can I proceed

15   here.  And in an email 10 minutes later she stated, quote, The

16   PAs complained about how he is intimidating to them and it's

17   already such a difficult job for them.  The quality of his

18   work is fair at best.  I need legal assistance to cut ties as

19   this email seems like a good opportunity.  Thanks in advance

20   for any help/suggestions.

21             THE COURT:  And obviously it sounds to me like

22   there's some -- there are a few issues being raised there.

23   One is what is alleged as somewhat intimidating conduct

24   towards the PAs, another is -- I forget if she said mediocre

25   at best or fair at best in terms of performance and then what

PROCEEDINGS

1    you're alluding to the email that you sent giving them some

2    occasion to potentially terminate you.

3              MR. WELLER:  Yes.  To create pretextual reasons to

4    terminate my employment.

5              THE COURT:  Now if I'm not mistaken, I don't think

6    you included the emails just between Dr. Navid and whoever was

7    on the receiving end of that email.  Because I'm looking at

8    your complaint in around paragraph 62 to 66, which covers this

9    date range, and it seems that you included mostly your emails

10   to them and perhaps some responses to you.  But did you

11   include some of these other ones?  And I apologize if I didn't

12   see them.

13             MR. WELLER:  No.  So on page 3, footnote one I

14   indicated that I did not include any evidence that I obtained

15   as a result of the subpoenas in state court in --

16             THE COURT:  That's what you're referring to?

17             MR. WELLER:  Yes.

18             THE COURT:  I see, okay.  And it's those emails you

19   say evince their intent to terminate you based on your

20   complaints about their employment practices --

21             MR. WELLER:  That's correct.

22             THE COURT:  -- and the wage issues?

23             MR. WELLER:  That's correct, your Honor, given the

24   extremely close temporal proximity one is left with but the

25   conclusion that there is a causal nexus between my complaints

18

PROCEEDINGS

1   of wage and hour issues and them wanting to -- conjuring up

2   pretextual reasons to terminate my employment.

3           THE COURT:  But, nonetheless, they didn't actually

4   terminate you, you did resign, but you're claiming that you

5   were constructively discharged because of the intolerable

6   situation they had created by instituting this new and

7   different hourly monitoring system for you, the clock-in,

8   clock-out.

9           MR. WELLER:  It was clear from the tone of the

10  communication that my remonstrations for proper wage payments

11  were not well received and it also appears that having spoken

12  with other employees at the time, PAs, physicians that it was

13  the standard practice at Mount Sinai at the time to only pay

14  for the length of the shift, for example, a 12-hour shift,

15  even though physicians and PAs typically have to stay outside

16  of their shift as to finish up work or give handover, complete

17  paperwork.  And Dr. Navid, as she indicated to me earlier,

18  said that the hospital does not pay for that and --

19          THE COURT:  Right.

20          MR. WELLER:  -- I essentially called them -- called

21  her out and said --

22          THE COURT:  No, that I understand.  Obviously,

23  that's your unpaid wage claim and you're alleging that the

24  protected speech you engaged in was complaining to them about

25  the failure to pay those wages along with some other hours

PROCEEDINGS

1   that you say you were working or dedicated to an issue

2   relating to work and didn't get paid for, so I understand all

3   that.

4          Again, I'm just trying to clarify really for the

5   purpose of any motion practice, what the basis, the factual

6   basis of what your claims are.  Because, as you know, the way

7   I would assess a motion to dismiss is to look to see if your

8   complaint actually is sufficient to allege the many claims

9   that you're bringing and if you don't include the factual

10  bases or allegations, then the complaint might be dismissed,

11  even though you may have the information.  So it may behoove

12  you again to amend to include reference to what you say or

13  suggest are perhaps smoking guns about the intent to terminate

14  you perhaps in retaliation for your complaining, but also as

15  some indication of the intolerable environment.  Because I

16  think you're suggesting that they instituted these practices

17  for the purpose of trying to make you leave, namely, watching

18  you more closely in terms of your hours.

19          Let's turn for the moment, then, to your Sherman Act

20  claims.  They strike me on the surface as being a bit of a

21  reach here.  Are your Sherman Act claims based on the

22  noncompete agreement that exists in the standard contract that

23  prospective physicians sign?

24          MR. WELLER:  Yes.  My position is that the

25  concurrent noncompete that was contained in the employment

PROCEEDINGS

1   contract -- sorry, the employment agreement represents

2   essentially a naked per se horizontal territory allocation

3   agreement between horizontal competitors.

4          THE COURT:  Can I ask you, though, one basic

5   question, do you have standing to challenge that practice

6   given that you were permitted to negotiate around that

7   noncompete provision because you were allowed to work at other

8   places after you raised the issue with the defendants.

9          MR. WELLER:  So I was only permitted to continue

10  working at essentially one hospital, Jacobi Medical Center,

11  however, the way the noncompete was structured is that without

12  the prior permission of the hospital, the chairperson of the

13  department, I was prohibited from working at any hospital or

14  any clinic anywhere in the world as a part-time per diem

15  hourly employee who would work approximately four to six

16  shifts a month for which there is -- yes.

17         THE COURT:  So you are arguing a per se violation of

18  the Sherman Act with respect to this noncompete provision in

19  the standard agreement?

20         MR. WELLER:  Correct.  So even -- so it could be

21  analyzed under a Section 1 claim as a naked per se horizontal

22  territory allocation agreement, market allocation agreement

23  ala *Topco*, or *State Oil v. Khan*, but it could also be a

24  Section 2 claim given Mount Sinai has significant market share

25  and this would be monopolization behavior.

