UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALEXANDER WELLER,
      PLAINTIFF,

                                                      Case No. 23-cv-04475 (PKC)(LB)

v.

ICAHN SCHOOL OF MEDICINE AT MOUNT
SINAI, KATHY NAVID, MD, DENNIS
CHARNEY, MD, CLARISSA JONES-WINTER,
MOUNT SINAI HEALTH SYSTEM, INC., THE
MOUNT SINAI HOSPITAL INC.,
      DEFENDANTS


**PLAINTIFF ALEXANDER WELLER'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**



Respectfully submitted,



By: Alexander S. Weller, MD
*Pro se* Plaintiff
250 North 10th St. Apt 428
Brooklyn, NY 11211
Asweller4@gmail.com
267-566-2440

# Contents

I.      INTRODUCTION ........................................................................ 3

   A.     Court has Jurisdiction Against Charney ........................................... 3

   B.– Employment Agreement Does Contain a Noncompete Agreement ........................ 5

   C. – Complaint States a Viable Claim Under the Sherman Act ..................................... 8

       i     Defendants' Assertions Under *Copperweld* Are Only Relevant to Section 1 Claim ............................................................................................ 9

       ii    Non-Compete Properly Analyzed as a Horizontal Restraint ............................. 9

       iii.   Restrictions Properly Analyzed Under Both Per Se or Truncated Rule of Reason (Quick Look) Standards ................................................................. 11

   D. Complaint States a Viable Sherman Act Section 2 Claim.......................................... 16

   E. Defendants Failed to Pay Plaintiff All Wages Due .................................................... 19

     A.   i - Plaintiff Stated a Claim under the FLSA for Rounding, Not Gap Time ...... 19

     B.   ii – Plaintiff's Work is Compensable .............................................................. 20

     C.   iii - Defendants' Ad Hominem Attack on Plaintiff .......................................... 21

   F. – Plaintiff Has Stated a Viable Claim for Retaliation Under FLSA/NYLL .............. 22

   G. Plaintiff Has Standing To Bring a NYLL § 195 Claim ............................................ 26

II.     CONCLUSIONS ........................................................................ 27

## I.     INTRODUCTION

*Pro se* Plaintiff Alexander Weller ("Plaintiff"), respectfully submits this Memorandum of Law in Opposition to Defendants Motion to Dismiss Plaintiff's First Amended Complaint (hereinafter "FAC") and request for attorneys' fees[1].

In brief, Plaintiff: (1) has properly named Charney (2) set forth sufficient facts to support Plaintiff's retaliation claim (3) stated a cognizable injury for being provided inadequate wage statements (4) properly interpreted the Employment Agreement to impose a concurrent non-compete (5) described how aforementioned non-compete violates the Sherman Act.

### A.   Court has Jurisdiction Against Charney

Under the Fair Labor Standards Act ("FLSA") (29 U.S.C. § 203 *et seq*.) and New York State Labor Law (Labor Law § 215 *et seq*.), natural persons who have control over a company's actual operations in a manner that relates to a plaintiff's employment are properly named as defendants. *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013).

In the Second Circuit, *Irizarry* and its progeny use the *Carter* test[2] to determine whether a

---

[1] In their Notice of Motion, Defendants ask the Court to award attorneys' fees. This is in the setting of notice from the Court that it is likely that many of Plaintiff's claims appear colorable and viable (as set forth in the annexed transcript), and thus would not be dismissed.  If the baseless request for attorneys' fees (combined with obtuse overtures that Plaintiff has committed, or is setting a perjury trap for himself, discussed later) is actually an implicit threat, intended to terrorize and dissuade Plaintiff from pursuing a colorable claim under the FLSA, that itself would be wrongful. The Second Circuit recently held that "baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment setting" *Kim v. Lee*, 2023 WL 2317248, at *3 (2d Cir. Mar. 2, 2023), citing *Romero v. Bestcare, Inc.*, 2018 WL 1702001 (E.D.N.Y. Feb. 28, 2018); see also *Rattigan v. Holder*, 604 F. Supp. 2d 33, 53 (D.D.C. 2009); *Darveau v. Detecon*, 515 F.3d 334, 343 (4th Cir. 2008). Moreover, as was written in 2020 by this honorable Court, that courts "in this Circuit are clear that 'instituting bad faith litigation against [an] employee constitutes actionable retaliation.'" *Rodriguez v. Nat'l Golf Links of Am*., No. 19- CV-7052(PKC)(RML), 2020 WL 3051559, at *3 (E.D.N.Y. June 8, 2020) (cleaned up) (collecting cases). See also *Torres v. Gristede's Operating Corp*., 628 F. Supp. 2d 447, 473 (S.D.N.Y. 2008) ("Bad faith or groundless counterclaims and other legal proceedings against employees who assert statutory rights are actionable retaliation precisely because of their *in terrorem* effect." (citing *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 740 (1983))); see also *Pili v. Patel*, No. 3:18-CV-317, 2019 WL 180185, at *15 (E.D. Va. Jan. 11, 2019)) (holding that "even implied threats of retaliatory adverse action suffice to establish that the plaintiff suffered adverse action by the employer.").
[2] "Whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Irizarry*, 722 F.3d at 105, quoting *Carter,* 735 F.2d 8 (2d Cir. 1984).

defendant is an "employer" under the FLSA. The *Irizarry* Court boiled it down to whether there is "evidence showing his authority over management, supervision, and oversight of [Gristede's] affairs in general." *Irizarry v. Catsimatidis*, 722 F.3d 111, quoting *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999).

Finally, "[a]n individual need not possess 'formal control' over a worker to qualify as an employer; 'functional control' is sufficient." *Shi v. TL & CG Inc.*, No. 19-CV-08502 (SN), 2022 WL 2669156, at *5 (S.D.N.Y. July 11, 2022) (citation omitted). Ultimately, the Second Circuit found that the CEO and president of a grocery store chain was an employer and he had "functional control over the enterprise as a whole."

Here, Dennis S. Charney, M.D. ("Dr. Charney") is the Dean of the Icahn School of Medicine at Mount Sinai and the President for Academic Affairs at Mount Sinai Health System. (FAC 13). Dr. Charney signed the Employment Agreement on behalf of the corporate Defendants. (FAC 26). Thus, Dr. Charney had the power to hire and fire employees, along with the power to approve decisions on compensation for employees, and he had access to employee records. These are all indicia that Courts have found to be indicative of being an employer under the FLSA. *See Grande v. 48 Rockefeller Corp.*, 2023 WL 5162418 (S.D.N.Y., 2023); *Gayle v. Harry's Nurses Registry, Inc.*, No. CV-074672(CPS)(MDG), 2009 WL 605790 (E.D.N.Y. Mar. 9, 2009), *aff'd*, 594 F. App'x 714 (2d Cir. 2014).

The cases cited by Dr. Charney are unavailing here. *Dove* and *Gutierrez* are both irrelevant, as they concerned Section 1983 claims, which has a different standard for personal liability. In *Allick*, the Court dismissed vague, conclusionary allegations relating to alleged criminal activity and a time-barred Title VII claim. Finally, in *Medisys*, the Court dismissed the breach of fiduciary duty claim a former employee brought against the directors and managers of her former employer;

Plaintiff here has not brought a breach of a fiduciary duty claim against Dr. Charney.

### B.– Employment Agreement Does Contain a Noncompete Agreement

Contrary to the interpretation advanced by Defendants that the Employment Agreement and incorporated Standard Terms merely required that Plaintiff notify Defendants in the event Plaintiff accepted another job, the Agreement, when interpreted in accordance with principals of contract interpretation, did in fact prohibit concurrent outside employment and clinical work. The interpretation advanced by Defendants is inconsistent with the plain text of the contract, would require the Court to disregard whole sentences in the Agreement, is contrary to the stated intentions of the party at the time the agreement was signed, and is made without citation to any statutory law or case.

