UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
ALEXANDER S. WELLER, MD,

                Plaintiff,

       - against -

ICAHN SCHOOL OF MEDICINE AT
MOUNT SINAI, KATHY NAVID, MD,
DENNIS CHARNEY, MD, CLARISSA
JONES-WINTER, MOUNT SINAI HEALTH
SYSTEM, INC., THE MOUNT SINAI
HOSPITAL INC.,

                Defendants.
-------------------------------------------------------x

**MEMORANDUM & ORDER**
23-CV-4775 (PKC) (LB)

PAMELA K. CHEN, United States District Judge:

       Plaintiff Alexander S. Weller, MD ("Plaintiff" or "Weller") brings this *pro se* action against Defendants Icahn School of Medicine at Mount Sinai ("ISMMS"), Mount Sinai Health System, Inc., and the Mount Sinai Hospital Inc. (collectively, "Mount Sinai" or "Mount Sinai Defendants"), Kathy Navid, MD ("Navid"), Dennis Charney, MD ("Charney"), and Clarissa Jones-Winter ("Jones-Winter"), (together with Mount Sinai Defendants, "Defendants"), for alleged violations of the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), the Sherman Act, and New York common law. Pending before the Court is Defendants' motion to dismiss the Amended Complaint in its entirety pursuant to Federal Rules of Civil Procedure ("Rule") 12(b)(1) and 12(b)(6). For the reasons stated herein, Defendants' motion to dismiss is granted in part and denied in part.

# BACKGROUND

## I.    Factual Background[1]

Defendant Mount Sinai Health System, Inc. is a "domestic not-for-profit corporation," and the "parent of an integrated health care system" which encompasses New York City medical school Defendant ISMMS and nine New York City hospital campuses, including Defendant Mount Sinai Hospital Inc. (hereinafter, "Mount Sinai Queens").[2]  (Am. Compl., Dkt. 18 ("Am. Compl."), ¶¶ 11–13.)

Defendant Charney is the Dean of ISMMS and the President for Academic Affairs at Mount Sinai Health System, Inc.  (*Id.* ¶ 13.)  Defendant Navid is the Chief of Medicine and Director of the Hospital Medicine Service at Mount Sinai Queens as well as an Associate Professor of Medicine.  (*Id.* ¶ 14.)  Defendant Jones-Winter is the Associate Dean for Faculty, Staff, and Trainee Relations at ISMMS.  (*Id.* ¶ 15.)

---

[1] The following facts are derived from Plaintiff's Amended Complaint and the exhibits attached thereto, (*see* Am. Compl., Dkt. 18), as well as Plaintiff's Employment Contract with Mount Sinai, which is attached as Exhibit A to Plaintiff's original Complaint, (*see* Dkt 1 at ECF 39–48), and the Court deems to be incorporated by reference in the Amended Complaint.  *See TileBar v. Glazzio Tiles*, No. 22-CV-3823 (PKC) (RML), 2024 WL 1186567, at *11 (E.D.N.Y. Mar. 15, 2024) ("[On a Rule 12(b)(6) motion,] in addition to the facts alleged in the complaint, the court may also consider documents that are appended to the complaint, incorporated in the complaint by reference, or integral to the complaint, as well as matters of which judicial notice may be taken." (citing *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558–59 (2d Cir. 2016))).  The Court "accept[s] all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in [P]laintiff's favor." *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 53 (2d Cir. 2022) (quoting *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010)).  Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[2] It appears from both parties' filings that Defendant "Mount Sinai Hospital Inc." specifically refers to the Mount Sinai Hospital in Astoria, New York, where Plaintiff worked. (*See* Dkt. 10 at 1; Am. Compl., Dkt. 18, ¶¶ 14, 21.)

### A.    Plaintiff's Employment Contract with Mount Sinai

In October 2022, Mount Sinai offered Plaintiff a part-time, per diem hospitalist physician position at Mount Sinai Queens.  (*See* Am. Compl. ¶ 21.)  Prior to signing an employment contract with Mount Sinai, Plaintiff raised several concerns about the proposed agreement with Gwendolyn Martin ("Martin"), an administrative assistant at Mount Sinai Queens, and Defendant Navid.  (*Id.* ¶¶ 27, 14, 16.)  One of Plaintiff's concerns pertained to Section G of the proposed employment agreement governing outside employment.  (*See* Dkt. 1 at ECF 41; Am. Compl. ¶ 27.)  Defendant Navid informed Plaintiff that it was unlikely the legal department would modify the "standardized per diem contract" and that they "edit[ed] the non-compete clause for hospitalists two years ago and they modified the language that per diems would notify [Mount Sinai] if they added other employers."  (Am. Compl. ¶ 28.)  After several days of negotiation over email, most of Plaintiff's proposed changes were rejected.  (*Id.* ¶¶ 29–38.)  However, Mount Sinai modified Section G to permit Plaintiff to continue his work as an independent contractor physician at Jacobi Medical Center through his LLC, Advanced Wellness Services.  (*Id.* ¶¶ 35–36, 25.)

On November 2, 2022, Plaintiff signed the final employment contract with Mount Sinai ("Employment Contract") which included Plaintiff's individual employment agreement ("Employment Agreement") and incorporated the Standard Terms and Conditions of Part Time Physician Employment ("Standard Terms and Conditions").  (*See* Dkt. 1 at ECF 39–48.)  The Employment Contract was also signed by Amrita Gupte, M.D., MPH, MBA, the Chief Medical Officer and Vice President of Medical Affairs at Mount Sinai Queens; Monica Kraft, M.D., the System Chair of the Department of Medicine at ISMMS; and Defendant Charney.  (*Id.* at ECF 43.)  Under Section D of the Employment Agreement, the parties agreed that Plaintiff would be compensated at "$130 per hour for weekdays; $150 per hour for weeknights, weekends and holidays."  (*Id.* at ECF 41.)  It states that "[i]n order to receive payments for per diem services,

3

[Plaintiff] must complete Mount Sinai's attestation form and submit it to the Administrator of the Department within five (5) business days of providing coverage for the per diem session." (*Id.*)

With respect to outside employment, Section G of the Employment Agreement states the following:

> You agree that you will not engage in any other clinical activity outside of your employment with the Faculty Practice except for your existing employment at Advanced Wellness Services located at 1244 Dickinson Drive, Yardley, PA 19067. You agree to notify the Chairman of your department if your employment arrangements outside Mount Sinai change from your existing arrangement. Any violation of this provision will void your contract with ISMMS.

(*Id.*)  Section D.4 of the Standard Terms and Conditions states the following:

> Under the Employment Agreement, the Physician may not accept an appointment or other position at any other educational, medical, or scientific institution (school of medicine, hospital, research organization, college, or university) or maintain a clinical practice outside Mount Sinai, other than as described in the cover letter and position description, unless prior written approval has been granted by the Chair. In the event that the Physician wishes to assume another position and maintain a role at Mount Sinai, we may consider a revised agreement.