PROCEEDINGS

1          I would note that the FTC and the DOJ recently, in

2    the past couple of years, have expressed their interest in

3    interpreting the Sherman Act as to be more -- into --

4    encompassing the types of claims that might be concerning

5    under this agreement to restrain the activities of a part-time

6    per diem physician from working at any other hospital without

7    the permission of the hospital.

8          Furthermore, I would just clarify that we're both

9    vertical, there's a vertical element and an horizontal

10   element.  In that the horizontal element comes in where that

11   Mount Sinai provides primary care services, they have clinics

12   all throughout the city that provide family medicine, internal

13   medicine services.  I am also a board-certified internist, so

14   I would provide the same services, out-patient primary care

15   services.  So what this agreement actually does, in fact, is

16   prohibit me from hanging out my own shingle and opening up my

17   own primary care office, or working for another hospital or

18   out-patient clinic that could compete with Mount Sinai's

19   primary care clinics.

20          THE COURT:  But what about the vertical aspect of

21   it, I'm not sure I understand.  I understand the horizontal

22   part.

23          MR. WELLER:  So the vertical aspect is more the

24   traditional employer/employee relationship.

25          THE COURT:  Just the standard, you can't work

PROCEEDINGS

1   anywhere else and we basically own your time.

2          MR. WELLER:  Correct.  As employment agreements are

3   usually thought of as a vertical agreement, but the DOJ in a

4   statement of interest they filed in a case in Nevada, I

5   believe the citation is in the complaint, are encouraging or

6   advocating a reevaluation of that traditional conception of

7   Section 1 of the Sherman Act to include physicians as

8   horizontal competitors to health systems.

9          THE COURT:  But is the only, I guess, authority

10  you're relying on for your theory about horizontal competition

11  that DOJ, I think you called it a statement of interest, is

12  that the only authority you have?

13         MR. WELLER:  No, your Honor.  So I also will rely on

14  Supreme Court rulings such as the famous *Barber v. Barber*

15  case, *Palmer v. BRG*, where the Supreme Court held that the

16  practice of allocating markets are subject to the per se rule.

17         I will also rely on *State Oil v. Khan*, which

18  indicated that some types of restraints have such predictable

19  and pernicious anticompetitive effect, and such limiting

20  potential for procompetitive benefit, that they are deemed

21  unlawful per se, and the per se rule is confined to restraints

22  such as price fixing, bid rigging and market allocation.

23  Restraints that tend to or that would always or almost always

24  tend to restrict competition and decrease output.  That's

25  based on Leegin from 2008.  But all this really just goes back

PROCEEDINGS

1   to -- it's all based on *Topco* as a horizontal market

2   allocation scheme.

3           And then in *Topco* from 1972, the Supreme Court did

4   indicate that categorically unreasonable restraints include

5   horizontal agreements to allocate territories.

6           THE COURT:  Well, I guess then let me go back then

7   maybe a step further because the defense intends to argue that

8   your complaint fails to allege an agreement between two

9   separate entities.  They, of course, cite the case of

10  *Copperweld*, one word, *Corporation* and in that case it was a

11  situation involving a parent and a subsidiary and they

12  couldn't be deemed to be separate entities for purposes of

13  conspiring under Section 1 of the Sherman Act.

14          Now you said, and you invoked a moment ago

15  Section 1.  What are the two separate entities or persons, I

16  guess, for the Section 1 analysis such that there is a

17  conspiracy?

18          MR. WELLER:  So a Section 2 claim does require an

19  agreement and a --

20          THE COURT:  No, Section 1 I think is the conspiracy

21  claim, am I wrong about that?

22          MR. WELLER:  A Section 1 claim, it's my

23  understanding, can include unilateral actions.

24          THE COURT:  No, I don't think that's right.  I think

25  Section 1 is a conspiracy and you have to allege entities are

PROCEEDINGS

1   separate persons for a Section 1 analysis.  But whether it's a

2   Section 1 or Section 2 I guess my question is, what are the

3   two separate entities you're alleging here?

4               MR. WELLER:  So -- yes, I do acknowledge that they

5   cited to *Copperweld* from 1984 I believe.

6               THE COURT:  Right.

7               MR. WELLER:  However, I would draw the Court's

8   attention to Needlepoint, which indicated that the

9   determination of whether a parent and a possibly related

10  entity is a fact intensive inquiry.

11              THE COURT:  But what are those even in this

12  scenario, who is the parent and the related entity?

13              MR. WELLER:  So the Icahn School of Medicine as

14  between Mount Sinai Hospital, the various defendants that are

15  named.

16              THE COURT:  So you're saying the Icahn, I-C-A-H-N,

17  School of Medicine and then Mount Sinai are the two separate

18  entities that are conspiring?

19              MR. WELLER:  Well, also for the Section 1 claim it

20  would be the unilateral action.  Furthermore -- I'm sorry, the

21  unilateral action of Mount Sinai and the Icahn School of

22  Medicine.  The Section 2 claim would be between Mount Sinai

23  and every -- I'm sorry.  The Section 2 claim can include

24  unilateral actions, see Aspen Ski.