The relevant section of the Employment Agreement provides:

> You agree that you will not engage in any other clinical activity outside of your employment with the Faculty Practice except for your existing employment at Advanced Wellness Services located at 1244 Dickinson Drive, Yardley, PA 19067. You agree to notify the Chairman of your department if your employment arrangements outside of Mount Sinai change from your existing arrangement. Any violation of this provision will void your contract with ISMMS.

The relevant section of the Standard Terms and Conditions of Part Time Physician Employment provides:

> This offer is predicated on the Physician's commitment to work for Mount Sinai under the specific terms and conditions described in the cover letter and consistent with the position description. Under the Employment Agreement, the Physician may not accept an appointment or other position at any other educational, medical, or scientific institution (school of medicine, hospital, research organization, college, or university) or maintain a clinical practice outside Mount Sinai, other than as described in the cover letter and position description, unless prior written approval  has been granted by the Chair. In the event that the Physician wishes to assume another position and maintain a role at Mount Sinai, we may consider a revised agreement.

The law in New York relating to contract interpretation is malleable, but guided by firm

rules. The intent of the parties guides how a court interprets a written contract, where intent is based solely on the words of the contract, courts may not insert or remove terms of the contract. See *Matter of MPM Silicones, L.L.C*., 874 F.3d 787, 795 (2d Cir. 2017); *Dysal, Inc. v. Hub Props. Tr.,* 938 N.Y.S.2d 642, 643 (2d Dep't 2012).

Moreover, courts must give meaning to every provision of the contract, so that no provision is left without force and effect: "It is well settled that a contract must be read as a whole to give effect and meaning to every term... Indeed, a contract should be interpreted in a way that reconciles all of its provisions, if possible. Thus, all parts of the contract must be read in harmony to determine its meaning... One portion of a contract should not be read so as to negate another portion." *Frank v. Metalico Rochester, Inc*., 174 A.D.3d 1407, 1411 (2019) (internal citations, quotations, alterations and references omitted); *LaSalle Bank Nat. Ass'n v. Nomura Asset Cap. Corp*., 424 F.3d 195, 206 (2d Cir. 2005) ("An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless... is not preferred and will be avoided if possible.") (cleaned up). Where a contract employs contradictory language, specific provisions control over general provisions. *Foley v. Foley*, 155 A.D.3d 1506 (2017); *Martinez v. Agway Energy Servs., LLC,* No. 22-1026, 2023 WL 8608637 (2d Cir. Dec. 13, 2023) ("When a contract contains 'definitive, particularized' language, that language takes precedence over expressions of intent that are general, summary, or preliminary.") (references, quotations omitted).

External evidence cannot be used to create ambiguity in the terms of the contract if the contract is unambiguous[3]: "A written agreement that is clear, complete and subject to only one

---

[3] "Contract terms are ambiguous if they are capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Olin Corp. v. OneBeacon Am. Ins. Co*., 864 F.3d 130, 148 (2d Cir. 2017) (citation omitted). Compare *Greenfield v. Philles Recs., Inc*., 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170–71 (2002) ("A contract is unambiguous if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the agreement itself, and concerning which there is no reasonable basis for a difference of opinion.") (cleaned up) (citation omitted).

reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties… Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence may be considered only if the agreement is ambiguous." *Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) (quotations, references omitted). To the extent the language of the contract is ambiguous or doubtful, ambiguity should be resolved against the drafter. *151 W. Assocs. v. Printsiples Fabric Corp.,* 61 N.Y.2d 732 (1984).

Here, the improperly narrow reading of the merged[4] Employment Agreement & Standard Terms, advocated by Defendants in a futile attempt to distance themselves from terms they themselves demanded, strains credulity. The plain text of the contract states that Plaintiff "agree[s] that [Plaintiff] will not engage in any other clinical activity outside of [Plaintiff's] employment with the Faculty Practice… [Plaintiff] may not accept an appointment or other position at any other educational, medical, or scientific institution (school of medicine, hospital, research organization, college, or university) or maintain a clinical practice outside Mount Sinai…"

Defendants' interpretation of the contract would require the Court to blind itself to entire sentences in the Agreement ("Any violation of this provision will void your contract with ISMMS."), to excise whole clauses, to pretend they do not exist, all contrary to New York law that the contract must be read as a whole, with meaning harmonized and given to every term. There is no ambiguity in the plain text of the Agreement. Even if there exists an apparent conflict between the two sections at issue, where either only notification is required in the event of breach, or the contract is void(able) in the event of breach, the two terms are not mutually exclusive, and must

---

[4] The Employment Agreement has a merger clause and is thus fully integrated. *Primex Int'l Corp. v. Wal-Mart Stores,* 89 N.Y.2d 594 (1997).

be given an interpretation that harmoniously gives full effect to every term: despite prohibitions thereof, once notification of outside employment is given, Plaintiff would be in breach, the Agreement is voided.[5] In fact, this interpretation is consistent with that advanced by administrators at Mt. Sinai while Plaintiff was in discussions regarding potential employment (see FAC 28 – 30).

### C. – Complaint States a Viable Claim Under the Sherman Act

With the interpretation as established[6] in point II, that the Employment Agreement and Standard Terms did prohibit Plaintiff from working as a physician anywhere outside of the Mt. Sinai system, this concurrent noncompete, as applied to a part-time, per diem, hourly physician, is highly anticompetitive and likely illegal under federal and state[7] law[8].

Section 1 of the Sherman Act prohibits all contracts, combinations, or conspiracies that unreasonably restrain trade. Non-compete agreements between employers and employees

---

[5] The use of the term "void" and not "voidable" introduces an element of legal ambiguity, as it seems likely Defendants actually intended "voidable". "Void promises are not legally binding, have no legal effect, and, therefore, are not contracts. The promisor has no duty of performance… it creates no legal obligation… [I]t is as if it never existed. It is a legal nullity." 1 Williston on Contracts § 1:20 (4th ed.). In contrast, a voidable agreement "is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance. A voidable contract is one under which a party, usually a victim of some wrong by another party, may elect to avoid any legal obligations." *Id;* see also *Landcastle Acquisition Corp. v. Renasant Bank,* 57 F.4th 1203 (11th Cir. 2023) (discussing difference between void and voidable); *Matter of Rothko's Est*., 43 N.Y.2d 305 (1977). Nevertheless, as documented in the FAC 21-38, Mt. Sinai's representatives clearly intended that breach of the non-compete provision would modify and/or terminate the legal relationship between Plaintiff and Defendants; Defendants drafted the agreement, and thus any ambiguity should be held against the drafter.

[6] Even if this honorable Court were to interpret the Employment Agreement to not create a binding concurrent non-compete, a formal contract is not necessary, where the key factor is whether Plaintiff was truly free to sell services to other buyers; see FAC 27 – 35, where Dr. Navid reinforces the existence of a non-compete. Compare  *ZF Meritor, LLC v. Eaton Corp*., 696 F.3d 254, 270 (3d Cir. 2012) ("an express exclusivity requirement, however, is not necessary because we look past the terms of the contract to ascertain the relationship between the parties and the effect of the agreement 'in the real world.'"); see also *United States v. Richfield Oil Corp*., 99 F. Supp. 280, 296 (S.D. Cal. 1951), *aff'd*, 343 U.S. 922 (1952) (although contracts were not denominated as requirements contracts, testimony of station owners that they were not free to deal with outsiders was sufficient to establish exclusive dealing arrangements).

[7] Defendants do not oppose Count 7 of the FAC, which alleges the overly broad non-compete violates common law in the State of New York, except for their claim that the Employment Agreement does not contain a non-compete.

[8] As specified in the FAC, Plaintiff's Sherman Act §§ 1 & 2 claims are pleaded in the alternative to each other. Also, many of the points of law raised by Defendants have already been addressed in relevant footnotes in the FAC.

constitute concerted action properly subject to scrutiny under Section 1 of the Sherman Act[9]. *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1154 (9th Cir. 2003) (evidence of "signed agreements" established concerted action); *Newburger, Loeb & Co., Inc. v. Gross*, 563 F.2d 1057, 1081 (2d Cir. 1977) ("When a company interferes with free competition for one of its former employee's services, the market's ability to achieve the most economically efficient allocation of labor is impaired."). Here, the Employment Agreement is between two separate entities: Plaintiff and corporate Defendants.