(*Id.* at ECF 47.)  Section D.5 of the Standard Terms and Conditions notes that "[i]f any provision of the Physician's Employment Agreement conflicts with any provision of the foregoing policies, the provision of the Employment Agreement shall control." (*Id.*)

### B.    Plaintiff's Employment at Mount Sinai

Plaintiff worked as a part-time, per diem hospitalist physician at Mount Sinai Queens. (Am. Compl. ¶ 21.)  In this role, Plaintiff would "admit patients to the hospital, manage and coordinate their medical care during the course of their hospitalization, and discharge patients at the appropriate time." (*Id.* ¶ 40.)  Plaintiff worked "various shifts as needed, including during the daytime and overnight." (*Id.* ¶ 41.)

On November 8, 2022, Martin emailed Plaintiff a timesheet to be signed for an overnight shift on November 6, 2022, indicating that Plaintiff worked 12 hours from 7 pm to 7 am.  (*Id.*

¶ 42.) Plaintiff responded that it did not reflect the "time required for turnover of patients to ensure continuity of care," and that it should include an additional 0.5 hours that Plaintiff worked on the morning of November 7, 2022. (*Id.* ¶ 43.) The following day, Defendant Navid emailed Plaintiff, writing that "we don't do any overtime costs for docs and Pas in the health system so the 30 min isn't covered." (*Id.* ¶ 45.) Plaintiff responded expressing concern that the policy may not comply with state and federal law, and writing, "since I am not claiming over 40 hours in a week, there is no claim for overtime." (*Id.* ¶ 46.) Over the next several days, Plaintiff, Martin, and Defendant Navid corresponded over email regarding the disputed 30 minutes from the overnight shift on November 6, 2022, without resolution. (*Id.* ¶¶ 47–56.) In one email, Defendant Navid noted that, "oncoming doctors usually come 15 min[utes] early so they don't hold up the next person from leaving—and that 15 min[utes] is considered part of the comp either as FT or as a per diem." (*Id.* ¶ 49.)

> On November 21, 2022, Defendant Navid emailed Plaintiff, writing:
>
> I don't usually track people by the minute like this but we will need to have you sign in and out on your time here. Gwen and I noted that you left early at 430 pm on one of your days but requested payment for the full time. We will need you to accurately portray time and will you need to edit any other attestations where you left early?

(*Id.* ¶ 57.) In response, Plaintiff expressed concern that the additional reporting requirements were in retaliation for complaining of possible FLSA and NYLL violations and "other related protected activity," demanded that Defendant Navid "reverse the retaliatory act(s)," and threatened legal action. (*Id.* ¶ 58.) Martin then emailed Plaintiff writing that the "30 minutes for the handoff on November 6 and the early departure from work – 30 minutes – on November 4 can be a washed." (*Id.* ¶ 60.) Plaintiff, Martin, and Defendant Navid continued to dispute the compensable time from November 4, 2022, over email without resolution. (*Id.* ¶¶ 61–65.) Defendant Navid wrote to

Plaintiff, "[y]ou left at 430pm after saying good night to myself and Gwen but attested on paper that you worked until 5pm," (*id.* ¶ 62), and Plaintiff stated that his attestation was made in good faith, "consistent with applicable generally accepted practices amongst hospitalist physicians and the controlling law in the jurisdiction," (*id.* ¶ 65).

On November 22, 2022, Plaintiff emailed Defendants Navid and Jones-Winter, among others, requesting payment for the time he spent "working to vindicate [his] legal right to payment for the 30 minutes of time from the beginning of [the] month." (*Id.* ¶ 66.) Defendant Navid forwarded the email to Defendant Jones-Winter and other administrators, writing that the "PAs complained about how [Plaintiff] is intimidating to them and it's already such a difficult job for them. The quality of [Plaintiff's] work is fair at best. I need legal assistance to cut ties as this email seems like a good opportunity." (*Id.* ¶ 67.) Later that day, Plaintiff emailed Defendant Jones-Winter requesting a new supervisor. (*Id.* ¶ 68.)

Between November 25, 2022, and November 27, 2022, Plaintiff, Martin, and Defendants Navid and Jones-Winter continued to discuss compensable hours over email without resolution. (*Id.* ¶¶ 70–75.) On November 28, 2022, Plaintiff met with the Director of Employee and Labor Relations at ISMMS, Daniel McCabe Jr. ("McCabe"), via Zoom, during which Plaintiff, according to an email from December 1, 2022, "shared with [McCabe] significant deviations from routine and customary practice that [Plaintiff] observed during [his] shift at Mount Sinai Queens" the previous weekend. (*Id.* ¶¶ 87, 80.) Plaintiff requested that Mount Sinai classify him as a whistleblower. (*Id.* ¶ 87.) Plaintiff resigned from his position at Mount Sinai Queens on December 2, 2022. (*Id.* ¶ 78.)

In light of this background, Plaintiff claims that Defendants failed to provide him with accurate wage statements which led to "ambiguity . . . , confusion, and ultimately, underpayment

of wages." (*Id.* ¶ 94.)  Plaintiff alleges that Defendants failed to compensate him for the following

hours of work: 0.5 hours from the November 4th shift; 0.5 hours from the November 6th shift;

0.75 hours from his meeting with McCabe on November 28th[3]; and 19 hours for "researching and

reviewing Mt. Sinai policy, federal and state law, drafting emails and other correspondences." (*Id.*

¶ 98.)  Plaintiff alleges that he was "retaliated against by Defendants for objecting to an unlawful

wage and hour practice." (*Id.* ¶ 97.)  Plaintiff states that because of these incidents, he "suffered

extreme mental anguish and emotional distress, including *inter alia*, difficulty sleeping, loss of

enjoyment of normal life events, diminishment in quality of life, anxiety, and stress." (*Id.* ¶ 96.)

## II.    Procedural Background

Plaintiff filed this suit on June 27, 2023, (Compl., Dkt. 1), and Defendants filed a waiver

of service on July 19, 2023, (Dkt. 6).  On August 28, 2023, Defendants filed a letter motion

requesting a pre-motion conference ("PMC") for their anticipated motion to dismiss.  (Dkt. 10.)

Plaintiff responded to Defendants' PMC request on August 30, 2023.  (Dkt. 11.)  The Court granted

Defendants' PMC request, (*see* 09/07/2023 Dkt. Order), and a PMC was held on October 31, 2023,

(*see* 10/31/2023 Min. Entry).  At the PMC, the Court directed Plaintiff to file an amended

complaint and set a briefing schedule for Defendants' motion to dismiss.  (*Id.*)  Plaintiff filed his

Amended Complaint on November 13, 2023.  (Am. Compl., Dkt. 18.)