25              THE COURT:  Right.  But you keep switching to

PROCEEDINGS

1  Section 2.  Again, I'm just talking about the conspiracy

2  alleged under Section 1.  And the purpose of the Sherman Act

3  obviously is to prevent potential competitors from conspiring

4  in some way I think to effect the market or somehow unfairly

5  exercise some market advantage.  I mean, I think that's sort

6  of the purpose and that's why you have to allege two separate

7  entities and not related entities or parents and subs, and so

8  that's what I'm trying to get at because I think the

9  defendants have an argument here.  It seems like your

10 conspiracy is the defendants and the prospective physicians,

11 but they're clearly not conspiring because you are alleging

12 that the prospective physicians are the ones who are, in some

13 ways, the victims of this alleged Section 1 conspiracy, or at

14 least that's what I understand your complaint to be.

15         MR. WELLER:  So my point would be under Section 1,

16 unilateral actions of the horizontal territory market

17 allocation agreement.

18         THE COURT:  I'm sorry, but, again, a conspiracy --

19 maybe you and I are talking at cross purposes, you are

20 alleging a conspiracy.

21         MR. WELLER:  Well, I'm alleging a claim under

22 Section 1 of the Sherman Act --

23         THE COURT:  Right.

24         MR. WELLER:  -- which it's poorly -- the way it's

25 been interpreted, it's my understanding by the Courts in the

PROCEEDINGS

1   past 120 years, is that Section 1 claims can...

2           THE COURT:  Perhaps we can move on.  I mean, the

3   bottom line is I think you're going to have some difficulty

4   until you can sort out your theory.  If you are going to

5   allege a conspiracy, you obviously have to have members of the

6   conspiracy, one or more -- I mean, sorry, two or more.  So the

7   question and I guess the potential flaw I guess or defect in

8   your argument is going to be that you haven't identified two

9   separate entities that conspired together to violate the

10  Sherman Act.

11          You may, as you suggest, have a different claim

12  under the Sherman Act, which has to do with monopolization or

13  monopolistic behavior I guess based on the argument that

14  somehow Mount Sinai or the Icahn School of Medicine are so

15  large that their unilateral action, I guess, could violate the

16  Sherman Act with respect to this noncompete agreement.  But I

17  don't think you've alleged or can allege a conspiracy, at

18  least based on what I've seen in the complaint so far.  But

19  that's something obviously for you to consider because the

20  defense is certainly going to attack that proposition.  But

21  just consider that because I think that there's some seemingly

22  evident problem with a conspiracy claim under the Sherman Act.

23          Let's move on to the last catchall claim that you

24  have and I think your statement at the outset of this

25  discussion suggests to me that you understand that you need to

PROCEEDINGS

1  spell out the different causes of action that you're alleging

2  and to whom or at which defendants you're alleging them

3  against, but you have here a catchall claim for breach of

4  contract, constructive discharge, fraud, and promissory

5  estoppel, breach of implied covenant of good faith and fair

6  dealing.  Those all have different elements and I think you

7  have to at least clearly allege what the facts are that you

8  say support those various claims in order, one, to give fair

9  notice to the defense and, two, to enable them to challenge

10  it, if appropriate, on a motion to dismiss.  And again, it

11  doesn't seem to me, although I can't quite tell, which

12  defendants you would include in all of those claims, but again

13  I think you need to spell that out.

14          You can't really have such a thing as an omnibus or

15  catchall, grab bag assortment of claims, you do have to

16  specifically allege them and separately allege them so that

17  the sufficiency of each of those claims can be assessed by me

18  and by the opposing party.

19          Let me turn now to you, Mr. McEvoy, for a moment.

20          MR. McEVOY:  Sure.

21          THE COURT:  Is it your intention to move to dismiss

22  all claims against all defendants?

23          MR. McEVOY:  Yes.

24          THE COURT:  So there is no claim that you think, for

25  example, the unpaid wages claims that might, that you think

PROCEEDINGS

1  might survive?

2          MR. McEVOY:  No, and let me point something out.  We

3  just heard a long dissertation about the Sherman Act and the

4  Sherman Act claim, I heard Dr. Weller say, is based on his

5  constructive -- or rather his noncompete claim.

6          THE COURT:  Right.

7          MR. McEVOY:  There is no noncompete.  The agreement

8  that Dr. Weller signed says, and I quote, You agree that you

9  will not engage in any other clinical activity outside of your

10  employment with the faculty practice, except for your existing

11  employment at Advanced Wellness Services located at 1244

12  Dickinson Drive, Yardley, PA 19067.  You agree to notify the

13  chairman of your department if your employment arrangement

14  outside of Mount Sinai change from your existing arrangement.

15  Any violation of this provision will void your contract with

16  ISMMS.  And the operative sentence is, you agree to notify the

17  chairman of your department if your employment arrangements

18  outside of Mount Sinai change.  There is no requirement that

19  the hospital agree, approve, authorize.  Dr. Weller was free

20  to work wherever he wanted as long as he notified the chairman

21  of his department that that was what he intended to do.

22          So all of this, whatever it is, about the Sherman

23  Act and about conspiracies and horizontal and vertical, none

24  of it gets anywhere because there's no noncompete.  And

25  Dr. Weller cited in his complaint, because his agreement says

PROCEEDINGS

1    it is subject to the standard terms and conditions applicable

2    to part-time physician employment, Section 4 of that agreement

3    in subsection or paragraph -- part F says that under the

4    employment agreement, the physician may not accept an

5    appointment or other position at any other educational,

6    medical or scientific institution, school of medicine,

7    hospital, research organization, college or university or

8    maintain a clinical practice outside Mount Sinai other than

9    described in the cover letter and position description unless

10   prior written approval has been granted by the chair.  In the

11   event that the physician wishes to assume another position and

12   maintain a role at Mount Sinai, we may consider a revised

13   agreement.