### i   Defendants' Assertions Under *Copperweld* Are Only Relevant to Section 1 Claim

Under *Copperweld*, and more recently *American Needle*, the Supreme Court found that for Section 1 claims, that a corporation and its unincorporated divisions, officers, directors, and employees of the same firm are a single entity and thus incapable of conspiring with each other. However, Plaintiff's Section 1 claim does not claim a conspiracy within each named defendant; Plaintiff's claim is for the agreement between Plaintiff and Defendants. The Section 2 claim implicates the unilateral conduct of Defendants, for which *Copperweld* is inapplicable.

### ii   Non-Compete Properly Analyzed as a Horizontal Restraint

Horizontal restraints, which are restraints imposed by agreement among actual or potential "competitors on the way in which they will compete with one another" are especially problematic under the Sherman Act. *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984). Some horizontal restraints, namely, agreements among actual or potential competitors to fix prices or

---

[9] Justice Kavanaugh's concurrence in *Alston* is enlightening: "Law firms cannot conspire to cabin lawyers' salaries in the name of providing legal services out of a 'love of the law.' Hospitals cannot agree to cap nurses' income in order to create a "purer" form of helping the sick… Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Nat'l Collegiate Athletic Ass'n v. Alston,* 141 S. Ct. 2141, 2167–68 (2021).

allocate markets - are illegal *per se* because of their inherent anticompetitive tendencies. See *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).

The non-compete at issue here foreclosed both an input (in the form of labor) to competitors of Defendants, but also competition in the output market for the provision of internal medicine services in both in hospitals *and* outpatient primary care clinics. As Plaintiff was licensed and board-certified in internal medicine at the time the agreement was signed, Plaintiff was an actual or potential competitor to Defendants, who operate their own chain of primary care clinics. Since the non-compete was imposed by agreement between competitors "on the way they will compete with one another" in the future (*Bd. Of Regents*, 468 U.S. at 99), the non-compete qualifies as a "horizontal restraint[10]." *Id*. Horizontal agreements among competitors to divide customers, markets, or territories, including agreements to refrain from soliciting each other's customers, are *per se* illegal. *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46 (1990); *United States v. Topco Assocs*., 405 U.S. 596, 608-12 (1972); *Deslandes v. McDonald's USA*, LLC, No. 17-C-4857, 2018 U.S. Dist. LEXIS 105260 (N.D. Ill. June 25, 2018).

The non-compete here prevented Plaintiff from competing directly (a horizontal restriction) or through another employer (a vertical restriction). Concerted action that limits horizontal competition, even if it has some vertical elements, is properly analyzed under the frameworks applied to horizontal restraints. See *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (conspiracy among publishers and vertically related distributor to fix publisher prices,

---

[10] *Polk Bros. v. Forest City Enterprises, Inc*., 776 F.2d 185, 189 (7th Cir. 1985). ("A covenant not to compete following employment does not operate any differently from a horizontal market division among competitors—not at the time the covenant has its bite, anyway."); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.*, 630 F. Supp. 3d. 968, 988 (N.D. Ill. 2022) ("The Court finds that Plaintiffs have plausibly alleged that the non-solicitation agreements are per se unreasonable naked horizontal market allocation agreements. As pleaded, Defendants agreed to divide the market for senior-level outpatient medical care employees by agreeing not to compete for the services of particular employees—namely, those currently employed by another Defendant. It makes no difference that Defendants were dividing employees as opposed to territories, customers, or products."); see also Phillip E. Areeda *et al*., Antitrust Law ¶ 2013b (3d ed. 2007) (collecting cases).

effectuated through vertical contracts, properly analyzed as "horizontal price fixing-conspiracy");

see also *Palmer* 498 U.S. 46 (1990) (treating agreement as horizontal where it both created vertical

licensor-licensee relationship and divided market in which licensor and licensee could compete).

Here, given binding Second Circuit[11] precedent in *Apple*, *supra*, the restriction at issue

here, with both horizontal and vertical elements, is properly analyzed as a horizontal restraint;

contrary to Defendants' assertion that "the applicable law requires that the rule of reason[12] be

applied", the Court must analyze this horizontal market allocation scheme under either the *per se*

or quick look standard, as is required for a horizontal market allocation scheme. *See Arrington v.*

*Burger King Worldwide, Inc*., 47 F.4th 1247 (11th Cir. 2022). *Deslandes v. McDonald's United*

*States, LLC*, 81 F.4th 699, 704-05 (7th Cir. 2023)

### iii.    Restrictions Properly Analyzed Under Both Per Se or Truncated Rule of Reason (Quick Look) Standards

"Typically only 'horizontal' restraints . . . qualify as unreasonable per se." *Ohio v. Am.*

---

[11] Plaintiff's conclusion is supported by recent Seventh Circuit case law: "The complaint alleges that McDonald's operates many restaurants itself or through a subsidiary, and that it enforced the no-poach clause at those restaurants. This made the arrangement horizontal: workers at franchised outlets could not move to corporate outlets, or the reverse." *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699, 703 (7th Cir. 2023) (references omitted).

[12] Defendants' citation to *American Express* for the proposition that vertical restraints are subject to the rule of reason is a red herring and inapt here; as pleaded, the FAC alleges a horizontal market allocation scheme, for which analysis as a horizontal restraint under *Topco* and *Palmer* is necessary.

*Beyer Farms* related to a unique type of relationship (dual-distribution) that is not informative here; also, the relevant holding was likely superseded by *Apple*. "The district court correctly held that Beyer's only properly pleaded conspiracy allegation alleged route-swapping by Elmhurst, a milk processor and distributor, and Bartlett Dairy, Inc. a non-defendant dairy. Contrary to Beyer's argument on appeal, Beyer alleged in its complaint that Elmhurst and Bartlett were engaged in a dual-distributorship relationship, or both a vertical and horizontal relationship. Had Beyer alleged a purely horizontal relationship between Elmhurst and Bartlett, Beyer would have alleged a per se violation of § 1 of the Sherman Act. Because Beyer did not so plead, its complaint was subject to scrutiny under the rule of reason." *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.,* 35 F. App'x 29 (2d Cir. 2002)(cleaned up). The other case cited by Defendants, *Fjallraven*, also alleged an illegal dual distributor relationship and vertical coordination on intrabrand retail prices. "Where a defendant both manufactures and distributes a product, its coordination with its distributors is known as a "dual distribution" arrangement, and is evaluated as a vertical restraint under the rule of reason." *2238 Victory Corp. v. Fjallraven USA Retail, LLC,* No. 19-CV-11733 (PKC), 2021 WL 76334, at *5 (S.D.N.Y. Jan. 8, 2021). As the relationship at issue in this case is not between a product manufacturer and a distributor, but between two actual or potential competitors at the same level, *Fjallraven* and *Beyer Farms* are inapplicable. Also, neither party here is a product manufacturer or distributor.

*Express Co.,* 138 S. Ct. 2274, 2283-84 (2018). If a restraint is properly characterized as horizontal, then a court applying Section 1 will condemn it outright if it falls into a category of restraints that courts have described as *per se* unlawful. *Broad. Music, Inc. v. Columbia Broad. Sys., Inc*., 441 U.S. 1, 9 (1979). Such restraints are anticompetitive by their "nature and character" and thus fall categorically "within the purview of the statute." *Standard Oil Co. v. United States*, 221 U.S. 1, 64-65 (1911). Categorically unreasonable restraints include horizontal agreements to "allocate territories." *Topco*, 405 U.S. at 608 (1972). The restraint at issue here should be characterized as an agreement among actual or potential competitors to allocate[13] Plaintiff's labor to only Mt. Sinai facilities, to the exclusion of every outpatient clinic and office around the country.