In the Amended Complaint, Plaintiff alleges four causes of action against all Defendants

related to the wage and hour disputes: (1) impermissible rounding and unpaid wages under the

FLSA, (2) failure to pay straight wages and unpaid gap time under NYLL § 198 and § 663, (3)

failure to keep accurate wage statements under NYLL § 195(3), and (4) retaliation under both the

---

[3] Plaintiff alleges that Defendants failed to compensate him for the "November 29 meeting with McCabe," (Am. Compl. ¶ 98), however, the Court notes that this appears to refer to the meeting that took place on November 28, 2022, (*see id.* ¶¶ 80–81).

FLSA and NYLL § 215.  (*Id.* ¶¶ 118–54.)  Related to Plaintiff's Employment Contract, Plaintiff also brings the following causes of action: (5) violation of the Sherman Act, 15 U.S.C. § 1 ("Section 1") against the Mount Sinai Defendants, (6) in the alternative to Count 5, violation of the Sherman Act, 15 U.S.C. § 2 ("Section 2") against the Mount Sinai Defendants and Defendant Navid; and finally, (7) violation of New York common law prohibiting unreasonable non-compete agreements against the Mount Sinai Defendants.  (*Id.* ¶¶ 155–84.)

On November 22, 2023, Plaintiff filed a PMC request for an anticipated motion for preliminary injunction against Defendants seeking reinstatement to his previous position at a different Mount Sinai hospital and enjoining Defendants from imposing any non-compete agreements or further violations of the FLSA or NYLL, among other relief.  (Dkt. 19.)  The Court construed Plaintiff's PMC request as his motion for preliminary injunction, which the Court denied.  (11/27/2023 Dkt. Order.)

In a letter filed on January 4, 2024, Plaintiff requested that the Court direct Defendants to file their unredacted motion to dismiss briefing under seal, and proposed redactions for the filing on the public docket.  (Dkt. 22.)  Defendants filed a response which included a request that the Court limit the number and length of footnotes used by Plaintiff in his opposition brief.  (Dkt. 23.)  The Court denied both requests.[4]  (1/22/2024 Dkt. Order.)  Defendants' motion to dismiss was fully briefed on February 2, 2024.  (*See* Dkts. 26–30.)

---

[4] The Court notes that Plaintiff's opposition brief contains 51 lengthy footnotes.  (*See* Pl.'s Mem. Opp. Mot. Dismiss ("Pl.'s Br."), Dkt. 31.)  Though the Court declined to limit the number of footnotes Plaintiff was permitted to use, the Court warned Plaintiff that it might disregard the contents if it found that the "use of footnotes was an attempt to circumvent the Court's Individual Rules[,]" which includes page limits for motion briefing.  (1/22/2024 Dkt. Order (citing *Miller-Rich v. Altum Pharms. Inc.*, No. 22-CV-03473 (JLR), 2023 WL 8187875, at *5 n.4 (S.D.N.Y. Nov. 27, 2023) ("It appears to the Court that [] Defendants sought to use such footnotes to circumvent the Court's page-limit requirements.  The Court would be within its rights to disregard the footnotes under the general principle that an argument made only in a footnote may be treated as

On February 11, 2024, Plaintiff moved this Court for leave to file supplemental briefing in light of a U.S. Supreme Court decision rendered on February 8, 2024, after the present motion was fully briefed, (Dkt. 32), and Defendants replied the following day, (Dkt. 33).  The Court denied Plaintiff's request, but assured Plaintiff it would review the decision, *Murray v. UBS Sec., LLC*, 601 U.S. 23 (2024), to determine its relevance to Defendants' motion to dismiss.  (2/14/2024 Dkt. Order.)  On August 29, 2024, Plaintiff filed a motion to compel Defendants to participate in a Rule 26(f) Conference.  (Dkt. 34.)  This Court referred the motion to the Honorable Lois Bloom, (8/30/2024 Dkt. Order), and Defendants replied on September 4, 2024, (Dkt. 35).  Judge Bloom held a conference on Plaintiff's motion to compel on September 26, 2024, and denied the motion. (9/30/2024 Dkt. Order.)  Discovery is stayed pending the resolution of the motion to dismiss.  (*Id.*)

## LEGAL STANDARD

"When [a defendant] move[s] to dismiss under both Rule 12(b)(1) and 12(b)(6), 'the Court must first analyze the Rule 12(b)(1) motion to determine whether the Court has the subject matter jurisdiction necessary to consider the merits of the action.'"  *Piotrowski ex rel. J.P. v. Rocky Point Union Free Sch. Dist.*, 462 F. Supp. 3d 270, 282 (E.D.N.Y. 2020) (quoting *S.E.C. v. Rorech*, 673 F. Supp. 2d 217, 220–21 (S.D.N.Y. 2009)).  "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  To survive a motion

---

forfeited or waived.")).)  Indeed, Plaintiff's use of footnotes does appear to be an attempt to avoid compliance with the Court's Individual Rules given that a substantial amount of Plaintiff's arguments is contained in the footnotes rather than the body of his brief.  (*See generally* Pl.'s Br., Dkt. 31.)  Nonetheless, given Plaintiff's *pro se* status, the Court considered the contents of his footnotes in deciding this motion.  However, Plaintiff is now sufficiently on notice that this practice will not be tolerated again in any future filings, and that the Court will disregard information contained in footnotes where the Court concludes that Plaintiff is seeking to circumvent the Court's page limits.

to dismiss for lack of standing, the "plaintiff must allege 'facts that affirmatively and plausibly suggest that [he] has standing to sue.'" *Reyes v. Sofia Fabulous Pizza Corp.*, No. 13-CV-7549 (LAK) (JCF), 2014 WL 12768922, at *2 (S.D.N.Y. Apr. 7, 2014) (quoting *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)), *R. & R. adopted*, 2014 WL 1744254 (S.D.N.Y. Apr. 24, 2014). In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), courts may consider matters outside the pleadings. *Id.*; *see also Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003))).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Hogan*, 738 F.3d at 514. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also Pension Benefit Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (citation omitted).

When evaluating the sufficiency of a complaint, courts are required to accept the well-pleaded factual allegations contained within the complaint as true, *see Bldg. Indus. Elec. Contractors Ass'n v. City of New York*, 678 F.3d 184, 187 (2d Cir. 2012), but "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations," *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2011) (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  Pleadings submitted by *pro se* plaintiffs are held to "less stringent standards than formal pleadings drafted by lawyers," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and the Court is required to read a *pro se* plaintiff's complaint liberally and interpret it as raising the strongest arguments it suggests, *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (citation omitted).

## DISCUSSION

Defendants move to dismiss Plaintiff's NYLL wage statement claim under Rule 12(b)(1) for lack of standing, and Plaintiff's other FLSA and NYLL, Sherman Act, and New York common law claims under Rule 12(b)(6) for failure to state a claim.  For the reasons set forth below, the Court grants Defendants' motion to dismiss Plaintiff's NYLL wage statement claim, and grants in part and denies in part Defendants' motion to dismiss the remaining claims under Rule 12(b)(6).