14           But what Dr. Weller didn't cite in the complaint is

15   the very next paragraph that says, relevant here, If any

16   provision of the physician's employment agreement conflicts

17   with any provision of the foregoing policies, the provision of

18   the employment agreement shall control.

19           So the operative controlling provision is Section G,

20   outside employment, which only requires notification.

21           So any amendment of the Sherman Act claim, the

22   constructive -- the noncompete claim would be futile.

23           THE COURT:  But didn't you just say it requires

24   approval though by --

25           MR. McEVOY:  No, that was under -- there is a

PROCEEDINGS

1    standard group of policies that applies to part-time

2    physicians.  One of those policies says you need prior written

3    approval to take a job outside of Mount Sinai.  The very next

4    paragraph says, if there's a conflict between that policy and

5    the provision in the employment agreement itself --

6         THE COURT:  Oh, I see.

7         MR. McEVOY:  -- the employment agreement controls.

8    And all the employment agreement requires, in one simple

9    sentence is, you agree to notify the chairman of your

10   department if your employment arrangement outside of Mount

11   Sinai changes from your existing arrangement.

12        So any leave to let Dr. Weller amend his noncompete

13   claim upon which his Sherman Act claim is predicated, as are

14   some other claims, would be futile because we'd be right back

15   here making the same argument.

16        THE COURT:  Well, I mean I guess on a motion to

17   dismiss you'd have to argue that the employment agreement and

18   perhaps that policy manual are incorporated by reference,

19   because as you point out some portion of what you recited

20   isn't in the complaint and I don't know if the notice

21   provision is in the complaint, but obviously in order for me

22   to consider that fact --

23        MR. McEVOY:  I'm sorry, your Honor, Dr. Weller

24   attached both of the agreements that I just quoted from as

25   exhibits to his complaint.

PROCEEDINGS

1      THE COURT:  Okay.  So let me ask you, then, a couple

2  of more questions.

3      MR. McEVOY:  Sure.

4      THE COURT:  In your letter you do say, I think, that

5  you're going to dispute whether the plaintiff has sufficiently

6  alleged that the defendants are employers --

7      MR. McEVOY:  Uh-huh.

8      THE COURT:  -- within the meaning of both the FLSA

9  and New York Labor Law.  What exactly do you mean or what do

10  you intend to argue?  Because I think that you may have a

11  difficult road on that one given the basic understanding of

12  what an employer is --

13      MR. McEVOY:  Well, yes.

14      THE COURT:  -- which is different than saying that

15  they were directly involved in his -- the alleged illegal

16  activity.

17      MR. McEVOY:  But the basic concept of employer is,

18  in most situations, not an individual.  You can't lump

19  everybody together and say they're employers.  I mean,

20  Dr. Weller was employed by Mount Sinai Queens Hospital under

21  whatever arrangement there was, he wasn't employed by

22  Dr. Navid, or Ms. Jones-Winter, he wasn't employed by those

23  people.  Those people work for people that may very well and

24  probably are employers, but they themselves are not employers.

25      THE COURT:  But is it fair to say, though, that they

PROCEEDINGS

1  did decide hiring and firing and pay decisions relative to

2  Mr. Weller and his position, because obviously it doesn't

3  simply mean the person who owns, in some sense, the company.

4         MR. McEVOY:  No, no, that's fair.  They certainly

5  were involved in negotiating -- the reason I'm hesitating is

6  that in the one sense you're correct, but it's not like any of

7  these people could simply go out and say okay, fine,

8  Dr. Weller, you're hired.  There are procedures they needed to

9  follow, there were approvals they needed to get.  There were

10  signatures they needed to obtain.  As a matter of fact,

11  Dr. Weller's contract at some point was signed by Ken Davis,

12  who is the CEO of the entire Mount Sinai health system.

13         THE COURT:  Right.

14         MR. McEVOY:  So it's, I think, overly simplistic to

15  simply say, well, because Dr. Navid or Clarissa Jones-Winter

16  were involved in his hiring, then say that they therefore had

17  the authority to hire and fire.  Even from what Dr. Weller was

18  quoting, although I think he made too much of it, Dr. Navid

19  went to Clarissa Jones-Winter -- who is an HR person

20  basically, she has an associate in title but she's in human

21  resources -- for advice on how to handle a particular

22  situation.  I don't think it was a conspiracy to get rid of

23  Dr. Weller.  It was, these are the facts, this is what we

24  know, and it is pretty much the standard practice at Mount

25  Sinai that where there is an issue about termination or

PROCEEDINGS

1   nonrenewal, that those things go to human resources for their

2   review and approval to ensure that policies are applied

3   uniformly throughout the organization.

4           THE COURT:  Well, I think the difficulty I'm having

5   with your argument is two-fold.  One is I think it almost

6   ignores reality that these defendants didn't have some

7   substantial role in whether or not Mr. Weller was hired or

8   fired and the conditions of his employment, including what he

9   claims was retaliatory monitoring of his hours and the

10  definition, as you I'm sure are aware, of employer under both

11  of these laws is pretty expansive.

12          MR. McEVOY:  Uh-huh.

13          THE COURT:  And ultimately, the second issue I have

14  is, there has to be some employer because clearly he was

15  employed.  So perhaps this is a fight about name only.  At

16  some point there is an employer and whoever the employer is,

17  assuming there is one, I guess the question then I want to ask

18  you is, what would be your argument against his unpaid wage

19  claim, assuming for a moment that there has to be an employer

20  or at some point he can name somebody within this

21  organization, if not the organization itself, as his employer.