"However, not all horizontal restraints are analyzed pursuant to the *per se* standard. Under the 'ancillary restraints' doctrine, a horizontal agreement is 'exempt from the per se rule,' and analyzed under the rule-of-reason, if it meets two requirements… These requirements are that the restraint must be (1) 'subordinate and collateral to a separate, legitimate transaction,' and (2) 'reasonably necessary' to achieving that transaction's pro-competitive purpose." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc*., 9 F.4th 1102, 1109 (9th Cir. 2021) (internal citations, quotations, references omitted). Agreements among competing employers not to hire or solicit each other's employees are *per se* unlawful unless defendants establish ancillarity[14].

---

[13] See also *In re Ry. Indus. Emp. No-Poach Antitrust Litig.,* 395 F. Supp. 3d 464 (W.D. Pa. 2019); *In re Outpatient Med. Ctr. Emp. Antitrust Litig.,* 630 F. Supp. 3d 968 (N.D. Ill. 2022)*; Rothery Storage,* 792 F.2d 224 ; *Polk Bros., Inc. v. Forest City Enters., Inc*., 776 F.2d 185 (7th Cir. 1985); *Lektro-Vend Corp. v. Vendo Co*., 660 F.2d 255, 265, 269 (7th Cir. 1981); *United States v. eBay, Inc.,* 968 F. Supp. 2d 1030 (N.D. Cal. 2013); *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699 (7th Cir. 2023)

[14] See also *In re Ry. Indus. Emp. No- Poach Antitrust Litig*., 395 F. Supp. 3d 464, 480-85 (W.D. Pa. 2019); *In re Animation Workers Antitrust Litig.,* 123 F. Supp. 3d 1175, 1211- 14 (N.D. Cal. 2015); *United States v. eBay, Inc.,* 968 F. Supp. 2d 1030, 1038-39 (N.D. Cal. 2013); *In re High-Tech Emp. Antitrust Litig.,* 856 F. Supp. 2d 1103, 1110-12, 1122 (N.D. Cal. 2012); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc*., 9 F.4th 1102, 1110 n.4 (9th Cir. 2021) (without deciding the issue, finding "considerable merit" in argument "that the per se rule applies to naked non-solicitation agreements"); *In re Geisinger Health & Evangelical Cmty. Hosp. Healthcare Workers Antitrust Litig*., No. 4:21-CV-00196, 2021 WL 5330783, at *2-4 (M.D. Pa. Nov. 16, 2021) (denying motion to dismiss *per se* claim based on "no-poach agreement"); *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699 (7th Cir. 2023).

"Naked restraints are categorically not 'ancillary[15] restraints.' Thus, naked horizontal restraints are always analyzed under the *per se* standard. A restraint is naked if it has no purpose except stifling of competition. Some examples of these restraints include agreements among actual or potential competitors to fix prices, rig bids, or divide markets." *Aya Healthcare Servs,* 9 F.4th at 1109 (9th Cir. 2021) (internal citations, quotations, references omitted) (cleaned up).

In contrast, under the rule of reason, "the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Khan*, 522 U.S. at 10.

In fact, some horizontal restraints, while not per se unlawful, have been deemed sufficiently anticompetitive that they may be condemned after a quick look, or truncated rule-of-reason analysis. *Cal. Dental Ass'n v. FTC,* 526 U.S. 756, 770 (1999); *see also Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692–96 (1978) (condemning after quick look engineering society's rule prohibiting competitive bidding); *Bd. of Regents*, 468 U.S. at 109-10; *FTC v. Ind. Fed'n of Dentists*, 476 U.S. at 459 (1986) (condemning dental association rule prohibiting members from submitting x-rays to insurers).

Even under a rule of reason analysis, Defendants' restrictions did cause an adverse impact on competition, to the extent that Defendants benefited from uncompensated on-call and flexibility by prohibiting other employment; even working just five days a month, Defendants' monopsony purchasing power deprived Plaintiff of on-call pay.

Nevertheless, federal courts typically decline at the motion to dismiss stage to resolve whether to apply the *per se*, quick look, or rule of reason analyses. *Lumber Liquidators, Inc. v.*

---

[15] Many of Plaintiff's antitrust claims have been substantially addressed in form and substance by Judge Easterbrook of the Seventh Circuit recently in *Deslandes v. McDonald's USA, LLC*. 81 F.4th 699 (7th Cir. 2023).

*Cabinets To Go, LLC*, 415 F. Supp. 3d 703 (E.D. Va. 2019); *United States v. eBay, Inc.,* 968 F. Supp. 2d 1030 (N.D. Cal. 2013).

To the extent that Defendants claim that Plaintiff lacks sufficient injury, the FAC sets forth injury that Plaintiff did suffer; Plaintiff also seeks a declaratory judgment to prevent the terms from being imposed on Plaintiff again; Plaintiff would be entitled to reinstatement under the NYLL and FLSA claims. However, Defendants appear to fundamentally misunderstand and conflate antitrust injury and antitrust standing.

Antitrust standing is generally considered to weigh both antitrust injury and whether the plaintiff is an efficient enforcer[16]. Antitrust injury describes "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Platinum & Palladium Antitrust Litig*., 61 F.4th 242, 258 (2d Cir. 2023) quoting *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC (Schwab II),* 22 F.4th 103, 115 (2d Cir. 2021). In conducting this analysis, the court assumes the antitrust violation occurred and then considers the aforementioned factors. *Pulse Network, L.L.C. v. Visa, Inc.,* 30 F.4th 480, 488 (5th Cir. 2022).

Here, in applying the three-step process set forth in *Henry Bath*[17] for determining whether Plaintiff has sufficiently alleged antitrust injury[18], the Court will likely find that Plaintiff was in fact injured[19].

---

[16] Factors courts look at to determine whether a plaintiff is an efficient enforcer are: "(1) the directness or indirectness of the asserted injury; (2) the existence of more direct victims or the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the extent to which the claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." *In re Platinum* at 258 *quoting In re Am. Express Anti-Steering Rules Antitrust Litig*., 19 F.4th 127, 138 (2d Cir. 2021).

[17] *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86 (2d Cir. 2019)

[18] *Compare United States v. Aiyer,* 33 F.4th 97, 119 (2d Cir. 2022) ("no need" for courts "to consider 'demonstrable economic effect[s]'" when evaluating *per se* conduct in light of its "inherent" anticompetitive potential).

[19] See also *Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 988–89 (9th Cir. 2000) ("Most courts understand that a buying cartel's low buying prices are illegal and bring antitrust injury and standing to the victimized suppliers."); *United States v. Brown,* 936 F.2d 1042, 1045 (9th Cir. 1991) (market allocation by billboard advertising companies of an input, billboard sites, was per se illegal); *Penn Allegheny Health Sys. v. UPMC,* 627 F.3d 85, 105

First, Plaintiff has identified the illegal practices *supra*. Plaintiff was in a worse position, such that he was foreclosed[20] from obtaining employment or practicing medicine outside the Mt. Sinai system, even though he would only work a few days a month and would have more availability than what could be scheduled at Mt. Sinai. Plaintiff was also caused to suffer otherwise lower wages[21], when other Mt. Sinai physicians were foreclosed from offering to supply their labor to other competing health systems, decreasing competitive pressures[22] on Mt. Sinai to raise wages; in an era of shortages of healthcare workers, the non-compete also had the effect of decreasing the supply[23] of physician healthcare services, leading to decreased availability of healthcare to Americans, especially in areas with severe shortages[24] of healthcare workers. Moreover, to the extent that Plaintiff is a competitor to Defendants, and that Plaintiff was foreclosed from the

---

(3d Cir. 2010) (defendants' contention that a buyer exercising monopsony power is permissible because it lowers prices for downstream consumers "reflects a basic misunderstanding of the antitrust laws").