## I.    Plaintiff's NYLL Wage Statement Claim

Plaintiff brings a claim for wage statement violations under NYLL § 195(3), alleging that Defendants "did not maintain, establish, and preserve Plaintiff's accurate weekly payroll records" and "failed to accurately disclose the number of hours Plaintiff worked on his wage statements." (Am. Compl., ¶¶ 136–37.)  Defendants move to dismiss this claim arguing that Plaintiff lacks Article III standing to assert a wage statement claim under NYLL § 195(3).  (Defs.' Mem. Supp. Mot. Dismiss, "Defs.' Br.", Dkt. 28, at 15–16.)

The Second Circuit recently addressed the issue of Article III standing for NYLL inaccurate wage statement claims in *Guthrie v. Rainbow Fencing, Inc.*, 113 F.4th 300 (2d Cir. 2024), finding that "a plaintiff cannot rely on technical violations of the [NYLL] but must allege actual injuries suffered as a result of the alleged . . . wage notice and wage statement violations." *Guthrie*, 113 F.4th at 305. The court explained that "a plaintiff must show some causal connection between the lack of accurate notices and the downstream harm." *Id.* at 308. "A plaintiff-employee *may* have suffered an injury-in-fact sufficient to establish standing when, for example, inaccurate or noncompliant notices prevented the employee from obtaining full payment of wages in a timely fashion," but "the plaintiff-employee must support a plausible theory as to *how* he was injured by the defendants' failure to provide the required documents." *Id.* at 309 (cleaned up) (emphasis in original).

Plaintiff characterizes his alleged injury from the wage statements as "ambiguity, confusion, inability and difficulty in reconciling timesheets with wage statements, inability to reconcile claimed time with time actually compensated, difficulty in making expostulations to Defendants of underpayment of wages, and ultimately underpayment of wages." (Am. Compl. ¶ 138.) Though Defendants argue that Plaintiff's alleged harm is already incorporated in his FLSA and NYLL claims for unpaid wages, (Defs.' Br, Dkt. 28, at 16), "[a] plaintiff need not . . . establish an injury that is greater than or different from the loss of wages or overtime pay alleged in their lawsuit," *Lock v. Costco Wholesale Corp.*, No. 23-CV-7904 (NJC) (ST), 2024 WL 4728594, at *4 (E.D.N.Y. Nov. 8, 2024) (citing *Guthrie*, 113 F.4th at 309).

However, the Court finds that Plaintiff has failed to establish Article III standing for his NYLL wage statement claim. *Guthrie* indicates that loss of wages is a concrete harm, but a plaintiff must plead facts that "plausibly [show] that defective notices led him or her to lose

wages." *Guthrie*, 113 F.4th at 310.  Plaintiff here has alleged no such facts, and his claim meaningfully differs from those that have survived post-*Guthrie*.  For example, this is not a case in which Plaintiff is alleging that Defendants' "failure to provide the notices result[ed] in [Plaintiff] working for years without knowledge of [his] correct pay frequency."  *Reyes v. Crystal Window & Door Sys., Ltd.*, No. 23-CV-2578 (RPK) (JRC), 2024 WL 4028308, at *4 (E.D.N.Y. Sept. 3, 2024).  Nor is this a case in which Plaintiff is alleging that had he received accurate wage statements, he "would have confronted Defendants and advocated for the proper payment of wages."  *Cinar v. R&G Brenner Income Tax, LLC*, No. 20-CV-1362 (RPK) (JRC), 2024 WL 4224046, at *4 (E.D.N.Y. Sept. 18, 2024).  Plaintiff has also not alleged that Defendants were able "to hide . . . violations of wage and hour laws" by "failing to provide the required wage statements."  *See Roma v. David Carmili, Physician, P.C.*, No. 23-CV-4072 (KAM) (CLP), 2024 WL 5152211, at *5 (E.D.N.Y. Dec. 18, 2024) (collecting cases post-*Guthrie*).

Instead, Plaintiff's Amended Complaint only plausibly alleges that his inability to reconcile his timesheets with his wage statements caused, at most, some confusion—not loss of wages. Plaintiff's unpaid wage claims *stem from* Defendants' communicated wage and hour policies and the disputed hours on Plaintiff's timesheets, irrespective of noncompliant wage statements.  As Defendants correctly note, any alleged recordkeeping violation "did not prevent Plaintiff from deciding that he was underpaid and promptly raising issues regarding his pay."  (Defs.' Br., Dkt. 28, at 15.)  As there is no indication here that the alleged informational injury itself prevented Plaintiff from advocating for himself and resulted in lost wages, Plaintiff has failed to show a "causal connection between the lack of accurate notices and the downstream harm."  *Guthrie*, 113 F.4th at 308.  Defendants' motion to dismiss Plaintiff's claim under NYLL § 195(3) for lack of standing is therefore granted.

## II.    Plaintiff's FLSA and NYLL Claims for Unpaid Wages and Retaliation

### A.    Plaintiff Plausibly Alleged that Defendant Charney Was His Employer

Defendants move to dismiss the claims against Defendant Charney under Rule 12(b)(6) arguing that the Amended Complaint fails to allege any wrongdoing on his behalf—the only allegation being that he signed Plaintiff's Employment Contract.  (Defs.' Br., Dkt. 28, at 3–4.) Plaintiff contends that Defendant Charney is an "employer" under both the FLSA and NYLL, and thus jointly and severally liable for the alleged statutory violations.  (Pl.'s Br., Dkt. 31, at 3–5.)

The FLSA and NYLL impose liability on employers.  The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 35 (E.D.N.Y. 2015) (quoting 29 U.S.C. § 203(d)).  "Courts have interpreted the definition of 'employer' under the [NYLL] coextensively with the definition used by the FLSA."  *Id.* at 37.  To be held liable as an employer, "an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 109 (2d Cir. 2013). The Second Circuit applies an "economic reality" test to determine whether an individual qualifies as an employer under the FLSA, considering the following relevant but non-exclusive factors: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."  *Id.* at 104–05 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008) and *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir.1984)).  Courts make this determination based on the totality of the circumstances.  *Id.* at 104.

Defendant Charney is the Dean of ISMMS and the President for Academic Affairs at Mount Sinai Health System, Inc.  (Am. Compl. ¶ 13.)  Plaintiff's initial allegations regarding

Defendant Charney's employer status are quite broad, simply reiterating the factors considered in the Second Circuit by writing that all Defendants "have the power to (i) hire and fire employees, (ii) determine rates and methods of pay, (iii) determine work schedules, (iv) supervise and control the work of the employees, and (v) otherwise affect the quality of the employees' employment." (*Id.* ¶ 20.)   The only other factual allegations against Defendant Charney in the Amended Complaint, beyond the titles he holds, are that he signed the Employment Agreement, (*id.* ¶ 26), and that he, along with Defendants Navid and Jones-Winter, "had the power to do more than carry out personnel decisions (including *inter alia*, hire and fire employees, supervise work schedule[s], set rates of pay, maintain payroll records) made by others, and aided, abetted, incited, compelled, or coerced improper payroll practices and wage payment acts against Plaintiff," (*id.* ¶ 120). However, while "[m]erely stating that plaintiff was 'employed' by the defendant is a legal conclusion and will not suffice[,] . . . detailed, elaborate recitations of specific facts are not required" at the pleading stage. *Jaigua v. Kayafas Contracting Co. Inc.*, No. 18-CV-1941 (RJD) (SMG), 2019 WL 1115025, at *6 (E.D.N.Y. Mar. 11, 2019) (citation omitted).