22          MR. McEVOY:  Sure.  The unpaid wage claim, as I hear

23  it, and I read it in the complaint, is based on two things.

24          THE COURT:  Well, there are three I think, but

25  let's --

PROCEEDINGS

1          MR. McEVOY:  Well, okay.

2          THE COURT:  -- based on today's conversations there

3     seem to be three categories of unpaid wages.

4          MR. McEVOY:  Well, one is the half an hour of time.

5          THE COURT:  Right.

6          MR. McEVOY:  And that in itself is its own story

7     because the hospital determined that Dr. Weller left a half an

8     hour early.  People saw him leave a half an hour early, but he

9     put in a time sheet that he worked for an extra half an hour.

10    And then he says that he did a half an hour of work before his

11    shift started for which he wanted to be paid.

12         THE COURT:  But these are factual disputes.  The

13    problem is he's alleging that he got -- he worked an extra

14    half an hour that he wasn't compensated for.  I understand at

15    the end of the day you may win based on the records you have,

16    but his claim -- and let's just address the claim, are you

17    saying there cannot be a FLSA or New York Labor Law claim if

18    someone says, I spent a half an hour wrapping up whatever I

19    was doing on my shift and transitioning for the next one for

20    which I wasn't paid, and this is sort of akin to the lunchtime

21    dispute that you've probably seen.  Wouldn't that give rise to

22    a viable claim even if on the facts it ultimately isn't going

23    to win?

24         MR. McEVOY:  Well, yes and no.  There are any number

25    of emails in which Dr. Weller is asked, Did you work from 4:30

PROCEEDINGS

1   to 5 o'clock?  And in response to those we got a dissertation

2   about, well, are you saying that when I say goodbye to

3   somebody at 4:30 that means I didn't work?  Never did

4   Dr. Weller say, yes, I worked till five o'clock.  The reason

5   you thought I left was X.  He danced around it repeatedly.

6   Well, if you're asked if you worked till 5 o'clock and you

7   don't say you did and you don't, then simply on the

8   documents -- and again the emails are reproduced in this

9   complaint to a large degree, and so the hospital would rely on

10  those same emails for that proposition.

11          And not to get off this topic, but lest I forget,

12  listening to Dr. Weller talk about his constructive discharge

13  claim, if everything he says happened is true, that he was

14  retaliated against, he engaged in protected activity that

15  doesn't state a constructive discharge claim.  There are

16  plenty of people who sue claiming they've been subject to a

17  hostile environment, they've been retaliated against.  A

18  constructive discharge claim requires a lot more than that.

19          THE COURT:  In terms of the reporting or exercising

20  First Amendment speech -- or protected speech I should say?

21          MR. McEVOY:  Well, I'm not sure what protected

22  speech we're talking about here.

23          THE COURT:  Well, I think the recent case law

24  suggests that reporting internally or complaining internally

25  might be enough, so that's --

PROCEEDINGS

1    MR. McEVOY:  Okay, but your Honor, assume it's

2  protected speech.  A constructive discharge claim requires

3  that the employer has intentionally made the working

4  conditions so intolerable that a reasonable person would feel

5  compelled to resign.  The working conditions need to be

6  intolerable and it has to be intentional.  Basically, to put

7  it in layman's language, somebody had to sit around and say

8  let's make this guy quit.  Let's make him so miserable that

9  he'll leave.  This doesn't come close to that either in the

10  complaint or in Dr. Weller's description of what it is is the

11  basis for a constructive discharge claim.

12    THE COURT:  Right.

13    MR. McEVOY:  It may state a retaliation claim,

14  although I have problems with that as well, but it certainly

15  doesn't state a constructive discharge claim.

16    THE COURT:  Right.  Let me say this.  Overall, I

17  tend to agree with you on a few things.  I do think that --

18  and I'm saying this to you, Mr. Weller, I don't see how you've

19  sufficiently alleged a constructive discharge claim.  What

20  you're saying is that they were imposing clocking in and

21  clocking out in response to your complaints about not getting

22  paid a half an hour you were owed.  It seems to me that

23  somehow monitoring a worker's hours, when the person is paid

24  by the hour, is not something that really constitutes

25  intolerable, but I think as even Mr. McEvoy acknowledges, it

PROCEEDINGS

1   might be considered retaliatory if it's only applied to you

2   and if it obviously occurs in close proximity, as it had to

3   since you only worked there for two months, to your

4   complaining about the pay or wage issue.  Even though you

5   cited these emails, you didn't have those at the time,

6   obviously you got those after leaving and once you started

7   suing, so it's not as if that information or what you describe

8   as an intentional effort to get rid of you was part of the

9   environment.  You may have had your suspicions but I wouldn't

10  count those towards or as part of the evidence to show an

11  intolerable set of work conditions, because the standard for

12  that is fairly demanding and given the short amount of time

13  you were there and short amount of time that this new policy

14  was implemented against you, it seems like it was maybe a week

15  because I think you were citing emails from November 22nd and

16  you quit on December 2.

17          So I would, just speaking frankly with you, I'm not

18  sure that claim would survive I think for the reasons that

19  we've discussed and that Mr. McEvoy has mentioned.

20          However, I think, Mr. McEvoy, I'm not in agreement

21  with you about the unpaid wages claim as well as the

22  retaliation claim surviving, even though I acknowledge at the

23  end of the day the evidence may not bear out those claims for

24  the reasons that you said, but again, as you know, I have to

25  look at the complaint to see if it sufficiently alleges these

PROCEEDINGS

1    two claims.  And what I do see being alleged is, even looking

2    at those agreements we talked about to the extent they are

3    relevant, he claims he worked an extra half an hour every

4    shift and didn't get paid for it.  You say that the records

5    don't bear that out that, in fact, he clocked out a half an

6    hour early or that he actually left half an hour before his

7    shift was over but was paid for the whole shift so, therefore,

8    he was compensated for the 30 minutes, but I can't consider

9    that right now.  In other words, I can't resolve that factual

10   dispute.