[20] "It must be remembered that while exclusive-dealing agreements are both "vertical" and "bilateral," they are also fundamentally exclusionary practices akin to monopolization. Unlike resale price maintenance or territorial restraints, exclusive dealing is not typically solicited by rivals. Further, the principal harm is exclusion of rivals." Phillip Arreda *et al.* Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) ¶ 1821

[21] Compare *U.S. v. Apple, Inc*., 791 F.3d 290, 328 (2d Cir. 2015) ("[A]ny conspiracy formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity ... is illegal per se, and the precise machinery employed ... is immaterial."); *Gelboim v. Bank of America Corp*., 823 F.3d 759, 771–72 (2d Cir. 2016) ("[T]he fixing of a component of price violates the antitrust laws. ... Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type of the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."); *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023) ("One problem with this approach is that it treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing). That's not right; it is equivalent to saying that antitrust law is unconcerned with competition in the markets for inputs, and *Alston* establishes otherwise.").

[22] Defendants' reference to *Tops Markets* is perplexing, as the Circuit Court was referring to the effects of the allegedly illegal agreement on competition in the market manifest as an adverse effect, like reduced output, not on injury to any one market participant, and was only in the context of a rule of reason analysis of a Section 2 claim. Also, the broad strokes Defendants draw in rejecting Plaintiff's arguments presented in the setting of post-employment non-competes is mere dicta, and in the process conflates several major areas of antitrust law. Finally, there is no such thing as "a rule of reason violation."

[23] Compare *Vazquez-Ramos v. Triple-S Salud, Inc.*, 55 F.4th 286, 295 (1st Cir. 2022) ("For these reasons, among others, the allegations that the exclusive dealing arrangement harmed patients do not provide a basis for denying standing to plaintiffs [competing doctors]."); *Oltz v. Saint Peter's Cmty. Hosp*., 861 F.2d 1440, 1447 (9th Cir. 1988) ("Our conclusion that injury to competition could exist in either the job market for anesthesia service positions or the patient market for anesthesia care is supported by *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*…")

[24] Compare *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010)

market, Plaintiff has standing[25]. Nevertheless, remarkably similar claims were addressed by the Seventh Circuit recently in *McDonalds* in the context of employment restrictions. *Deslandes v. McDonald's United States,* LLC, 81 F.4th 699 (7th Cir. 2023).

### D. Complaint States a Viable Sherman Act Section 2 Claim

As is required for a Section 2 claim[26], Plaintiff defined the relevant product market and geographic market in the FAC. Thereafter, in general, plaintiffs must demonstrate that the defendant had market power in that market, which is the ability to profitably raise prices (or lower them for a monopsonist[27] as is Defendants) above (or below) what would be charged (paid) in a competitive market. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents,* 468 U.S. 85, 109 n.38 (1984). Market share is a non-dispositive indicator of market power (*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 26-29 (1984)); while a market share under 30% frequently means a defendant does not have requisite market power, when other relevant factors are considered, courts have found sufficient market power in firms with less than 30% market share. Within broadly defined product markets, "well-defined submarkets may exist" which themselves "constitute product markets for antitrust purposes," and whose boundaries are "determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United*

---

[25] *Vazquez-Ramos v. Triple-S Salud, Inc.,* 55 F.4th 286 (1st Cir. 2022) (Urologists and urology practices alleged an antitrust injury as result of exclusive dealing arrangement between government-run healthcare plan insurer and competitor urology network sufficient to have standing to bring private causes of action for violations of federal antitrust law, where urologists and practices alleged that during time period covered by the exclusive dealing agreement, they were excluded from competing in the alleged market of patients insured by insurer.)
[26] No demonstration of market power is necessary for Plaintiff's Section 1 claim. "The complaint alleges a horizontal restraint, and market power is not essential to antitrust claims involving naked agreements among competitors." *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699, 703 (7th Cir. 2023)
[27] "[T]he antitrust laws prohibit monopsonies, just as they prohibit monopolies." *Deslandes v. McDonald's USA, LLC,* 81 F.4th 699, 702 (7th Cir. 2023) referencing *NCAA v. Alston,* 141 S. Ct. 2141 (2021).

*States*, 370 U.S. 294, 325 (1962).

Here, Plaintiff alleged, *inter alia*, that Defendants have a 39% market share in the Manhattan adult medical/surgical inpatient market. This itself is a relevant and sufficiently-sized submarket, enough to cross the low hurdle at the pleading stage. Nonetheless, market share alone is not dispositive, and Courts consider other factors. Here, there are extremely high barriers to entry[28], such that hardly anyone would be able to enter the Manhattan inpatient hospital market due to both very high capital needs, extended time required for new entrants[29] to enter the market, and government licensing requirements. Also of relevance, Defendants have not elucidated any pro-competitive[30] justifications for the restraint. Nevertheless, Courts have found that a market share "less than 30 percent would not, in any event, foreclose the possibility that the Individual Plaintiffs may succeed on their Section 2 claims. That is because market share and monopoly power are not the same thing; the former is merely evidence of the latter." *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 562 F. Supp. 2d 392, 400 (E.D.N.Y. 2008); see also *M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp.*, 981 F.2d 160, 166 (4th Cir. 1992).

Nonetheless, at the pleading stage, Plaintiff must only allege facts that plausibly delineate a relevant market; as set forth in the FAC, Plaintiff has done[31] so. Courts are lenient toward Section

---

[28] Compare *United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y.), modified, 183 F. Supp. 2d 613 (S.D.N.Y. 2001), and aff'd, 344 F.3d 229 (2d Cir. 2003), and aff'd, 344 F.3d 229 (2d Cir. 2003); *Kelco Disposal Inc. v. Browning–Ferris Indus. of Vermont, Inc.*, 845 F.2d 404, 408 (2d Cir.1988); *Fineman v. Armstrong World Indus.*, 980 F.2d 171, 201–203 (3d Cir. 1992); *Fed. Trade Comm'n v. Facebook, Inc.*, 581 F. Supp. 3d 34 (D.D.C. 2022).
[29] *Am. President Lines, LLC v. Matson, Inc.*, 633 F. Supp. 3d 209 (D.D.C. 2022)
[30] "Conduct that intentionally, significantly, and without business justification excludes a potential competitor from outlets (even though not in the relevant market), where access to those outlets is a necessary though not sufficient condition to waging a challenge to a monopolist and fear of the challenge prompts the conduct, is "anticompetitive." *LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) quoting Eleanor M. Fox, What Is Harm to Competition? Exclusionary Practices and Anticompetitive Effect, 70 Antitrust L. J. 371, 390 (2002).
[31] Compare *Le v. Zuffa, LLC*, No. 2:15-CV-01045-RFB-BNW, 2023 WL 5085064 (D. Nev. Aug. 9, 2023) (Certifying class of UFC fighters in suit against UFC for violating Sec. 2, alleging monopolization, including exclusive dealing). The exclusive dealing claims in *Zuffa* are notably similar to Plaintiff's claims herein.