Plaintiff alleged that each of the Defendants, including Defendant Charney, had the power to "hire and fire employees," "determine rates and methods of pay . . . and work schedules," and "supervise and control" employees' work.  (Am. Compl. ¶ 20.)  Plaintiff concedes that some of these personnel decisions were "made by others," but also alleges that Defendant Charney exercised influence over the "improper payroll practices and wage payment acts against Plaintiff." (*Id.* ¶ 120.)[5]

---

[5] While Plaintiff's Amended Complaint might lack the sophistication of pleadings drafted by experienced attorneys, *pro se* pleadings are held to "less stringent standards." *Erickson*, 551 U.S. at 94.

Defendants contend that Charney's authority at ISMMS, and his signature on the Employment Contract, is insufficient to "show that [he] made decisions regarding pay policies and compensation." (Defs.' Reply Supp Mot. Dismiss ("Defs.' Reply"), Dkt. 30, at 2–3.) Defendants correctly assert that Charney's position at ISMMS does not, on its own, suffice to establish he is an "employer" under the FLSA. *Irizarry*, 722 F.3d at 109 ("Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate 'employer' status."). But the facts alleged in the Amended Complaint raise a plausible inference, even if barely, that Defendant Charney exercised the requisite degree and type of control to qualify him as Plaintiff's employer at Mount Sinai under the FLSA and NYLL. Whether Plaintiff can prove that Defendant Charney "had sufficient operational control to be considered [an employer] under the FLSA and [NYLL] is a matter to be determined on summary judgment or at trial." *Hernandez v. Habana Room*, No. 11-CV-1264 (RMB) (JCF), 2012 WL 423355, at *3 (S.D.N.Y. Feb. 9, 2012).[6]

## B. Plaintiff Has Failed to Sufficiently Allege a FLSA Claim for "Impermissible Rounding/Unpaid Wages"

Plaintiff brings a FLSA claim for "Impermissible Rounding/Unpaid Wages." (Am. Compl. ¶¶ 118–28.) However, Plaintiff has failed to allege an impermissible rounding claim and has otherwise failed to plead a claim of unpaid wages under the FLSA.

Under the FLSA, rounding practices are not per se unlawful. *Burns v. Haven Manor Health Care Ctr., LLC*, No. 13-CV-5610 (DLI) (CLP), 2015 WL 1034881, at *1 n.2 (E.D.N.Y. Mar. 10,

---

[6] Plaintiff also asserts in his opposition brief that Defendant Charney has "functional control" if not "formal control" over employees. (Pl.'s Br., Dkt. 31, at 4.) While the Court declines to consider the applicability of the "functional control" test at this stage, the Court notes that the factors considered in determining whether an alleged employer exercised "functional control" are "most relevant in cases where the plaintiff has pleaded a subcontracting relationship between defendants." *Chica v. Shallu Constr. Corp.*, No. 21-CV-0869 (ARR) (SJB), 2022 WL 970744, at *7 (E.D.N.Y. Mar. 31, 2022).

2015).  The U.S. Department of Labor has adopted a regulation explaining that the rounding of

hours is acceptable, except when it results in employees not being properly compensated for all

hours worked:

> It has been found that in some industries, particularly where time clocks are used, there has been the practice for many years of recording the employees' starting time and stopping time to the nearest 5 minutes, or to the nearest one-tenth or quarter of an hour.  Presumably, this arrangement averages out so that the employees are fully compensated for all the time they actually work.  For enforcement purposes this practice of computing working time will be accepted, provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

29 C.F.R. § 785.48(b).  Courts have found "that rounding policies that on average, favor neither

overpayment nor underpayment of wages are permissible, while those that systematically

undercompensate employees are unlawful."  *Boone v. PrimeFlight Aviation Servs., Inc.*, No. 15-

CV-6077 (JMA) (ARL), 2018 WL 1189338, at *5 (E.D.N.Y. Feb. 20, 2018), *R&R adopted*, 2018

WL 1187402 (E.D.N.Y. Mar. 7, 2018) (citing *Hinterberger v. Cath. Health Sys.*, 299 F.R.D. 22,

52 (W.D.N.Y. Mar. 27, 2014)).

The Court finds that Plaintiff has failed to plausibly allege that Defendants had an

impermissible rounding policy under the FLSA.  Plaintiff claims that Defendants have a

"widespread practice of not properly paying all wages owed, and shorting employees by informing

providers . . . they do not have a right to compensation for work performed before and after the []

provider's scheduled shift."  (Am. Compl. ¶ 95.)  To support this contention, Plaintiff relies on

emails sent to him from Defendant Navid stating, "we don't do any overtime costs for

[doctors] . . . so the 30 min[utes] isn't covered," (*id.* ¶ 45), and that "oncoming doctors usually

come 15 min[utes] early so they don't hold up the next person from leaving—and that 15 min[utes]

is considered part of the comp either as FT or as a per diem," (*id.* ¶ 49.)  Additionally, Plaintiff's

allegation that he was not paid for 30 minutes of compensable work on November 7, 2022, relates

17

to disputed "turnover" time after his November 6th overnight shift.  (*Id.* ¶ 42–43.)  This practice, however, is not a rounding policy.

As Defendants note, (Defs.' Reply, Dkt. 30, at 7), nowhere in the Amended Complaint does Plaintiff allege that Defendants round up or down his start and stop times by a specific interval, nor is there any allegation that Plaintiff did, in fact, routinely arrive for his shifts early and perform compensable work that went uncompensated because of a rounding policy, (*see generally* Am. Compl.).  Here, Plaintiff only asserts that he was told doctors "usually come 15 min[utes] early" and that it is not covered, and that there were thirty minutes for which he was not compensated for "turnover time" after his overnight shift on November 6, 2022.  (*Id.* ¶¶ 42–43, 49.)  These allegations are insufficient to assert that Defendants utilize any specific rounding policy at all, and meaningfully differ from successful impermissible rounding claims in this Circuit.  *See, e.g.*, *Canelas v. World Pizza, Inc.*, No. 14-CV-7748 (ER), 2017 WL 1233998, at *10–11 (S.D.N.Y. Mar. 31, 2017) (finding a rounding practice impermissible under the FLSA where Defendants "rounded their employees' hours [up and down] to the nearest half hour each day and then paid wages only for those rounded hours"); *Neor v. Acacia Network, Inc.*, No. 22-CV-4814 (ER), 2023 WL 1797267, at *3 (S.D.N.Y. Feb. 7, 2023) (denying motion to dismiss impermissible rounding claim where Defendants rounded clock-in times up and clock-out times down to the nearest quarter hour); *see also Hinterberger*, 299 F.R.D. at 52–53 (noting that allegations of unpaid pre- or post-shift work are legally distinct from a claim for "rounding the clocked times at which employees start and stop their 'principal' activities").