11         So some part of me wonders if it would be a better

12   use of everybody's time to simply let the claims that seem to

13   be potentially viable at this point go through, the unpaid

14   wage claim under both federal and state law, and the

15   retaliation claim under federal and state law.  The

16   termination claim I don't know enough about in terms of the

17   law because I still, based on some preliminary research, don't

18   think you're right, Mr. Weller, about whether or not you're

19   entitled to a termination notice since it appears you resigned

20   and, as we've just discussed, I don't think you can make an

21   argument you were constructively discharged for purposes of

22   that provision of the New York Labor Law, but you say it

23   doesn't matter.  Obviously, I could hear argument on that or

24   see that in your briefing.

25         And then in terms of the notice upon hire of the

PROCEEDINGS

1    wage claim that you have, I have some questions about whether

2    or not your form argument or basis for your claim is viable.

3    I mean, I think here it would be difficult for you to claim

4    injury and standing, I think if nothing else, because you were

5    informed in your employment agreement what your wage was going

6    to be.

7         So just so you know I've issued a number of

8    decisions in the context of New York Labor Law finding that if

9    you cannot allege some kind of cognizable injury, and I don't

10   think confusion would even count here because you couldn't

11   have been confused, you had an employment agreement, but even

12   if I were to acknowledge a confusion could constitute some

13   sort of injury, I don't think you have standing, putting aside

14   whether or not the form of it is really -- would be enough for

15   the New York Labor Law claim.  So I have some doubts about

16   whether either of your New York Labor Law notice claims, the

17   hiring wage statement or the termination notice claims would

18   work -- would survive rather.

19        The Sherman Act claims I really just don't see those

20   as surviving, in part, for the reasons that you and I have

21   discussed.  You're missing a party for the conspiracy and then

22   I think Mr. McEvoy makes a very good point that if your

23   Sherman Act claim is based on this noncompete issue, you're

24   going to have a tough time with the noncompete clause or

25   provision argument because it doesn't sound like you were

PROCEEDINGS

1    prevented from competing.  It doesn't even sound like the

2    standard policy, even if that could be said to apply to you

3    given that you did negotiate outside employment, bars working

4    somewhere else.  It only seems to require notice.

5            Now, maybe you read the documents differently and

6    maybe that would be the basis for your noncompete claim and

7    maybe then by extension a Sherman Act claim, but not alleging

8    conspiracy.  But all of the claims that we're discussing now,

9    other than the unpaid wages and the retaliation claims, I see

10   a great possibility that those will be dismissed no matter

11   what you try to allege because I think the law doesn't quite

12   support it or the facts don't support it.

13           So, part of the reason I hold these conferences is

14   to give both sides some initial assessment of my -- or my

15   initial assessment of the claims or the motion.

16           So what we'll do is, I certainly will allow you,

17   Mr. Weller, if you want to amend your complaint, though I

18   think you should -- or you would be wise to do some trimming

19   as well as some adding of allegations to support your claims.

20   But like I said, I'm trying to give you some view of what I

21   think is a realistic outcome here.  You seem to have a couple

22   of potential claims that can go forward, but a lot of the

23   other ones I have serious doubts about it.

24           You, again, have this catchall claim.  I don't know

25   about breach of contract and all that.  Those seem to me -- I

PROCEEDINGS

1  don't understand the basis even of the breach of contract

2  because they didn't fire you unless I were to find you were

3  constructively discharged, so I'm not quite sure how you're

4  saying that they failed, meaning the defendants or the

5  hospital failed to comply with what was required under the

6  contract with you.  Is it the constructive discharge

7  essentially that drives that claim?

8            MR. WELLER:  So a couple of things.  I find the

9  defendants' contention about applicability of the FLSA to be a

10  little perplexing given the Second Circuit ruling in *Irizarry*

11  *versus Catsimatidis.*

12            THE COURT:  You're talking about the employer issue.

13            MR. WELLER:  Yes.

14            THE COURT:  I wouldn't get hung up on that.  At the

15  end of the day there's going to be an employer you can sue.

16  And I also think I've intimated that I'm not sure I agree with

17  Mr. McEvoy about his more narrow reading of who is an

18  employer.  I've written decisions where I found that

19  supervisors, for example at a restaurant, who determine the

20  hours and the wages, for the most part, or recommend hiring

21  and firing as a supervisor and certainly some of these people

22  qualify as that, are employers.  So I don't find that they

23  have to either own the entity or be the heads of the entity in

24  order to be an employer.  I'm not sure actually about

25  Dr. Charney, however, because it seems to me it's not clear

PROCEEDINGS

1    based on what you've alleged that person was the employer, but

2    I think under Mr. McEvoy's theory maybe he is the employer

3    because he's the dean at the school.  But I don't think

4    there's going to be any real argument that FLSA does apply,

5    that they were your employer, whoever that person or entity

6    is, so I think, as I said to Mr. McEvoy, I think that's just a

7    name thing.  There has to be an employer here.  That's not the

8    issue.