2[32] claims that lack precise market details at the complaint[33] stage; "Consistent with *Twombly*, which declined to 'require heightened fact pleading of specifics,' we do not require that the plaintiffs provide precise figures and calculations at the pleading stage. Requiring such a high burden[34] would impose a nearly insurmountable bar for plaintiffs at the pleading stage because very precise and particularized estimates of fair value and anticipated litigation costs may require evidence in the exclusive possession of the defendants, as well as expert analysis." *In re Loestrin 24 Fe Antitrust Litig*., 814 F.3d 538, 552 (1st Cir. 2016) (internal citations, quotations omitted)(cleaned up); see also *Morales-Villalobos v. García-Lloréns*, 316 F.3d 51, 55 (1st Cir. 2003) ("[T]he matter [of market definition] cannot be resolved on the face of the complaint" because defining the relevant geographic market "depends on circumstances"); see also *George*

---

[32] This discussion of market power and market share are only relevant to the Section 2 claim. Section 1 claims for horizontal market allocation do not require any analysis of the market; restraints subject to the per se rule are "unlawful on [their] face." *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 50 (1990*); NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (holding that the per se rule "do[es] not require proof that an agreement . . . is, in fact, anticompetitive in the particular circumstances"). Although not cited by Defendants in their papers, *Bogan* could be easily misread; the Second Circuit did not declare in *Bogan* that a market analysis is necessary in all per se cases; it was made in the context of analyzing a group-boycott claim, and that not all group boycotts are per se illegal; but if in expanding the universe of novel per se cases, an analysis of the market, in order to determine competitive harms, might be necessary. *Bogan v. Hodgkins,* 166 F.3d 509 (2d Cir. 1999); see discussion in *Bennett v. Cardinal Health Marmac Distribs., Inc*., No. 02-cv-3095 (JG), 2003 WL 21738604 (E.D.N.Y. July 14, 2003); *United States v. Patel*, No. 3:21-CR-220 (VAB), 2022 WL 17404509 (D. Conn. Dec. 2, 2022)

[33] Defendants' obtuse claim that since Plaintiff was able to find a higher paying job, Plaintiff was not caused to suffer harm from the wrongful activities set forth in the FAC, fundamentally misconceives the nature and type of injury that results from exclusive dealing, which is somewhat different than other antitrust claims. "Where the circumstances are such as to warrant a jury in finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement, the conclusion that a conspiracy is established is justified. Neither proof of exertion of the power to exclude nor proof of actual exclusion of existing or potential competitors is essential to sustain a charge of monopolization under the Sherman Act… A combination may be one in restraint of interstate trade or commerce or to monopolize a part of such trade or commerce in violation of the Sherman Act, although such restraint or monopoly may not have been actually attempted to any harmful extent… It is not necessary that the power thus obtained should be exercised. Its existence is sufficient." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810, (1946) (cleaned up). See also *LePage's, Inc. v. 3M*, 324 F.3d 141, 159 (3d Cir. 2003) ("When a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general. It has been recognized, albeit in a somewhat different context, that even the foreclosure of "one significant competitor" from the market may lead to higher prices and reduced output."); see also *United States v. Dentsply Int'l, Inc*., 399 F.3d 181 (3d Cir. 2005)

[34] Compare "Once a complaint has identified a plausible antitrust claim, further development requires discovery, economic analysis, and potentially a trial." *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 705 (7th Cir. 2023)

*Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir. 1998) ("In antitrust cases in particular, the Supreme Court has stated that 'dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.'") (quoting *Hospital Building Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976)).

### E. Defendants Failed to Pay Plaintiff All Wages Due

### A.   i - Plaintiff Stated a Claim under the FLSA for Rounding, Not Gap Time

Count I of the FAC was for impermissible rounding under the FLSA, not gap time. As alleged in the FAC (paragraph 49), Plaintiff's direct supervisor told Plaintiff by email that he was expected to perform at least 15 minutes of work before his scheduled shift, off the clock without compensation; "Our oncoming doctors usually come 15 min early so they don't hold up the next person from leaving- and that 15 min is considered part of the comp either as FT or as a per diem… If the time to handoff is not covered please let me know if you want to proceed with taking shifts because I need to make contingency plans."

Federal regulation allows rounding "provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked." 29 C.F.R. § 785.48(b). Courts in the Second Circuit have allowed rounding claims under the FLSA when they result "over a period of time, in a failure to compensate their employees properly for all the time they actually worked." *Canales v. World Pizza, Inc.*, No. 14 Civ. 7748, 2017 WL 1233998 (S.D.N.Y. Mar. 31, 2017); see also *Montiel-Flores v. JVK Operations Ltd.*, No. 19-CV-3005 (JS)(SIL), 2023 WL 5979209 (E.D.N.Y. Aug. 1, 2023), R & R adopted, 2023 WL 6057375. The rounding policy required by Defendants was not facially neutral – employees were expected to come in at least 15 minutes early every shift; "rounding policies that on average, favor neither overpayment nor underpayment of wages are permissible, while

those that systematically undercompensate employees are unlawful." *Boone v. PrimeFlight Aviation Servs., Inc.,* No. 15-CV-6077(JMA)(ARL), 2018 WL 1189338 (E.D.N.Y. Feb. 20, 2018), R & R adopted, 2018 WL 1187402.

In any event, in Count II of the FAC, Plaintiff alleges unpaid straight time/gap time under NYLL §§ 198 & 663[35]; Defendants do not object to the unpaid gap time claim under NYLL.

### B.  ii – Plaintiff's Work is Compensable

By Defendant's own motion, Plaintiff has not been compensated for at least one hour; on this basis alone, Plaintiff's claim should not be dismissed. Nonetheless, given that the wage statements provided by Defendants (*see* Exhibit A, FAC) do not identify which periods of work were actually paid, what Defendants have actually paid Plaintiff is an issue of fact. Further, whether any specifically claimed time is compensable is a mixed question of law[36] and fact; in the absence of a developed factual record, with details of what work was done during each period, it would be premature for the Court to determine whether any claimed period of time is non-compensable.

The contours of what is compensable work as suggested by Defendants is wrongfully narrow. Under the FLSA, "Employ" includes to suffer or permit to work. 29 U.S.C.A. § 203. Department of Labor regulations further specify: "Work not requested but suffered or permitted is work time. For example, an employee may voluntarily continue to work at the end of the shift… [H]e may desire to finish an assigned task or he may wish to correct errors, paste work tickets, prepare time reports or other records. The reason is immaterial. The employer knows or has reason

---

[35] Defendants' assertion that Plaintiff brought a gap time claim under the FLSA is a strawman. Plaintiff did not plead a gap time claim under the FLSA, only under the NYLL (Count 2 of the FAC). The Second Circuit held in *Lundy* that the FLSA does not cover pure gap-time (non-overtime hours worked for which an employee is not compensated because an employee has a sufficiently high hourly rate, when all compensated and non-compensated hours are divided into the weekly pay, the employee's average hourly pay still exceeds the FLSA minimum).

[36] "The question of whether a particular set of facts and circumstances constitutes work under the FLSA is a question of law… It is for the court to determine if a set of facts gives rise to liability; it is for the jury to determine if those facts exist." *Dade Cnty., Fla. v. Alvarez*, 124 F.3d 1380, 1383 (11th Cir. 1997) (cleaned up).

to believe that he is continuing to work and the time is working time." 29 C.F.R. § 785.11. Moreover, time spent "adjusting grievances" is compensable under many situations, pursuant to 29 C.F.R. § 785.42, though the exact contours of what qualifies is not clearly delineated by the courts. *See Wetzel v. Town of Orangetown*, No. 06-CIV-15190(LAP), 2013 WL 1120026 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 556 F. App'x 46 (2d Cir. 2014); *DeBraska v. City of Milwaukee*, 189 F.3d 650 (7th Cir. 1999).

Here, Defendants had reason to believe that Plaintiff was working – Plaintiff sent Defendants emails[37] outside his scheduled shifts and was adjusting grievances thereof. Furthermore, as Plaintiff was not explicitly barred from doing work (such as sending emails), Defendants must compensate him, even in the absence of affirmative authorization. 29 C.F.R. § 785.11.

### C.  iii - Defendants' Ad Hominem Attack on Plaintiff

Instead of making substantive arguments about the applicable law as applied to Plaintiff's factual allegation as set forth in the FAC, Defendants in this section make an unprofessional *ad*

---

[37] Compare *Allen v. City of Chicago*, 865 F.3d 936 (7th Cir. 2017) (Some current and former members of the Chicago Police Department's Bureau of Organized Crime claimed that the Bureau did not compensate them for work they did off-duty on their mobile electronic devices (BlackBerrys). The Court found that some of the off-duty work was compensable, but the Bureau did not prevent plaintiffs from requesting payment for such non-scheduled overtime work and did not know that plaintiffs were not being paid for it).