Rather, as Defendants correctly assert, Plaintiff's allegations about not being compensated for work he performed before and after his work shift are more properly construed as a gap-time claim, which is not recognized under the FLSA.  (Defs.' Br., Dkt. 28, at 11); *see Lundy v. Cath.*

*Health Sys. of Long Island Inc.*, 711 F.3d 106, 115 (2d Cir. 2013) ("A gap-time claim is one in which an employee has not worked 40 hours in a given week but seeks recovery of unpaid time worked, or in which an employee has worked over 40 hours in a given week but seeks recovery for unpaid work under 40 hours."); *id*. at 116 (explaining that the Second Circuit does not recognize a claim for gap-time under the FLSA).

Although the FLSA does proscribe the underpayment of wages, *see* 29 U.S.C. §§ 206–07, 216(b), "[s]o long as an employee is being paid the minimum wage or more, [it] does not provide recourse for unpaid hours below the 40-hour threshold, even if the employee also works overtime hours the same week," *Lundy*, 711 F.3d at 116. Here, aside from his claim for "impermissible rounding," Plaintiff does not otherwise allege that his compensation fell below the statutory minimum required by the FLSA or that he was required to work over 40 hours in a week for which he was not properly compensated. (*See generally* Am. Compl.) Thus, Plaintiff has failed to state a claim for impermissible rounding or unpaid wages under the FLSA and Count 1 of his Amended Complaint is therefore dismissed.

### C.  Plaintiff Has Sufficiently Alleged a NYLL Claim for Unpaid Wages

Though Plaintiff fails to state a claim for unpaid wages under the FLSA, Plaintiff's Amended Complaint is sufficient to state a claim for unpaid wages under the NYLL, but only for a total of 1.0 hour. Plaintiff alleges that Defendants failed to compensate him for the following: (i) 0.5 hours from his overnight shift on November 4, 2022; (ii) 0.5 hours from his overnight shift on November 6, 2022; (iii) 0.75 hours from his November 28, 2022, meeting with McCabe; and (iv) 19 hours spent "researching and reviewing [Mount] Sinai policy, federal and state law, drafting emails and other correspondences." (*Id.* ¶¶ 98, 80.) Based on these facts, Plaintiff asserts a claim for unpaid gap-time under NYLL § 198 and § 663. (*Id.* ¶¶ 129–34.) Unlike the FLSA, "the NYLL does recognize [g]ap [t]ime [c]laims and provides for full recovery of all straight-time wages

19

owed." *Isayeva v. Diamond Braces*, No. 22-CV-4575 (KPF), 2024 WL 1053349, at *17 (S.D.N.Y. Mar. 11, 2024) (quoting *Lundy*, 711 F.3d at 118). "Thus, to the extent that [Plaintiff] has adequately pled that [he] worked compensable time for which [he] was not properly paid, [he has] a statutory right under the NYLL to recover straight-time wages for those hours." *Id.* (citations omitted); *see* N.Y. Lab. L. § 663(1) ("If any employee is paid by his or her employer less than the wage to which he or she is entitled . . . he or she shall recover in a civil action the amount of any such underpayments.").

With respect to the 19.75 hours of allegedly unpaid time Plaintiff spent researching and corresponding over email with Defendants and the time Plaintiff spent in the November 28, 2022, meeting with McCabe, Defendants assert that this is not compensable time because it was pursued for Plaintiff's own benefit and "not necessarily and primarily for the benefit of Mount Sinai." (Defs.' Br., Dkt. 28, at 12.) Plaintiff counters that "time spent 'adjusting grievances' is compensable under many situations" but concedes that "the exact contours of what qualifies is not clearly delineated by the courts." (Pl.'s Br., Dkt. 31, at 21.) The Court agrees with Defendants.

The NYLL "incorporates the FLSA's standards for determining whether time worked is compensable." *Gao v. Savour Sichuan Inc.*, No. 19-CV-2515 (JPC), 2024 WL 664718, at *20 (S.D.N.Y. Feb. 16, 2024). The FLSA does not define what constitutes compensable "work," *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011), but the Supreme Court interpreted it generally to mean "physical or mental exertion . . . controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer," *Singh v. City of New York*, 524 F.3d 361, 367 (2d Cir. 2008) (quoting *Tenn. Coal, Iron & R.R. Co. v. Muscoda Loc. No. 123*, 321 U.S. 590, 598 (1944)). The Department of Labor issued a regulation addressing grievances specifically, which states that "[t]ime spent in adjusting grievances between an

20

employer and employees *during the time the employees are required to be on the premises is hours worked*." 29 C.F.R. § 785.42 (emphasis added).

Plaintiff's factual allegations are insufficient to establish that the 19.75 hours he spent researching the law, corresponding over email, and attending meetings regarding the complaints to his employer constitute compensable work. There is no indication that any of those hours were "controlled or required by the employer" or "pursued necessarily and primarily for the benefit of the employer." *Singh*, 524 F.3d at 367 (quoting *Tenn. Coal, Iron & R.R. Co.*, 321 U.S. at 598). There is also no allegation that any of these activities occurred "during the time [Plaintiff was] required to be on the premises."[7] 29 C.F.R. § 785.42.

Plaintiff cites *Wetzel v. Town of Orangetown*, No. 06-CV-15190 (LAP), 2013 WL 1120026 (S.D.N.Y. Mar. 18, 2013), *aff'd*, 556 F. App'x 46 (2d Cir. 2014) (summary order), for the proposition that, though case law on this issue is limited in this Circuit, time spent adjusting grievances can be compensable. (Pl.'s Br., Dkt. 31 at 21.) But Plaintiff's reliance on *Wetzel* is unavailing, as that case concerned a disciplinary hearing that the court found to benefit the employer, and which occurred during the employee's regular working hours—neither of which is the case here. *Wetzel*, 2013 WL 1120026, at *3 ("The Court agrees that 'adjusting grievances' [under 29 C.F.R. § 785.42] is the most analogous provision in the FLSA to attending disciplinary hearings. However, the Court also interprets this regulation to impose the requirement of compensation only to those hearing hours that were scheduled during the employee's regular shift.").

---

[7] This includes the November 28, 2022, meeting with McCabe, which Plaintiff does not allege took place during his scheduled work hours. (*See* Am. Compl. ¶¶ 80–86.)