9           The question really is whether or not you're

10   entitled to make some of these New York Labor Law claims

11   mostly, the ones about notice and also the noncompete

12   agreement, which is part of your constructive discharge claim,

13   I think, or part of your Sherman Act claim, sorry, and

14   separately the constructive discharge I think I've given you

15   an idea that it's hard for me to find, it would be very hard

16   for me to find that you've alleged enough for that claim when

17   you're talking about a week's worth of theoretical or proposed

18   greater scrutiny of your hours, that's really what it amounts

19   to.

20          MR. WELLER:  It was also an allegation that I had

21   violated policy by leaving work early and attesting an

22   incorrect time sheet.

23          THE COURT:  But you don't think an employer is

24   allowed to do that without creating an intolerable work

25   environment even if you dispute it?

PROCEEDINGS

1    MR. WELLER:  Under the Supreme Court standard

2    elucidated in Burlington Northern Railroad in 2008, the

3    standard is if the employers actually would have the tendency

4    to dissuade a reasonable employee from raising a claim.  To

5    allege an employee violated a policy in -- an employer's

6    policy of wage and hour -- or any policy in the same --

7         THE COURT:  But you're talking about the retaliation

8    claim --

9         MR. WELLER:  Yes.

10         THE COURT:  -- not the constructive discharge claim.

11         MR. WELLER:  So I will allow that the standards

12   under New York law or the common law standards in New York for

13   constructive discharge would be a bit more --

14         THE COURT:  Onerous.

15         MR. WELLER:  -- onerous and challenging to meet

16   compared to the FLSA and New York Labor Law retaliation

17   standards.

18         THE COURT:  Right.  So let's do this.

19         Mr. McEvoy, obviously at some point if you want to

20   file your motion you will of course be allowed to because I

21   can't say you cannot, but I do want to counsel you to try to

22   save time and money for yourself and your client.  What I want

23   to do is have Mr. Weller first amend his complaint both to add

24   facts or allegations, factual allegations that would better

25   support his claims, but also then specify as to which

PROCEEDINGS

1  defendants are being charged not to say in every claim all

2  defendants, and then to consider I think trimming, for

3  example, the Sherman Act claim and I would say the

4  constructive discharge claim as well as the notice claims.

5  Those would be my --

6          MR. McEVOY:  And how about the noncompete, your

7  Honor?

8          THE COURT:  Right.  But the noncompete, is that a --

9  that's a state law claim I guess just based on, it seems to

10  be -- it seems like it undergirds the Sherman Act claim a

11  little bit.

12          MR. McEVOY:  Well, but the problem is, you know, I

13  realize that we are all going to cite cases and Dr. Weller

14  seems well versed in them, notify means notify, it doesn't

15  mean anything other than notify and it's got a pretty clear

16  definition in common English understanding and if all it says

17  is Dr. Weller was required to notify his chair that he was

18  accepting another job somewhere and it didn't require any

19  approval by anybody, then --

20          THE COURT:  Right.

21          MR. McEVOY:  -- leaving to amend that complaint is

22  futile.

23          THE COURT:  Well, let me just say this.  I am

24  looking at I guess his claims and there is the Sherman Act

25  which I think is based on this noncompete notion, and then

PROCEEDINGS

1    there is the eighth cause of action which is a catchall claim

2    for breach of contract, so that's where I agree you should

3    consider dropping your constructive discharge claim for the

4    reasons that we've discussed.  I think it would be near to

5    impossible for you to convince me that you can sufficiently

6    allege such a claim under the facts, as I understand them, and

7    I think I've gotten a better understanding of them.

8         MR. McEVOY:  Yes, but, your Honor, I'm talking about

9    the noncompete, not the constructive discharge.

10        THE COURT:  Oh, I'm so sorry, you're right.  Now

11   that I think about it, there isn't a freestanding noncompete,

12   you're right, that really is just part of the Sherman Act

13   claim.  Am I right, Mr. Weller?

14        MR. WELLER:  So the number one in paragraphs 23 and

15   24, my esteemed opposing counsel's characterization of the

16   agreement is slightly different, he left out one sentence.

17   Any violation of this provision will void your contract with

18   the Icahn School of Medicine at Mount Sinai.

19        THE COURT:  Right, but that's the provision where

20   you have to tell them if your work circumstances change.

21        MR. McEVOY:  Yes.  It means -- sorry.  I mean, if

22   Dr. Weller goes out and takes another job and doesn't tell the

23   chair before he does it, then he's violated the agreement.  As

24   long as he notifies the chair, he hasn't violated the

25   agreement.  It doesn't seem complicated.

PROCEEDINGS

1          MR. WELLER:  I would add that would impose an

2     obligation on the employee, which as a part-time per diem

3     employee has essentially no function, I would just work when

4     needed a couple of shifts a month.  In a part-time per diem

5     employee has no duty to tell their employer that they have

6     another job and it's --

7          THE COURT:  Well, if the agreement says they do,

8     then they have a duty.

9          MR. WELLER:  Right, but --

10          THE COURT:  Your argument is that somehow that

11     requirement violates the Sherman Act, where it's non -- it's

12     uncompetitive.

13          MR. WELLER:  Well, not just that but more so the

14     standard terms and conditions of the part-time physician

15     employment, which prohibits maintaining a clinical practice

16     outside of Mount Sinai.

17          THE COURT:  Right, but I think that unless there's

18     another provision, and you had one in your agreement that

19     overrides that, and that's I think what Mr. McEvoy is saying.

20     So that is not an unqualified restriction because it

21     apparently has a second clause or another sentence which says,

22     if you have something else, which apparently you did in your

23     part-time contract with Icahn School of Medicine, that

24     overrides the absolute bar on you working somewhere else, then

25     you can work somewhere else so long as you give notice.