*hominem* attack on Plaintiff, with inchoate allusions to perjury[38], and lodge trivial objections[39] (hair splitting) that the Court should not entertain. Nonetheless, for purposes of a motion to dismiss, Plaintiff's claims must be accepted as true; Defendants' concerns would be better addressed after the development of a factual record[40]. As reviewed in other places in this brief, since Defendants' non-compliant wage statements do not specify what time (dates/hours) was paid, Plaintiff lacks sufficient information to form a belief as to whether he was actually paid for the 30 minutes of time under dispute, as well as for other days of work.

### F. – Plaintiff Has Stated a Viable Claim for Retaliation Under FLSA/NYLL

Defendants materially misstate the standard for evaluating retaliation under the FLSA/NYLL. Courts apply the familiar *McDonnell Douglas* burden-shifting[41] test. "An employment action

---

[38] Plaintiff wonders if this allusion to perjury, combined with the requests for attorneys' fees (see n. 1), are part of a misguided attempt to wrongfully intimidate, silence, and dissuade Plaintiff from pursuing what are plausible, if not meritorious, claims in court, consistent with a long-standing pattern of retaliatory actions by Mt. Sinai; the Court is asked to take notice of the full text of the *New York* magazine article incorporated by reference in n. 4 of the FAC, which describes a culture of retaliation at Mt. Sinai, where fear of "career-damaging retribution" is pervasive, not for the truth of the matters asserted therein, but for impact the article has in reifying Plaintiff's fear of retaliation. See fn. 1. "In addition to considering the Plaintiff's complaint, the Court may consider documents that are referenced in the complaint, documents that the plaintiffs relied on in bringing suit… or matters of which judicial notice may be taken." *Mockingbird 38, LLC v. Int'l Bus. Times, Inc.*, No. 21-cv-283 (LJL), 2022 U.S. Dist. LEXIS 8721, at *6-7 (S.D.N.Y. Jan. 18, 2022) (citations, references omitted) (cleaned up); *Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 426 (2d Cir. 2008) ("[M]atters judicially noticed by the District Court are not considered matters outside the pleadings."); *Davis v. HSBC Bank Nevada, N.A.,* 691 F.3d 1152, 1160 (9th Cir. 2012). Furthermore, Plaintiff respectfully asks that the Court consider striking Defendants' scandalous statement under its inherent authority, as it impugns the Plaintiff's character, and implies that Plaintiff is engaging in criminal activity. *G-I Holdings v. Baron & Budd,* 238 F. Supp. 2d 521, 555 (S.D.N.Y. 2002) (Courts will strike allegations that have "criminal overtones"); see also *Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019); *Bartlett v. SAL*, No. 19-CV-7 (CBA) (TAM), 2021 U.S. Dist. LEXIS 258420 (E.D.N.Y. Aug. 5, 2021); *In re NASDAQ Mkt.-Makers Antitrust Litig*., 164 F.R.D. 346, 349 (S.D.N.Y. 1996) ("A court has inherent authority to strike any filed paper which it determines to be abusive or otherwise improper under the circumstances.").

[39] "Because [plaintiff] is a *pro se* litigant, we read his supporting papers liberally, and will interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)

[40] *Arguendo*, even if Plaintiff had physically left at 4:30pm, Plaintiff was still on-call and responsible for his patients till 5pm, including calls and messages from nursing staff and critical laboratory results. Moreover, evidence that Plaintiff was doing work between 4:30 – 5 pm, namely metadata from the Epic electronic health record showing that Plaintiff was logged into the EMR system reviewing patient charts and entering orders, is within the exclusive control of Defendants at this time (pending discovery).

[41] "[A] plaintiff alleging retaliation under FLSA must first establish a prima facie case of retaliation by showing: (1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010).

disadvantages an employee if it well might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s]....'" *Mullins* quoting *Burlington N. & Santa Fe Ry. Co. v. White*[42], 548 U.S. 53, 68 (2006). Further, "a causal connection between an adverse action and a plaintiff's protected activity may be established through evidence of retaliatory animus directed against a plaintiff by the defendant or by showing that the protected activity was closely followed in time by the adverse action." *Mullins* at 53 (cleaned up). Adverse action "must be sufficiently harmful ... that it could well dissuade a reasonable worker from engaging in protected activity. Along with reductions in pay or benefits, a hostile work environment may constitute adverse action." *Wilson v. New York & Presbyterian Hosp.*, No. 21-1971-CV, 2022 WL 17587564, at *2 (2d Cir. Dec. 13, 2022) (internal citations, quotations, references omitted); see also *Shultz v. Congregation Shearith Israel of City of New York*, 867 F.3d 298, 309 (2d Cir. 2017). "Causation in a retaliation claim can be shown either directly or through circumstantial evidence, usually when the adverse action followed soon after the protected activity." *Wilson* at *2.

As set forth in the FAC, Plaintiff demonstrated that Plaintiff engaged in activity protected[43] under the FLSA, when Plaintiff questioned his direct supervisor, defendant Dr. Kathy Navid ("Dr. Navid"), the Chair of the Department of Medicine, why she refused to sign off on Plaintiff's timesheet reflecting work done after Plaintiff's scheduled shift (FAC 43 – 50). Soon thereafter, Plaintiff questioned Dr. Navid's pronouncement that Mt. Sinai does not compensate for work that hourly employees do after their scheduled shift, such that employees are expected to do work off the clock (FAC 49), and that if Plaintiff expected to be compensated for all time worked, he should find a new job.

---

[42] *White* also approvingly quotes an earlier Supreme Court case for the proposition that the "purpose of the antiretaliation provision is to ensure that employees are 'completely free from coercion against reporting' unlawful practices." *White* quoting *NLRB v. Scrivener*, 405 U.S. 117, 121–122 (1972).
[43] Cf. *Kassman v. KPMG* LLP, 925 F. Supp. 2d 453 (S.D.N.Y. 2013) (discussing examples of protected activity.)

Plaintiff suffered adverse action (as defined for the FLSA/NYLL) when immediately (6 minutes) after following up previous emails questioning illegal and wrongful Mt. Sinai wage and hour policies, Plaintiff was accused of violating corporate policy by leaving work 30 minutes early on a different day (when Defendants were aware of the alleged violation several weeks prior, and had not objected), and having lied and violated corporate policy when Plaintiff claimed the entire scheduled shift on his timesheet. (FAC 57; see also n. 6 in FAC).

In retaliation, Dr. Navid imposed new timekeeping requirements on Plaintiff ("I don't usually track people by the minute like this but we will need to have you sign in and hour on your time here."). *Id*. Less than one hour later, Plaintiff responded by complaining that he was being retaliated against for objecting to a possible FLSA violation and demanded that the retaliation cease. (FAC 58). Instead of recognizing and reversing the wrongful actions, over the next 24 hours, Dr. Navid instead colluded with senior administrators at Mt. Sinai to conjure up contrived pretextual justifications to terminate Plaintiff; Dr. Navid wrote to senior administrators "This isn't worth it even with the desperate situation. How can I proceed here?... The PAs complained about how he is intimidating to them and it's already such a difficult job for them. The quality of his work is fair at best. I need legal assistance to cut ties as this email seems like a good opportunity." FAC 67.

Defendant Associate Dean Jones-Winter ("Dean Jones-Winter") thought so little of Plaintiff, and of Plaintiff's efforts to uphold his rights under law[44], that she wrote to the secretary for Dr. Navid: "Weller's choice to engage in extended antagonistic emails and research legal language to support this was his own choice. You should absolutely not entertain this." FAC 73. Dean Jones-Winter also remarked to an HR colleague, referring derisively to Plaintiff's efforts to

---

[44] Jones-Winter is a New York-licensed attorney, and thus should have had a greater awareness and appreciation for an individual's rights under the law. However, see footnote 5 in FAC.

advocate for his federally-protected rights, "The attending who is also now a 2L." FAC 69.