Despite the foregoing, Plaintiff's NYLL gap-time claim survives, but only as to a total of 1.0 hour.  Regarding the allegedly unpaid 0.5 hours on November 4, 2022, and the 0.5 hours on November 6, 2022, Defendants assert that Plaintiff has been fully compensated.  However, this remains a disputed issue of fact that the Court cannot resolve at this stage of the proceeding.  All that Plaintiff is required to plead is that he "worked compensable time for which [he] was not properly paid."  *Isayeva*, 2024 WL 1053349, at *17 (quoting *Lundy*, 711 F.3d at 118).  Here, Plaintiff alleges that "on information and belief[,] . . . Defendants have failed to compensate Plaintiff for" 0.5 hours from the November 4, 2022, shift, and 0.5 hours for the November 6, 2022, shift.  (Am. Compl. ¶ 98.)  The email correspondence included in his Amended Complaint indicates there was a dispute as to whether he performed compensable work during those hours, which has yet to be resolved.  (*Id.* ¶¶ 60–65, 74–75.)  The Court cannot at this stage conclude whether Plaintiff did or did not perform compensable work for which he was not paid during or after the shifts at issue.  Thus, Plaintiff has plausibly alleged a gap-time claim under the NYLL, and Defendants' motion to dismiss this claim is denied.

### D.  Plaintiff Has Sufficiently Alleged FLSA and NYLL Retaliation Claims

Plaintiff brings claims of retaliation under the FLSA and NYLL against all Defendants. Plaintiff contends that after voicing complaints about allegedly unlawful wage and hours practices, Defendants (i) "accus[ed] Plaintiff of violating various corporate policies," (ii) "impos[ed] new hourly record requirements not required of other similarly situated employees," (iii) "collud[ed] internally to generate pretextual reasons to fire Plaintiff," and (iv) "wrongfully dock[ed] Plaintiff's pay." (Am. Compl. ¶ 148.)

Under the FLSA, it is "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under [the FLSA]." 29 U.S.C. § 215(a)(3). Similarly, under

22

the NYLL, an employer may not "discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee [] because such employee has made a complaint . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter." N.Y. Lab. L. § 215. The requirements for pleading a claim for retaliation under both the FLSA and the NYLL "significantly overlap," and thus are analyzed using the same standard for retaliation under the FLSA. *Salazar v. Bowne Realty Assocs., L.L.C.*, 796 F. Supp. 2d 378, 384 (E.D.N.Y. 2011).

"FLSA retaliation claims are analyzed under the three-step burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Velasquez v. Yoh Servs., LLC*, 803 F. App'x 515, 517 (2d Cir. 2020) (summary order). A plaintiff alleging retaliation under the FLSA must first establish a *prima facie* case of retaliation by demonstrating "(1) participation in protected activity known to the defendant, like the filing of a FLSA lawsuit; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." *Id.* (internal quotation marks omitted). At the pleading stage, "the Court does not specifically apply the *McDonnell Douglas* burden-shifting test to determine whether [the] [p]laintiff has stated a retaliation claim, but rather generally assesses [the] [p]lausibility of [the] [p]laintiff's claim based on the facts alleged in the Complaint." *Brundidge v. Xerox Corp.*, No. 12-CV-6157 (FPG), 2014 WL 1323020, at *3 (W.D.N.Y. Mar. 31, 2014); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015) ("[B]ecause a temporary presumption of discriminatory motivation is created under the first prong of the *McDonnell Douglas* analysis, a plaintiff need only give plausible support to a minimal inference of discriminatory motivation." (cleaned up)).

23

Defendants do not contest that Plaintiff participated in protected activity, and the Court agrees.[8]  Instead, Defendants assert that Plaintiff fails to plausibly allege that Defendants' conduct constitutes an adverse employment action.  (Defs.' Br., Dkt. 28, at 14.)  An adverse employment action is one which "might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s].'"  *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  As Defendants note, Plaintiff's allegation that Defendants "collud[ed] internally to generate pretextual reasons to fire Plaintiff," (Am. Compl., ¶ 148), would not suffice to establish an adverse employment action on its own because Plaintiff was not fired, (*id.* ¶ 78).  But Plaintiff also alleges that Defendants imposed new hourly reporting requirements on Plaintiff and withheld his pay.  Indeed, Plaintiff's Amended Complaint includes an email from Defendant Navid which states: "I don't usually track people by the minute like this but we will need to have you sign in and out on your time here. Gwen and I noted that you left early at 430 pm on one of your days but requested payment for the full time."  (*Id.* ¶ 57.)  This message was sent to Plaintiff on November 21, 2022, in an email chain which commenced November 8, 2022, and included Plaintiff's complaints that Defendants' wage and hour policies may violate federal and state law.  (*Id.* ¶¶ 42–57.)

Taking Plaintiff's factual allegations as true, the Court finds that he has sufficiently pled retaliation under the FLSA and NYLL.  Defendants' argument that "excessive scrutiny and

---

[8] "Protected activity" includes internal written or oral complaints made to employers so long as the employer is sufficiently "on notice that the employee is asserting statutory rights under the [FLSA]."  *See Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 116 (2d Cir. 2015).  Similarly, "[a]n informal complaint to an employer that the employer is violating a provision of the [NYLL] suffices."  *Grant v. Abbott House*, No. 14-CV-8703 (NSR), 2016 WL 796864, at *9 (S.D.N.Y. Feb. 22, 2016) (citation omitted).  Thus, Plaintiff's emails to Defendants specifically naming alleged violations of the FLSA and NYLL suffice.  (*See* Am Compl. ¶¶ 46, 51, 54.)

monitoring of attendance are not adverse actions," (Defs.' Reply, Dkt. 30, at 8), is an oversimplification of the retaliatory harm alleged by Plaintiff.  In addition to Defendants imposing a new attendance reporting procedure solely on Plaintiff, Plaintiff also asserts that Defendants wrongfully withheld his pay for two shifts, November 4 and 6, 2022 (as previously noted in the gap-time analysis).  (Am. Compl. ¶¶ 98, 148; Pl.'s Br., Dkt. 31, at 25–26.); *see Gaughan v. Rubenstein*, 261 F. Supp. 3d 390, 420 (S.D.N.Y. 2017) (noting that withholding of wages for a period of time can be an adverse action for purposes of stating a retaliation claim).  As explained *supra*, the Court finds that a factual dispute remains as to whether Plaintiff was paid for all compensable time worked during his November 4th and 6th shifts.  These allegations are sufficient to conclude that Defendants' conduct, in the aggregate, "might have 'dissuaded a reasonable worker from making or supporting [similar] charge[s].'"  *Mullins*, 626 F.3d at 53 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).[9]

Further, Plaintiff's Amended Complaint demonstrates a close temporal proximity between the allegedly retaliatory conduct and Plaintiff's written complaints of potential statutory violations.  "Although the application of pre-existing disciplinary policies to a plaintiff without more, does not constitute adverse employment action, a causal connection between an adverse action and a plaintiff's protected activity may be established . . . by showing that the protected activity was closely followed in time by the adverse action."  *Mullins*, 626 F.3d at 53 (cleaned up); *see Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("In this Circuit, a plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by 'showing that the protected activity was closely followed in time by the

---

[9] The Court, however, agrees with Defendants that because Plaintiff resigned his position at Mount Sinai, he cannot claim that termination was an adverse employment action that he suffered.  (*See* Defs.' Br., Dkt. 28, at 14.)

adverse [employment] action.'") (citation omitted).  Here, Plaintiff indicates that the allegedly retaliatory conduct occurred within two weeks—and in some instances, on the same email chain— as Plaintiff's complaints of potential FLSA and NYLL violations.  (Am. Compl., ¶¶ 46–67, 148).  Though the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Sirois v. Long Island R.R. Co.*, 797 F. App'x 56, 60 (2d Cir. 2020) (summary order), it is clear Plaintiff's allegations are well within those bounds, *see Gorman-Bakos*, 252 F.3d at 554 (collecting cases).  This is sufficient to plead a claim of retaliation under the FLSA and NYLL.  Whether the underlying factual contentions are true, and whether Defendants can meet their burden under the *McDonnell Douglas* burden-shifting test, is not for the Court to determine at this stage.  Thus, Defendants' motion to dismiss is denied with respect to Plaintiff's FLSA and NYLL retaliation claims.