PROCEEDINGS

1      MR. WELLER:  Sure.  That's based on the construction

2  where my esteemed opposing counsel's construction of the

3  agreements that such that there would be a conflict, but

4  notifying and prohibiting practice is not clearly -- it's not

5  clear that's there's a conflict therein.

6      MR. McEVOY:  Just two quick things, your Honor.  One

7  is there is a separate count regarding the noncompete, it's

8  Count Seven --

9      THE COURT:  Yes --

10      MR. McEVOY:  -- and --

11      THE COURT:  -- I just saw that as well.  Go ahead.

12      MR. McEVOY:  And the other thing is that -- and this

13  will eventually come out either in motion practice on a motion

14  to dismiss or as the case goes along, Dr. Weller negotiated

15  this agreement to the fare-thee-well.  There are an endless

16  number of emails between Dr. Weller and people at the

17  hospital, this provision isn't good, this provision is

18  illegal, this provision violates my rights, and at the end of

19  the day he signed the agreement that has the provision I just

20  quoted.  So it's a little hard to now hear, oh, but, gosh, it

21  shouldn't be held against me that this provision now has

22  different meaning than what I agreed to.

23      THE COURT:  Right.  No, I understand.  I think that

24  was in your letter that there was a marked up copy of the

25  agreement sent back.

PROCEEDINGS

1          MR. McEVOY:  Yes.

2          THE COURT:  Again, I'm just trying to counsel for

3   efficiency and conservation of resources for both sides.  So,

4   Mr. Weller, I cannot prevent you from putting into your

5   complaint whatever claims you want, just like I can't prevent

6   Mr. McEvoy from moving on whatever bases he wants to dismiss,

7   but I'm just giving you my assessment of whether your

8   noncompete claim, which is a freestanding claim and also

9   relating to your Sherman Act claim will survive.  I really

10  don't think it will, based on the facts you've alleged, and

11  putting aside any evidentiary sort of -- or evidentiary

12  defense that there might be down the road, which I won't take

13  into account.

14          But you're your own counsel so you'll decide to do

15  whatever you wish.  Just tell me how much time you want to

16  amend.

17          MR. WELLER:  Fourteen days would be fine for me.

18          THE COURT:  We'll give you 14 days from now, which

19  is what date, Fida?

20          MR. McEVOY:  It should be November 14th.

21          THE COURT:  That's right, November 14th.

22          MR. McEVOY:  Today is Halloween.

23          THE COURT:  Well done.  November 14th.  How much

24  time -- I'm assuming you'll still -- let's put it this way.

25  You can file your motion 30 days from then, if you like,

PROCEEDINGS

1   Mr. McEvoy, or file a letter indicating that you're not moving

2   to dismiss if for some reason Mr. Weller trims his complaint

3   in a way that makes you think it's not worth that effort right

4   now.

5          MR. McEVOY:  So thirty days would be December 14th.

6          THE COURTROOM DEPUTY:  Fourteenth.

7          MR. McEVOY:  That's fine.

8          THE COURT:  Then I'll give you 30 days to respond

9   with some -- probably two weeks maybe for the holidays,

10  Mr. Weller.

11         So five weeks, Fida.

12         THE COURTROOM DEPUTY:  Five weeks takes us to

13  January 13th, that pushes us to January 19th.

14         THE COURT:  January 19th for the response to any

15  motion to dismiss, then two weeks for any reply.

16         MR. McEVOY:  Fair enough.

17         THE COURTROOM DEPUTY:  February 2nd.

18         THE COURT:  Good.  All right.

19         The way I operate, and you have probably heard this,

20  Mr. McEvoy, there's something called bundling.  What it means

21  is you don't file your motion, Mr. McEvoy, until the last day

22  on which your reply is due, then you file both your motion and

23  your reply, but you serve Mr. Weller on the first date, the

24  one in --

25         MR. McEVOY:  December.

PROCEEDINGS

1          THE COURT:  -- December.  And then file your letter,

2     cover letter indicating that you've served Mr. Weller so that

3     we know that you're complying with the schedule.

4          Similarly, Mr. Weller, you'll file -- you won't file

5     your opposition until that final day in February, but you will

6     serve Mr. McEvoy with your opposition, and then just file your

7     letter indicating that you have served Mr. McEvoy.  You don't

8     have to follow this practice, but it makes it easier for me to

9     give you extensions of time should either side want it and

10    both of you hopefully will agree to it, because you won't be

11    running up against my internal deadlines to rule on the

12    motion, which are triggered by the actual filing of the

13    motion.

14          So if we wait until everything is briefed, so it's

15    referred to as bundling just for your education, Mr. Weller,

16    if you follow the bundling practice, the time for me to

17    resolve the motion won't start until it's fully briefed, and

18    like I said, then it makes it easier for me to give you some

19    extensions before then.

20          MR. McEVOY:  Your Honor, there will be an order on

21    ECF?

22          THE COURT:  Correct, with all the deadlines and then

23    recapitulating this bundling notion, this noncompulsory

24    bundling notion.

25          MR. McEVOY:  Okay.

PROCEEDINGS

1          THE COURT:  Okay?  Thank you both.  Pleasure meeting

2    you.  Look forward to hearing from you.

3          MR. McEVOY:  Thank you.

4          (Matter concluded.)

5                    *    *    *    *    *

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

7

8    s/ Georgette K. Betts              November 6, 2023

9    GEORGETTE K. BETTS                 DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25