As described in the previous paragraph, Defendants did take adverse action against Plaintiff such that it would tend to dissuade a reasonable person from reporting wage and hour concerns, when Defendants accused Plaintiff of making a false entry on a timesheet, violating corporate policy, and imposed on Plaintiff new, extraordinary, and burdensome timekeeping obligations not required of others, all immediately after lodging a reasonable complaint. Furthermore, Plaintiff has presented direct evidence of retaliatory animus against Plaintiff.

Cases cited by Defendants are not applicable in this case. In *Sealy*, the plaintiff had not presented any direct evidence of retaliatory animus, unlike Plaintiff here; in *Sealy*, where the plaintiff alleged that the employer assigned another "employee to 'watch over' Sealy as he removed toilets from a bathroom," plaintiff had not alleged any cognizable harm thereof; here, Plaintiff was wrongfully accused of lying on a timesheet and made to use a new, onerous timekeeping systems not required of other employees. Similarly, Defendant's reference to *Jaeger* is inapposite, as it related to a Title VII claim, and only complained of everyday workplace[45] grievances, disappointments and setbacks. *Jaeger v. N. Babylon Union Free Sch. Dist.,* 191 F. Supp. 3d 215 (E.D.N.Y. 2016).

To the extent that Defendants claim that Plaintiff was not actually docked pay (and not "disadvantaged" by any employment actions) because the 30 minutes of compensation due for staying late on November 6 offset the 30 minutes from when Plaintiff allegedly left early on November 4, the Court should find this argument to be a specious red herring, as it presupposes

---

[45] Finding that alleged series of minor indignities, which male high school teacher found to be personally offensive, including being placed under heightened scrutiny, having his attendance monitored more closely, being criticized by school district officials for having a "bad year," and being the subject of a meeting to discuss his emotional stability, were not "adverse employment actions" that could form a basis of Title VII  claim of gender discrimination, where the indignities had no discernible effect on material terms and conditions of his employment.

and reifies Defendants' incorrect assertion (logical fallacy of denying the antecedent) that Plaintiff did not work the entire shift on November 4 - a factual dispute; nonetheless, these types of actions fall squarely under the penumbra of protection afforded under the NYLL[46] retaliation statute; a reasonable employee would certainly think twice before lodging a protected complaint if, immediately thereafter, she would be accused of violating other corporate policies, lying in official records, and thereafter be subject to attempts to be terminated under blatantly pretextual pretenses.

### G. Plaintiff Has Standing To Bring a NYLL § 195 Claim

Frankly, Plaintiff is perplexed by Defendants' reasoning on the bottom half of page 15[47] of Defendants' Brief. Nonetheless, the wage statements do not comply with the requirements of the NYLL § 195 (requiring statements "contain rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary… gross wages…") Moreover, Defendants failure to include all hours worked on Plaintiff's wage statements render them incorrect, and thus violate NYLL § 195(3). *Copper v. Cavalry Staffing, LLC*, 132 F. Supp. 3d 460, 468 (E.D.N.Y. 2015). Furthermore, Plaintiff stated that he was caused to suffer tangible injury "manifest as ambiguity, confusion, inability and difficulty in reconciling timesheets with wage statements, inability to reconcile claimed time with time actually compensated, difficulty in making expostulations to Defendants of underpayment of wages." FAC 94, 138. These types of informational injuries are sufficient to

---

[46] "No employer or his or her agent… or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer… or any other person, that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…"N.Y. Lab. Law § 215

[47] "As a preliminary matter, the wage statements contained both Plaintiff's rate of pay ($150.00 an hour) and the total pay. Am. Compl. Ex. A. As a result, Plaintiff could not have suffered any tangible injury because all he needed to do was divide the total gross pay by his rate of pay to find out how many hours for which he was paid."

To clarify, Plaintiff was paid a different rate for working overnights & weekends (and in fact had worked such shifts); attempting to solve for hours worked when there is one dependent variable (total wages) and two independent variables (DaytimeHours*DaytimeRate; OvernightHours*OvernightRate) is impossible by using algebra and other known mathematical tools; Plaintiff could develop a function to model the potential values, but not determine a sum certain; Plaintiff's wage statements did not differentiate daytime hours from overnight hours.

satisfy Article III's requirement for injury in fact sufficient to have standing under *TransUnion* and *Lujan*. *See Stih v. Rockaway Farmers Mkt., Inc.,* No. 22-CV-3228 (ARR)(RER), 2023 WL 2760492 (E.D.N.Y. Apr. 3, 2023); *Cuchimaque v. A. Ochoa Concrete Corp.*, No. 22-CV-6136 (RPK)(RML), 2023 WL 5152336 (E.D.N.Y. July 18, 2023), adopted by order, (E.D.N.Y. Aug. 23, 2023).

Defendants' reference to *Pie Chatach* is unavailing, as it alleged[48] inchoate injury; *Chen* is not relevant, as plaintiff in that case made [49] vague allegations; *Shi* was at summary judgment, and the plaintiff had not asserted an[50] informational injury, unlike here[51].

## II.   CONCLUSIONS

For all the foregoing reasons, Defendants' Motion to Dismiss the First Amended Complaint and for imposition of attorneys' fees should be denied.

---

[48] "Plaintiff has advanced a theory to show how defendants' failure to provide a time-of-hire notice and wage statements caused him to sustain concrete harm. He reasons that if defendants had given him the notice and wage statements, that notice and those statements would have informed him that he was not being paid overtime. Enlightened by that knowledge, plaintiff then would have demanded his overtime. Having made such a demand, defendants would have then paid him his overtime, and plaintiff would have avoided the injury he suffered by the failure to pay overtime. Based on the assumption that had these things happened, he would have been paid overtime, plaintiff argues that he was also deprived of the time value of money." *Melgar v. Pie Chatach 1776 LLC,* No. 23-CV-917 (BMC), 2023 WL 2868299, at *1 (E.D.N.Y. Apr. 10, 2023)

[49] "Vague allegations that Defendants' violations facilitated their other unlawful conduct do not give rise to a cognizable downstream consequence…" *Chen v. Lilis 200 W. 57th Corp.,* No. 19-CV-7654 (VEC), 2023 WL 2388728, at *8 (S.D.N.Y. Mar. 7, 2023)(cleaned up).

[50] "Plaintiff fails to allege an injury in fact sufficient to confer standing. First, Plaintiff's claimed monetary harm is purely hypothetical. He explains that Defendants' lack of notice "facilitated" the underpayments at the heart of this case and should have prevented them from claiming a tip credit... Nor has Plaintiff identified an informational injury with consequences beyond this lawsuit." *Shi v. TL & CG Inc.*, No. 19-CV-08502 (SN), 2022 WL 2669156, at *9 (S.D.N.Y. July 11, 2022)

[51] It appears that Defendants move under FRCP 12(b)(1) to dismiss the NYLL wage statements claim for failure to sufficiently establish Article III standing. *Alemu v. Department of For-Hire Vehicles,* 327 F. Supp. 3d 29 (D.D.C. 2018) (A motion to dismiss for lack of standing and ripeness constitute a motion to dismiss for lack of subject matter jurisdiction under the Federal Rules of Civil Procedure, because both defects are defects in subject-matter jurisdiction). "Motions under Rule 12(b)(1) fall into two different categories: a facial or a factual attack on jurisdiction. A facial attack challenges subject matter jurisdiction without disputing the facts alleged in the complaint and requires the court to treat the allegations of the complaint as true. A factual challenge attacks the factual allegations underlying the assertion of jurisdiction, either through the filing of an answer or otherwise presenting competing facts." § 1350 Motions to Dismiss—Lack of Jurisdiction Over the Subject Matter, 5B Fed. Prac. & Proc. Civ. § 1350 (3d ed.). Defendants do not state whether their objection is facial or factual; however, Plaintiff construes Defendants' motion as a facial challenge. However, Plaintiff has plead cognizable injuries sufficient to establish Article III standing; "If the jurisdictional allegations of the complaint are complete, uncontradicted, and sufficient, the district court must overrule a Rule 12(b)(1) motion directed merely at the language of the pleading and allow the action to proceed." *Id.*