### III.     Plaintiff's Sherman Act and New York Common Law Claims

Plaintiff asserts that the alleged "non-compete clause" in his Employment Contract with the Mount Sinai Defendants violates (i) New York common law prohibiting unreasonable non-compete agreements, (ii) Section 1 of the Sherman Act as an unlawful agreement restraining trade and commerce, and (iii) in the alternative to his Section 1 claim, Section 2 of the Sherman Act as a conspiracy to monopolize the market.  (*See* Am. Compl. ¶¶ 155–84.)  Defendants move to dismiss these claims under Rule 12(b)(6).  Indeed, these claims must be dismissed.

The Sherman Act "prohibits, *inter alia*, 'every contract, combination, or conspiracy, in restraint of trade or commerce among the several States,'" *Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting 15 U.S.C. § 1) (cleaned up), and "makes it an offense to 'monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States,'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 651 (2d Cir. 2015) (quoting 15 U.S.C. § 2).  It is intended to police potentially monopolistic behavior by large

companies and promote robust competition by prohibiting "cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 502 (2015). Plaintiff's Sherman Act claims are plainly inapposite and completely unsupported by his factual allegations.

Plaintiff's Employment Contract with Mount Sinai consists of the Employment Agreement and the Standard Terms and Conditions. (*See* Dkt. 1 at ECF 39–48.) Plaintiff sets forth no plausible basis to infer that his Employment Contract contains or constitutes a non-compete agreement, as the relevant provisions simply require notice and approval for outside work during his employment with Mount Sinai. Although Section G of Plaintiff's Employment Agreement prohibited Plaintiff from "engag[ing] in any other clinical activity outside of [his] employment [at Mount Sinai,] . . . except for [his] existing employment at Advanced Wellness Services," Plaintiff was allowed to "notify the Chairman of [his] department if [his] employment arrangements outside Mount Sinai change from [his] existing arrangement." (*Id.* at ECF 41; Am. Compl. ¶ 25.) Similarly, although Section D.4 of the Standard Terms and Conditions provides that "[Plaintiff] may not accept an appointment or other position . . . or maintain a clinical practice outside Mount Sinai . . . unless prior written approval has been granted by the Chair," (Dkt. 1 at ECF 47), it goes on to state that "[i]n the event that [Plaintiff] wishes to assume another position and maintain a role at Mount Sinai, we may consider a revised agreement," (*id*).

Plaintiff's conclusory assertion that these provisions prevented him from competing in the market during the time he worked for Defendants is unconvincing. Not only does the Employment Contract contain language allowing for outside employment with notice and approval, but Plaintiff's own factual allegations show he was, in fact, able to negotiate the inclusion of outside work with his LLC, Advanced Wellness Services. (*See* Am. Compl. ¶¶ 25–36.) Plaintiff even

asserts that Defendant Navid told him during his contract negotiation that they "had [the legal department] edit the non-compete clause for hospitalists two years ago and they modified the language that per diems would *notify* [Mount Sinai] if they added other employers." (*Id.* ¶ 28 (emphasis added).) To the extent the language in the Standard Terms and Conditions could be read to be more restrictive than Plaintiff's individual Employment Agreement, the Standard Terms and Conditions also state that "[i]f any provision of the Physician's Employment Agreement conflicts with any provision of the foregoing policies, the provision of the Employment Agreement shall control." (Dkt. 1 at ECF 47.)

There is also nothing in the Employment Contract that restricts Plaintiff's employment options after leaving Mount Sinai, and no indication that Plaintiff was prevented from accepting competitive employment after he resigned, (*see* Dkt. 1 at ECF 39–48.), unlike instances where courts have found non-compete clauses unenforceable under New York law, *see, e.g.*, *Magtoles v. United Staffing Registry, Inc.*, 665 F. Supp. 3d 326, 347–48 (E.D.N.Y. 2023) (holding covenant not to compete in the nursing industry for three years post-employment unenforceable); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 507 (S.D.N.Y. 2011) (finding covenant not to compete for ten years post-employment without geographic limitation unreasonable in scope); *Nat. Organics, Inc. v. Kirkendall*, 860 N.Y.S.2d 142, 143–44 (N.Y. App. Div. 2008) (finding covenant not to compete for 18 months post-employment unenforceable because there was no legitimate employer interest to protect). In fact, Plaintiff states in his Amended Complaint that he obtained "similar employment at a different NYC-based health system" at which his "hourly compensation increased by over 20%." (Am. Compl. ¶ 115.) Given that the Employment Contract contains no post-employment non-compete agreement, and only requires notice for outside work during Plaintiff's employment at Mount Sinai, there is no non-

compete clause for the Court to evaluate.    And without the existence of a non-compete agreement—a contention on which his claims depend—Plaintiff's Sherman Act and New York common law claims are dismissed.[10]

## CONCLUSION

For the reasons set forth above, the Court grants in part and denies in part Defendants' motion to dismiss.  The following claims are dismissed: (1) Plaintiff's impermissible rounding and unpaid wages claim under the FLSA; (2) Plaintiff's wage statement claim under NYLL § 195(3); (3) Plaintiff's New York common law claim; and (4) Plaintiff's Sherman Act claims.  The remaining claims shall proceed.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated: March 7, 2025
       Brooklyn, New York

---

[10] Even if Plaintiff's Employment Contract could be construed has having anti-competitive features, Plaintiff's Complaint does not come close to alleging a violation of the Sherman Act, which prohibits contracts that "restrain[] . . . trade or commerce among the several States,'" *Anderson News, LLC*, 680 F.3d at 182, and punishes the monopolization or attempted monopolization of "any part of the trade or commerce among the several States," *New York ex rel. Schneiderman*, 787 F.3d at 651 (internal quotation marks omitted).  *See N.C. State Bd. of Dental Exam'rs*, 574 U.S. at 502 (explaining that Sherman Act is intended to police potentially monopolistic behavior by large companies and promote robust competition by prohibiting "cartels, price fixing, and other combinations or practices that undermine the free market").